1   LAURENCE F. PULGRAM (CA State Bar No. 115163) (*pro hac vice*)
    lpulgram@fenwick.com
2   CLIFFORD C. WEBB (CA State Bar No. 260885) (*pro hac vice pending*)
    cwebb@fenwick.com
3   FENWICK & WEST LLP
    555 California Street, 12th Floor
4   San Francisco, California 94104
    Telephone:    (415) 875-2300
5   Facsimile:    (415) 281-1350

6   KURT OPSAHL (CA State Bar No. 191303) (*pro hac vice*)
    kurt@eff.org
7   CORYNNE MCSHERRY (CA State Bar No. 221504) (*pro hac vice*)
    corynne@eff.org
8   ELECTRONIC FRONTIER FOUNDATION
    454 Shotwell Street
9   San Francisco, California 94110
    Telephone:    (415) 436-9333
10  Facsimile:    (415) 436-9993

11  CHAD BOWERS (NV State Bar No. 7283)
    bowers@lawyer.com
12  CHAD A. BOWERS, LTD
    3202 West Charleston Boulevard
13  Las Vegas, Nevada 89102
    Telephone:    (702) 457-1001
14  Attorneys for Defendant and Counterclaimant
    DEMOCRATIC UNDERGROUND, LLC, and
15  Defendant DAVID ALLEN

16              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEVADA
17
    RIGHTHAVEN LLC, a Nevada limited liability company,      ) Case No. 2:10-cv-01356-RLH
18                                                           ) (RJJ)
                        Plaintiff,                           )
19          v.                                               )
                                                             )
20  DEMOCRATIC UNDERGROUND, LLC, a District of               ) **CONSOLIDATED BRIEF**
    Columbia limited-liability company; and DAVID ALLEN,     ) **IN OPPOSITION TO**
21  an individual,                                           ) **PLAINTIFF'S MOTION**
                                                             ) **FOR VOLUNTARY**
                        Defendants.                          ) **DISMISSAL TO THE**
22  ───────────────────────────────────────────             ) **EXTENT IT SEEKS TO**
    DEMOCRATIC UNDERGROUND, LLC, a District of               ) **FORECLOSE AWARD OF**
23  Columbia limited-liability company,                      ) **ATTORNEYS' FEES, AND**
                                                             ) **IN SUPPORT OF CROSS-**
24                      Counterclaimant,                     ) **MOTION FOR SUMMARY**
            v.                                               ) **JUDGMENT**
25                                                           )
    RIGHTHAVEN LLC, a Nevada limited liability company,      )
26  and STEPHENS MEDIA LLC, a Nevada limited-liability       )
    company,                                                 )
27                      Counterdefendants.                   )
                                                             )
28

---

1

**TABLE OF CONTENTS**

2

**Page**

3    MEMORANDUM OF POINTS AND AUTHORITIES ........................................................ 1

4    INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

5    CONCISE STATEMENT OF FACTS NOT GENUINELY IN DISPUTE ................... 3

6            A.    Democratic Underground and David Allen ............................................. 3

7            B.    The "Pampango" Post ...................................................................................... 4

8            C.    The Article's Origins and Righthaven's Claim to Ownership ............... 5

9            D.    Righthaven, Stephens Media, and Their Business of Copyright Litigation............ 6

10           E.    Righthaven Sues Democratic Underground and David Allen ............... 7

11   ARGUMENT ...................................................................................................................... 7

12   I.    THE UNDISPUTED FACTS DEMONSTRATE THAT PLAINTIFF'S CLAIMS
           WERE MERITLESS FROM THEIR INCEPTION .............................................. 7

13

14           A.    Defendants Have Committed No Volitional Act of Infringement ........... 7

             B.    Posting the Excerpt to the DU Forum Was Fair Use ............................. 10
15

16                 1.    Posting the Excerpt to the DU Website Was Highly Transformative
                         and Minimally Commercial ................................................................ 10

17                 2.    The Highly Factual, Politically Important, and Previously Published
                         Nature of the Article Supports Fair Use..................................................... 12
18

19                 3.    The Small Amount of the Work Taken Supports a Finding of Fair
                         Use ............................................................................................................... 13

20                 4.    The Lack of Potential or Actual Market Harm Supports Fair Use .......... 14

21                 5.    The *Realty One* Decision Was Not a Change in the Law that Could
                         Excuse Righthaven's Pursuit of this Baseless Lawsuit............................. 15
22

23           C.    Plaintiff's Demand for Domain Name Transfer Represents Another
                   Baseless, *In Terrorem* Tactic ................................................................... 16

24   II.   THE COURT SHOULD NOT GRANT THE MOTION FOR VOLUNTARY
           DISMISSAL ABSENT A CONDITION THAT DEFENDANTS MAY APPLY
25         FOR THEIR ATTORNEYS' FEES................................................................... 17

26           A.    Where Attorneys' Fees are Afforded to a Prevailing Party by an
                   Independent Statute, Conditioning a Dismissal with Prejudice on Denial of
27                 Those Fees Would be Contrary to Law.................................................... 17

28

1

# TABLE OF CONTENTS
**(Continued)**

2

**Page**

3

4      B.    The Court Should Authorize a Request For Attorneys' Fees Regardless of
             Whether Plaintiff Would Have a "Right" to Withdraw its Motion ...................... 19

5
             1.    The Court Should Not Be Held Hostage by Plaintiff's Refusal to
6                  Dismiss Where Justice Requires Award of Fees ...................................... 20

7            2.    Payment of Defendants' Fees is Appropriate Here Because the Case
                   Was Frivolous and/or Pursued in Bad Faith ............................................. 20
8
             3.    Attorneys' Fees and Costs Will Be Warranted Under Section 505 ......... 21
9
                   a.    The Degree of Success Supports an Award of Attorneys'
10                       Fees ............................................................................................. 21

11                 b.    Righthaven's Lawsuit Was Frivolous and Unreasonable ............. 22

12                 c.    Righthaven's Claims Were Improperly Motivated and
                         Require Compensation to Defendants as a Deterrence to
13                       Future Abuse ................................................................................. 23

14 III.   THE COURT SHOULD NOT DISMISS THE COUNTERCLAIM,
          REGARDLESS OF WHETHER VOLUNTARY DISMISSAL OF THE
15        COMPLAINT IS APPROVED ........................................................................... 26

16     A.    Plaintiff Has No Right to Condition Its Voluntary Dismissal on any Action
             Respecting the Counterclaim ................................................................................ 26
17
       B.    The Counterclaim Would Not Be Disposed of by the Voluntary Dismissal
18           of Righthaven's Original Complaint ..................................................................... 26

19     C.    If the Original Complaint is Not Voluntarily Dismissed, the Counterclaim
             is Not Subject to Dismissal as Redundant or Superfluous .................................... 29
20
       CONCLUSION ..................................................................................................................... 30
21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AeroTech, Inc. v. Estes*,
  110 F.3d 1523 (10th Cir. 1997).......................................................................... 20, 21

*AIR-vend, Inc. v. Thorne Indus., Inc.*,
  625 F. Supp. 1123 (D. Minn. 1985) ............................................................................ 28

*Am.Geophysical Union v. Texaco Inc.*,
  60 F.3d 913 (2d Cir. 1994).......................................................................................... 12

*Blackmer v. Shadow Creek Ranch Dev. Co.*,
  2007 U.S. Dist. Lexis 99224 (S.D. Tex. June 26, 2007)........................................... 30

*Bond v. Blum*,
  317 F.3d 385 (4th Cir. 2003)....................................................................................... 25

*Bridgeport Music, Inc. v. Diamond Time, Ltd.*,
  371 F.3d 883 (6th Cir. 2004)................................................................................. 24, 25

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) ................................................................................... 11, 12, 13, 14

*Cardinal Chem. Co. v. Morton Int'l, Inc.*,
  508 U.S. 83 (1993) ......................................................................................... 28, 29, 30

*Carroll v. President and Comm'rs of Princess Anne*,
  393 U.S. 175 (1968) .................................................................................................... 17

*Cartoon Network LP v. CSC Holdings, Inc.*,
  536 F.3d 121 (2d Cir. 2008).......................................................................................... 9

*Colombrito v. Kelly*,
  764 F.2d 122 (2d Cir. 1985)........................................................................................ 19

*Compaq Computer Corp. v. Ergonome, Inc.*,
  387 F.3d 403 (5th Cir. 2004)....................................................................................... 25

*Consumers Union of U.S., Inc. v. Gen. Signal Corp.*,
  724 F.2d 1044 (2d Cir. 1983), *cert. denied*, 469 U.S. 823 (1984) .......................... 13

*CoStar Group, Inc. v. LoopNet, Inc.*,
  373 F.3d 544 (4th Cir. 2004).................................................................................. 9, 10

*Degussa Admixtures, Inc. v. Burnett*,
  471 F. Supp. 2d 848 (W.D. Mich. 2007), *aff'd*, 277 Fed. Appx. 530,
  2008 U.S. App. Lexis 10017 (6th Cir. May 5, 2008)................................................. 19

*Diamonds.net LLC v. Idex Online, Ltd.*,
  590 F. Supp. 2d 593 (S.D.N.Y. 2008)......................................................................... 28

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Dominion Elec. Mfg. Co. v. Edwin L. Weigand, Co.*,126
    F.2d 172 (6th Cir. 1942)............................................................................. 28

*Elvis Presley Enters., Inc. v. Passport Video*,
    349 F.3d 622 (9th Cir. 2003)................................................................... 14

*Englewood Lending, Inc. v. G&G Coachella Invs., LLC*,
    651 F. Supp. 2d. 1141 (C.D. Cal. 2009) ................................................ 30

*Entm't Research Group v. Genesis Creative Group*,
    122 F.3d 1211 (9th Cir. 1997)................................................................. 22

*Fantasy, Inc. v. Fogerty*,
    94 F.3d 553 (9th Cir. 1996).............................................................. 21, 23

*Faulkner Press, LLC v. Class Notes, LLC*,
    94 U.S.P.Q. 2d (BNA) 1318 (N.D. Fla. Mar. 17, 2010) ........................ 29

*Field v. Google, Inc*.,
    412 F. Supp. 2d 1106 (D. Nev. 2006) ..................................................... 8

*Fisher v. Dees*,
    794 F.2d 432 (9th Cir. 1986)................................................................... 11

*Fogerty v. Fantasy, Inc*.,
    510 U.S. 517 (1994)................................................................................ 21

*Harper & Row, Publrs. v. Nation Enters.*,
    471 U.S. 539 (1985)................................................................................ 12

*Hofheinz v. AMC Prods., Inc.*,
    2003 U.S. Dist. LEXIS 16940 (S.D.N.Y. Sep. 3, 2003) ........................ 26

*Jefferson Cty. Sch. Dist. v. Moody's Investor's Servs.*,
    175 F.3d 848 (10th Cir. 1999)................................................................. 17

*L.A. News Serv. v. CBS Broad., Inc.*,
    305 F.3d 924 (9th Cir. 2002)................................................................... 13

*Lau v. Glendora Unified Sch. Dist.*,
    792 F. 2d 929 (9th Cir. 1986).................................................................. 19

*Lawrence v. Fuld*,
    32 F.R.D. 329 (D. Md. 1963)............................................................ 19, 21

*Leach v. Ross Heater & Mfg. Co.*,
    104 F.2d 88 (2d Cir. 1939)..................................................................... 29

*Lenz v. Universal Music Corp.*,
    572 F. Supp. 2d 1150 (N.D. Cal. 2008) ................................................. 23

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*Marobie-Fl., Inc. v. Nat'l. Ass'n of Fire Equip. Distribs.*,
   983 F. Supp. 1167 (N.D. Ill. 1997) ........................................................ 9

*Mattel, Inc. v. Walking Mt. Prods.*,
   2004 U.S. Dist. LEXIS 12469 (C.D. Cal. June 24, 2004) .............................. 23, 26

*Mattel, Inc. v. Walking Mt. Prods.*,
   353 F.3d 792 (9th Cir. 2003)........................................................ 16

*Maxtone-Graham v. Burtchaell*,
   803 F.2d 1253 (2d Cir. 1986).......................................................... 14

*Med. Mut. Ins. Co. of Maine v. Indian Harbor Ins. Co.*,
   583 F.3d 57 (1st Cir. 2009)........................................................ 17

*Mother & Father v. Cassidy*,
   338 F.3d 704 (7th Cir. 2003)........................................................ 18, 19

*MRSI Int'l, Inc. v. Bluespan, Inc.*,
   2006 U.S. Dist. LEXIS 68891 (D. Utah Sep. 21, 2006) ........................ 30

*New Era Publ'ns Int'l ApS v. Carol Publ'g Group*,
   904 F.2d 152 (2d Cir. 1990)........................................................ 14

*Nuñez v. Caribbean Int'l News Corp.*,
   235 F.3d 18 (1st Cir. 2000)........................................................ 11

*Parker v. Google, Inc.*,
   422 F. Supp. 2d 492 (E.D. Pa. 2006) .................................................. 8

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007).................................................. 11, 12, 14, 15

*Perfect 10, Inc. v.CCBill LLC*,
   488 F.3d 1102 (9th Cir. 2007)........................................................ 23

*Quadrozzi v. The City of N.Y.*,
   127 F.R.D. 63 (S.D.N.Y. 1989) .................................................. 19, 21

*Religious Tech. Ctr. v. Netcom On-line Commnc'n Servs.*,
   907 F. Supp. 1361 (N.D. Cal. 1995) ...................................... *passim*

*Righthaven LLC v. Realty One Group, Inc.*,
   2010 U.S. Dist. LEXIS 111576 (D. Nev. Oct. 19, 2010)................ *passim*

*Riviera Distribs., Inc. v. Jones*,
   517 F.3d 926 (7th Cir. 2008)........................................................ 18, 19, 22

*Robinson v. Lopez*,
   69 U.S.P.Q. 2d (BNA) 1241 (C.D. Cal. 2003)........................................ 22

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Sega Enters. Ltd. v. Maphia*,
   948 F. Supp. 923 (N.D. Cal. 1996) ................................................................ 10, 12

*Shell Trademark Mgmt. BV v. Canadian AMOCO*,
   2002 U.S. Dist. LEXIS 9597 (N.D. Cal. May 21, 2002) ................................ 17

*Smith v. Lenches*,
   263 F.3d 972 (9th Cir. 2001)............................................................................ 29

*Smoot v. Fox*,
   353 F.2d 830 (6th Cir. 1965)............................................................................ 20

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984)......................................................................... 12, 14, 16

*Stewart v. Abend*,
   495 U.S. 207 (1990)......................................................................................... 11

*Stickrath v. Globalstar, Inc.*,
   2008 U.S. Dist. LEXIS 95127 (N.D. Cal. May 13, 2008) ................................ 28

*Sundeman v. Seajay Soc'y, Inc.*,
   142 F.3d 194 (4th Cir. 1998)............................................................................ 14

*Taubman Co. v. Webfeats*,
   319 F.3d 770 (6th Cir. 2003)............................................................................ 17

*Tavory v. NTP, Inc.*,
   297 Fed. Appx. 986 (Fed. Cir. 2008) .............................................................. 25

*Thompson v. Hubbard*,
   131 U.S. 123 (1889)......................................................................................... 16

*Tory v. Cochran*,
   544 U.S. 734 (2005)......................................................................................... 17

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,
   996 F.2d 1366 (2d Cir. 1993)........................................................................... 13

*United Wats, Inc. v. Cincinnati Ins. Co.*,
   971 F. Supp. 1375 (D. Kan. 1997) ................................................................... 30

*Video-Cinema Films, Inc. v. CNN, Inc.*,
   2001 U.S. Dist. Lexis 25687 (S.D.N.Y. Nov. 28, 2001)................................. 15, 25

*Video-Cinema Films, Inc. v. CNN, Inc.*,
   2003 U.S. Dist. LEXIS 4887 (S.D.N.Y. Mar. 31, 2003) ................................ 24, 25

*Vietnam Veterans of Am. v. CIA*,
   2010 U.S. Dist. LEXIS 3787 (N.D. Cal. Jan. 19, 2010 ) ................................ 29

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Wells v. Cal. Home Loan Solutions*,
  2007 U.S. Dist. Lexis 74291 (S.D. Cal. 2007) ........................................................ 18

*Whittlestone, Inc. v. Handi-Craft Co.*,
  618 F.3d 970 (9th Cir. 2010) ............................................................................... 16

*York v. Ferris State Univ.*,
  36 F. Supp. 2d 976 (W.D. Mich. 1998) ........................................................... 20, 21

*Zenith Ins. Co. v. Breslaw*,
  108 F.3d 205 (9th Cir. 1997) ............................................................................... 18

**STATUTES**

17 U.S.C. § 106 ............................................................................................................ 9

17 U.S.C. § 107 .................................................................................................... *passim*

17 U.S.C. § 505 .................................................................................................... *passim*

17 U.S.C. § 512 ......................................................................................................... 23

**RULES**

Fed. R. Civ. P. 11 ..................................................................................................... 22

Fed. R. Civ. P. 41 ................................................................................................ *passim*

Fed. R. Civ. P. 54 ..................................................................................................... 18

Fed. R. Civ. P. 65(d)(2) ........................................................................................... 17

**OTHER AUTHORITIES**

George C.C. Chen, *A Cyberspace Perspective on Governance, Standards and Control*, 16
  J. Marshall J. Computer & Info. L. 77, 113 (1997) ................................................ 17

Eric Goldman, *Search Engine Bias and the Demise of Search Engine Utopianism*
  Yale J. L. & Tech. 188 (Spring 2006) .................................................................... 15

H.R. Rep. No. 105-551(I), (1998) ............................................................................ 9

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**INTRODUCTION AND SUMMARY OF ARGUMENT**

3        Plaintiff Righthaven, LLC is attempting to make a business out of suing Internet websites

4   for copyright infringement.  It has filed 179 copyright actions in this Court—without ever first

5   asking that a work be removed from the target website—in each case alleging "willful

6   infringement" and attempting to extract settlements by threats of statutory damages (up to

7   $150,000) and attorneys' fees.  For most defendants, it makes no economic sense to invest in

8   litigation.  Regardless of the merits, it is better to pony up a settlement and get on with their work.

9        But in the present case, Righthaven shot at the wrong target.  It filed a baseless action

10  naming a political discussion forum, Democratic Underground LLC, and, for added *in terrorem*

11  effect, its principal, David Allen (collectively "Defendants").  Defendants had taken no volitional

12  act to duplicate copyrighted material, as necessary to be held liable; rather Democratic

13  Underground merely hosted political commentary posted by others for discussion.  Further,

14  Righthaven sued over a user's posting that was plainly fair use—a non-commercial posting of an

15  excerpt comprising one-tenth of a news article, accompanied by a link to the article itself.

16       Defendants refused to be intimidated.  They retained counsel and responded with a

17  counterclaim that joined Righthaven's affiliate and funder, Stephens Media, LLC, and laid bare

18  the numerous defects not only in Righthaven's claims, but in its business model itself.  Not

19  surprisingly, Righthaven now wants out—so badly, in fact, that it has moved to voluntarily

20  dismiss its claim *with prejudice* in order to avoid a decision on the merits.

21       Defendants agree that this case should be over—indeed, it should never have started.  But

22  it should not end until Righthaven is called to account for the cost of the defense it provoked.

23  This was a meritless lawsuit from the beginning, launched as part of a well-publicized business

24  model in which Righthaven acquires interests in copyrights for the sole purpose of suing

25  unsuspecting alleged infringers, and then seeks to leverage the cost of defending (and its own

26  purported right to attorneys' fees and domain name seizures) to coerce settlements.  To allow

27  Righthaven to avoid compensating those who have no choice but to defend would be unjust and

28  unsupportable.  Defendants disagree that Righthaven has a right to "withdraw" its voluntary

1   dismissal if this Court does not immunize it from attorneys' fees.  But even assuming Righthaven

2   had that right, this provides no reason to immunize Righthaven from its responsibilities.  The

3   Court should condition any dismissal on preservation of Defendants' right to submit an

4   application for fees pursuant to Section 505 of the Copyright Act, which authorizes fees in

5   exactly this instance.  Nor would preserving Defendants' rights to seek attorneys' fees somehow

6   "force" Righthaven to continue to litigate claims it does not want to pursue.  *See* Righthaven's

7   Motion for Voluntary Dismissal ("Motion"), Dkt. 36 at 3.  Righthaven can unconditionally

8   dismiss today and end its claims.  It just cannot walk away from the injury its wrongful filing has

9   caused.

10      In a twist as ironic as it is cynical, Righthaven purports to seek dismissal in the name of

11   "judicial economy and efficiency"—even as it tries to hold the termination of its claim hostage

12   unless the Court agrees to preclude a statutory claim for attorneys' fees.  As the price to clear a

13   spurious lawsuit from its docket, Righthaven demands that the Court compel Defendants to

14   forego their statutory rights to seek fees (and a precedential decision on the Counterclaim), and

15   allow Righthaven to sue undeserving victims without consequence.  But Rule 41 does not

16   authorize a plaintiff to negotiate with the Court a settlement of its opponents' rights.  Rule 41

17   gives *the Court* the right to determine what conditions to apply to unilateral dismissals.  This

18   Court's docket should not be held captive by Righthaven's tactics.

19      Defendants therefore propose an alternative method to terminate the matter:  by summary

20   judgment.  As described below, the undisputed facts establish that Defendants cannot be liable on

21   this Complaint under at least two grounds (among others not briefed here):  (i) as the mere host of

22   a discussion forum to which a third party posted an excerpt of an article, and having taken down

23   the excerpt promptly when first informed of Plaintiff's objections to it,  Defendants committed no

24   "volitional act" of copying or distribution giving rise to copyright liability; and (ii) in all events,

25   fair use provides a complete defense to the infringement claimed.  Since Righthaven has already

26   raised the merits of its claims in its Motion—arguing that its lawsuit was "non-frivolous" and

27   "objectively reasonable"—this Court will need to consider the merits in any case.  When it does,

28   it will find that summary judgment is due to be granted, as Defendants now move.

1    Granting summary judgment will also address Righthaven's purported desire to avoid

2    multiple appeals to the Ninth Circuit of rulings concerning "non-holistic copying."  After

3    summary judgment, if it wishes to test whether such a claim has merit, Righthaven can appeal.  It

4    will then have no need to appeal in *Realty One*, the case in which the Hon. Larry R. Hicks found

5    fair use for another "non-holistic" copying.  In fact, Righthaven has no need to appeal in *Realty*

6    *One* already:  it settled (unsurprisingly) with the only defendant to appear.  Its potential future

7    appeal would be against a non-appearing defendant, and only *if* Righthaven requests, and *if* Judge

8    Hicks then denies, the entry of a default judgment.  Righthaven's mantra—that it desires to

9    abandon the present case against well-represented Defendants because a potential appeal against a

10   defaulting party in *Realty One* would be more "efficient"—is, in a word, transparent.

11   Accordingly, this Court should (1) deny Righthaven's Motion to Dismiss, absent

12   Righthaven's stipulation that Defendants may submit their application for attorneys' fees under

13   Section 505, and (2) absent such stipulation, enter summary judgment on the Complaint, and (3)

14   decline to dismiss the Counterclaim prior to resolution of the issues it raises.

15             **CONCISE STATEMENT OF FACTS NOT GENUINELY IN DISPUTE**

16        **A.    Democratic Underground and David Allen**

17   Defendant and Counter-Claimant Democratic Underground, LLC maintains a website at

18   www.democraticunderground.com (the "DU Website") devoted to disseminating and discussing

19   political news and progressive policies.  Declaration of David Allen ("Allen Decl.") ¶ 3.

20   Defendant David Allen is the principal of Democratic Underground LLC.  *Id.* ¶ 4.  The company

21   has two other employees. The DU Website consists primarily of user-generated content in the

22   form of posting by readers in one of various discussion forums (the "DU Forum"). *Id.* ¶ 5.  The

23   DU Website currently has more than 165,000 registered users who have, since its founding in

24   2001, posted more than 52 million posts to discussion threads addressing items of political and

25   public interest.  *Id.*  The DU Website is supported by advertising revenue generated by display of

26   advertising on the site.  *Id.* ¶ 6.

27   While Democratic Underground owns and manages the DU Website, it does not pre-

28   screen posts by contributors.  *Id.* ¶ 7.  Once a contributor writes a post, the post gets added

1    through an automated process into a database on the server that hosts the DU Website.  *Id.*  When

2    a reader seeks to access the web address of a particular post or DU Forum (such as by clicking a

3    link to that location in a browser), a request is automatically sent to the server.  Its software will

4    then automatically retrieve the contents of that post from the database and send them to the reader

5    through the Internet.  *Id.* ¶ 8.  Neither Mr. Allen nor the other two employees reads every post

6    made by users at the DU Website; in fact, such a task would be impossible as there is an average

7    of 14,000 posts per day.  *Id.* ¶ 9.  Neither does Democratic Underground pay posters or offer any

8    financial incentive for adding content to the site.  *Id.* ¶ 10.

9         Democratic Underground proactively works against copyright infringement by, among

10   other things, advising users to post only short excerpts and to provide a link to the original when

11   posting about a news article. *Id.* ¶ 11-12; Ex. A.  For example, on the forum for "Latest Breaking

12   News," contributors must identify the source and provide a link to the news article they post

13   about in the form they fill out to make the post.  *Id.* ¶ 12.  In addition, Democratic Underground

14   encourages readers to notify moderators if a post contains an entire article by clicking on an

15   "Alert" link that is included on every post.  *Id.* ¶ 13.  The moderator will then edit the post to

16   include only a short excerpt or delete the post.  *Id.*

17        **B.      The "Pampango" Post**

18        On May 13, 2010, a Democratic Underground user named "Pampango" posted a portion

19   of an article (the "Article") from the *Las Vegas Review-Journal* ("*LVRJ*") entitled "U.S. Senate

20   Race: Tea Party Power Fuels Angle" (the "Excerpt").  *See* Righthaven's Complaint ("Compl.")

21   Dkt. 1, Ex. 3.  Pampango is neither an agent nor employee of Democratic Underground.  Allen

22   Decl. ¶ 15.  The Excerpt in Pampango's post reported on the ranking and movement in political

23   polls of candidates in the Republican Senate primary in Nevada.  Compl., Ex. 3.  On its face, the

24   Excerpt contains content that is primarily informational, factual, or news and that is of concern to

25   persons nationwide interested in the future of the Tea Party or Senate Majority Leader Reid's

26   prospects.  *Id.*  The entire Article as found at the *LVRJ* is 50 sentences long; the post by

27   Pampango contained just *five* of those sentences and a link back to the full article at the *LVRJ*'s

28   website.  *Id.* Exs. 2, 3.  Within 40 minutes, three Democratic Underground users left comments

1   on the post, each of which dealt with the subject matter of the article. *Id.* Ex. 3.

2        In the 92 days it was posted, Pampango's post garnered 565 views, less than 6.5 per day,

3   and less than one-thousandth of one-percent (0.001%) of the traffic to the DU Website.  Allen

4   Decl. ¶ 16.  In contrast, on a typical day, the DU Website as a whole serves roughly 700,000 page

5   views to 90,000 unique visitors.  *Id.* ¶ 17.  During its display, Pampango's post appeared on pages

6   that, like the rest of the DU Website, contained advertising.  However, none of that advertising

7   was sold for display with or targeted by Democratic Underground to go with Pampango's post; it

8   was simply the same advertising displayed generally throughout the DU Website. *Id.* ¶ 18.  Given

9   the average advertising revenue that the DU Website makes from views of its site, Pampango's

10  post would not have been connected to any more than $2 in revenue.  *Id.* ¶ 19.

11       Mr. Allen had not read the post in question before he learned of this lawsuit.  *Id.* ¶ 21.

12  Neither Righthaven nor the *LVRJ* ever notified Defendants that they objected to the display of the

13  Excerpt or considered it infringing. *Id.* ¶ 22.  Mr. Allen learned of the claim of infringement in a

14  call from the *Las Vegas Sun* the day after this suit was filed, August 11, 2010.  *Id.* ¶ 23.   As a

15  precautionary matter, the Excerpt was taken down on August 13, 2010.  *Id.*  By the time

16  Defendants were first contacted by Righthaven—through service of the lawsuit—the allegedly

17  infringing material was already unavailable on the DU Website.  *Id.* ¶ 24.

18       **C.      The Article's Origins and Righthaven's Claim to Ownership.**

19       The copyright records reflect that Stephens Media (through its control of the *LVRJ*) was

20  the "author" of the Article as a work made for hire.  Compl., Ex. 4.  However, neither Stephens

21  Media nor the *LVRJ* first registered the copyright; Righthaven did that on July 9, 2010, claiming

22  rights through assignment by "written agreement."  Compl. ¶ 30, Ex. 4.  Contrary to Righthaven's

23  representation in obtaining this copyright registration, no such assignment had occurred by that

24  date.  Stephens Media's declaration attaches an assignment dated July 19, 2010, ten days after the

25  registration date.  Dkt. 38, Ex. 1.  Moreover, the entire Article remains publicly available on the

26  *LVRJ* website at no cost, with copyright notice credited to the *LVRJ,* not Righthaven.  Declaration

27  of Kurt Opsahl ("Opsahl Decl.")  ¶ 3.  The purported assignment reflects that Stephens Media

28  continues to own a "right of reversion" in the Article and is receiving unspecified "monetary

1    commitments" from Righthaven.  Dkt. 38, Ex. 1.

2          As with other articles on its website, the *LVRJ* encouraged—and still encourages—users

3    to save and share the Article of which Pampango posted the Excerpt.  Opsahl Decl. ¶ 4; Ex. A.  In

4    fact, the *LVRJ* encourages users to share articles on at least 18 different third-party Internet

5    resources or to email, save, or print the article at no cost.  *Id.*

6          **D.      Righthaven, Stephens Media, and Their Business of Copyright Litigation**

7          Despite Stephens Media's encouragement of its readers to share its work, it has created

8    Righthaven as a business with no purpose other than to sue those who do so.  As explained further

9    in Opposition to Stephens Media's Motion to Dismiss, Stephens Media created and funded

10   Righthaven as an instrument to bring lawsuits.[1]  Righthaven has filed at least 179 suits similar to

11   this action in this District since March 2010.  *Id.* ¶ 17; Ex. L.  Righthaven employs a

12   "proprietary" technology to search the Internet to find news stories and excerpts from the *LVRJ*

13   posted on third-party websites.  *Id.* ¶ 5; Ex. C. Once Righthaven finds an excerpt, it registers the

14   copyright, obtains a purported partial assignment from Stephens Media, and then sues its

15   victim—who usually resides outside the state—without providing prior notice or opportunity to

16   take down the work.[2]

17         When Righthaven files these suits, it consistently alleges "willful infringement," thereby

18   raising potential statutory damages to $150,000 regardless of any actual harm, demands to

19   recover its attorneys' fees, and seeks domain name seizure.   Opsahl Decl. ¶ 18.  It further

20   advances its efforts to coerce quick and cheap settlements by, among other tactics, proposing

21   discovery terms with absurdly burdensome and oppressive document preservation and production

22   regimes.  *Id.* ¶ 20.  Many of its targets settle these cases quickly, finding it uneconomic to fund

23   any litigation, much less in a foreign forum.  In at least nine cases, the defendants had posted less

24

25   [1] According to Sherman Frederick, who was then its President and CEO, Stephens Media "grubstaked and contracted
     with a company called Righthaven.  It's a local technology company whose only job is to protect copyrighted

26   content."  Opsahl Decl. Ex. B.  Righthaven is a limited liability company owned by two more limited liability
     companies, each with a 50 percent stakes.  *Id.* Ex. D.  One of those companies is composed of members of Arkansas
     investment banking billionaire Warren Stephens' family.  *Id.*  The Stephens' family investments include Stephens

27   Media.  *Id.*  The other 50 percent stake in Righthaven is owned by an LLC managed by attorney Steve Gibson,
     counsel for Righthaven in this case. *Id.* Ex. F; *see also* Complaint (with Steve Gibson as lead counsel).

28   [2] Defendants request that the Court take judicial notice of the complaints and dismissals in the other Righthaven
     actions filed in this Court.  Collected data about those actions is found in Ex. L to the Opsahl Decl.

than 50 percent of the *LVRJ* articles in question.  *Id.* ¶ 19.

### E.   Righthaven Sues Democratic Underground and David Allen

Once Mr. Allen learned of this lawsuit, he had no choice but to hire attorneys to defend himself and Democratic Underground.  Allen Decl. ¶ 26.   Unwilling to be bullied into a settlement of a baseless claim, he spent $3,600 on an attorney before finding pro bono counsel at the Electronic Frontier Foundation and its cooperating law firms.  *Id.* ¶ 27.  These attorneys spent substantial time investigating and preparing the detailed Answer and Counterclaims in this matter, negotiating in an attempt to reach an early settlement, and engaging in other case management efforts.  Counterclaim ("C.Claim"), Dkt. 13.

The Counterclaim named Stephens Media, as well as Righthaven, as Counter-Defendants, based on the former's creation of, control of, financial interest in, and collusion with the latter to pursue meritless claims of infringement.  The 196 paragraph Counterclaim spelled out in detail the facts supporting its requests for declaratory relief, including at least the following dispositive issues: 1) that Defendants did not infringe Righthaven's copyright based on a lack of a volitional act; 2) that Defendants did not infringe Righthaven's copyright because it made a fair use of the Excerpt; 3) that Righthaven does not rightfully own the copyright in question, in that the assignment was a sham designed solely to pursue litigation with rights being retained by Stephens Media; 4) that Righthaven and/or Stephens Media have, by their invitation to copy and share the Article, granted Defendants a license to post the Excerpt; 5) that Righthaven failed to mitigate its damages, in that it gave no notice or opportunity to remove the allegedly infringing work;  6) that any harm was not actionable as *de minimis*; and (7)  that Righthaven and Stephens Media are engaged in barratry, champerty and maintenance by spawning transactions designed for no purpose other than to pursue litigation. *See generally* C.Claim.

### ARGUMENT

### I.   THE UNDISPUTED FACTS DEMONSTRATE THAT PLAINTIFF'S CLAIMS WERE MERITLESS FROM THEIR INCEPTION

### A.   Defendants Have Committed No Volitional Act of Infringement

Righthaven's Complaint makes only a single claim for direct copyright liability, yet its

1   claim is predicated upon the Excerpt posted by Pampango, not by Defendants.  Compl. ¶¶ 33-36;

2   Ex. 3.  Righthaven fails to allege the elements of any theory of indirect liability, such as

3   contributory or vicarious liability, so this Court need not consider them.  *Id.* Under the Copyright

4   Act, direct liability only attaches, if at all, to the party who controls the decision to copy—in the

5   case of an online forum, the user who uploaded the material.[3]  An online forum host like

6   Democratic Underground, whose role is limited to providing the means by which copies are

7   made, is not liable for direct infringement as a matter of law.

8        This Court addressed the volitional act requirement in *Field v. Google, Inc.*, 412 F. Supp.

9   2d 1106 (D. Nev. 2006), in which the plaintiff alleged that Google directly infringed when it

10  showed users copies of material that were "cached" on its computers—*i.e.*, stored automatically

11  for ease of delivery to those searching for those materials.  *See id.* at 1115. The Hon. Robert Jones

12  disagreed, holding that a "plaintiff must also show volitional conduct on the part of the defendant

13  in order to support a finding of direct copyright infringement." *Id.*; *accord Parker v. Google, Inc.*,

14  422 F. Supp. 2d 492 (E.D. Pa. 2006).  This Court's decision relied upon *Religious Tech. Ctr. v.*

15  *Netcom On-line Commnc'n Servs.*, 907 F. Supp. 1361 (N.D. Cal. 1995), one of the first and most

16  important cases addressing online service provider copyright liability.

17       In *Netcom*, an Internet service provider was accused of direct copyright infringement

18  based on a customer's posting of material to the service provider's servers. *See id.* at 1367-68.

19  The court rejected the direct infringement claim, holding that it requires "some element of

20  volition or causation which is lacking where a defendant's system is merely used to create a copy

21  by a third party." *Id.* at 1370. Volitional control over the copying is necessary because any other

22  "theory would create many separate acts of infringement and carried to its natural extreme, would

23  lead to unreasonable liability" through the mere operation of the Internet. *Id.* at 1369.

24       While the volitional act requirement is tremendously important to the Internet, it is not a

25  new rule.  The Copyright Act has always required volition–as embodied within its protection of

26  the exclusive right "to do" one of the actions reserved for copyright owners in 17 U.S.C. § 106.

27

28

---

[3] As explained in Part II.B. below, no liability attaches to Pampango because he engaged in a fair use of the Article.

1  *Netcom* simply interpreted § 106 for the digital age and has been widely followed.[4]  The Fourth

2  Circuit's holding in *CoStar* is particularly instructive.  CoStar was a real estate listing service that

3  took photos of commercial real estate offered by its customers.  LoopNet provided an online

4  hosting service for real estate listings.  Some of CoStar's customers also wanted listings on

5  LoopNet, and uploaded CoStar's copyrighted photographs for display on the LoopNet website.

6  *See CoStar*, 373 F.3d at 546-47. CoStar sued for direct infringement. Following *Netcom,* the

7  Fourth Circuit held that "[b]ecause LoopNet, as an Internet service provider, is simply the owner

8  and manager of a system used by others who are violating CoStar's copyrights and is not an actual

9  duplicator itself, it is not directly liable for copyright infringement." *Id*. at 546.

10        Accordingly, the fact that Defendants operate the DU Website, upon which a third party

11  posted allegedly infringing material, does not state a claim for direct copyright infringement.

12  Although Righthaven's burden of proof for its copyright claim includes the essential element of

13  volition, the undisputed facts shows that neither Democratic Underground nor David Allen

14  engaged in any volitional act to display the Excerpt.  Allen Decl. ¶¶ 5-9; 21.  As soon as

15  Defendants learned of Plaintiff's claim, far from volitionally infringing, they removed the

16  Excerpt.  *Id.* ¶¶ 23-24.

17        Nor is it sufficient for Righthaven to allege generalized knowledge that websites

18  sometimes contain infringing material (Compl. ¶ 19) or "willful blindness." *Id.* ¶ 23.  As *CoStar*

19  cogently explains, even constructive knowledge that some DU Website users may be using the

20  forum to engage in copyright infringement would be insufficient to state a direct liability claim.

21  *CoStar*, 373 F.3d at 549; *see also Sega Enters. Ltd. v. Maphia*, 948 F. Supp. 923, 1372 (N.D. Cal.

22  1996) (no direct liability even where defendant operating website knew infringing games were

23  uploaded and solicited others to upload games).  Indeed, in *CoStar* the user-uploaded photos were

24  reviewed by LoopNet employees before posting, and CoStar had informed LoopNet of its claims

25

26  [4]  *See CoStar Group, Inc. v. LoopNet, Inc*., 373 F.3d 544 (4th Cir. 2004) (concluding "that *Netcom* made a particularly rational interpretation of § 106 when it concluded that a person had to engage in volitional conduct — specifically, the act constituting infringement — to become a direct infringer."); *Cartoon Network LP v. CSC*

27  *Holdings, Inc.,* 536 F.3d 121, 131 (2d Cir. 2008) (agreeing with *CoStar* that *Netcom* was "particularly rational"); *Marobie-Fl., Inc. v. Nat'l. Ass'n of Fire  Equip. Distribs*., 983 F. Supp. 1167, 1176-79 (N.D. Ill. 1997) (following

28  *Netcom*); H.R. Rep. No. 105-551(I), at 11 (1998) (Congress describes *Netcom* as the "leading and most thoughtful judicial decision to date" in the subject of Internet liability).

1   for copyright infringement long before filing suit, yet, this was still insufficient.  Democratic

2   Underground, by contrast, does not pre-review posts, and neither Righthaven nor Stephens Media

3   notified the forum prior to the lawsuit. Allen Decl. ¶ 9.

4          The Court should grant summary judgment on the Complaint because the undisputed facts

5   show that Defendants engaged in no volitional act respecting the alleged infringement.

6          **B.     Posting the Excerpt to the DU Forum Was Fair Use**

7          Independently, the undisputed facts establish that posting the Excerpt to the DU Website

8   constitutes fair use, and accordingly is "not an infringement of copyright."  17 U.S.C. § 107.

9   Righthaven's conclusion that "reasonable minds may disagree" on this point (Motion at 2) is not

10  only left unexplained in its Motion, but is undermined by *Righthaven's own acknowledgment* in

11  other actions that uses as minimal as those here are *not* infringing. Similarly, Righthaven's

12  attempt to characterize Judge Hicks' *Realty One* decision as a shift in the law that has motivated

13  its attempted dismissal tries to make a silk purse out of a sow's ear. It was clear from the start that

14  the use was fair, and Righthaven had no legitimate basis to claim otherwise.

15         The fair use doctrine "creates a limited privilege in those other than the owner of a

16  copyright to use the copyrighted material in a reasonable manner without the owner's consent."

17  *Fisher v. Dees*, 794 F.2d 432, 435 (9th Cir. 1986).  It permits and requires courts "to avoid rigid

18  application of the copyright statute when, on occasion, it would stifle the very creativity which

19  that law is designed to foster."  *Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 577 (1994)

20  (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)).  17 U.S.C. § 107 lays out four non-

21  exclusive factors that a court must consider in assessing whether a use is fair.  *See, e.g., Perfect

22  10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1163 (9th Cir. 2007).  Based on the undisputed

23  facts, each of these factors strongly supports a finding of fair use, and accordingly summary

24  judgment is warranted.

25         **1.     Posting the Excerpt to the DU Website Was Highly Transformative
26                and Minimally Commercial**

27         In assessing the first factor, the "purpose the character of a use," courts evaluate the extent

28  to which the use is "transformative" of the original work, (*Campbell*, 510 U.S. at 579), that is,

1    whether the use "does not 'merely supersede the objects of the original creation' but rather 'adds

2    something new, with a further purpose or different character.'"  *Perfect 10,* 508 F. 3d at 1164

3    (*quoting Campbell*, 510 U.S. at 579).  As the Ninth Circuit recognized in *Perfect 10*, where the

4    use is made to "serve a different purpose," that use can be "highly transformative." *Id*. at 1165,

5    1168 (exact replicas of images, reduced in size to thumbnails, found transformative); *see also*

6    *Nuñez v. Caribbean Int'l News Corp*., 235 F.3d 18 (1st Cir. 2000) (modeling photo taken for

7    portfolio purpose was transformed into news when published in newspaper).  Criticism and

8    comment are recognized as canonical examples of a transformative use (*Campbell,* 510 U.S. at

9    579); indeed, Section 107 expressly calls out protections for uses "such as criticism, comment

10   [and] news reporting . . . ."  17 U.S.C. § 107.

11          The use made of the Excerpt on the DU Website is a classic example of a transformative

12   use.  In posting an excerpt on a political discussion forum, Pampango invited the type of critical

13   analysis and commentary on an issue of important political news that is the core subject of fair

14   use protection.  *Campbell,* 510 U.S. at 579 (transformative uses "lie at the heart of the fair use

15   doctrine's guarantee of breathing space within the confines of copyright").  *Id*.   Other users of the

16   forum responded to this post by posting their own comments, consistent with the purpose of the

17   DU Website of fostering criticism and debate.  Compl., Ex. 3; Allen Decl. ¶ 3.  In a world where

18   the public forum increasingly exists online, the ability to include excerpts of news to prompt

19   discussion is of singular importance.[5]

20          The first factor may also consider "whether the original was copied in good faith to

21   benefit the public or primarily for the commercial interests of the infringer."  *Am.Geophysical*

22   *Union v. Texaco Inc*., 60 F.3d 913, 922 (2d Cir. 1994).  However, as a highly transformative use,

23   any potential commercial character fades in significance.  *Campbell,* 510 U.S. at 579; *Perfect 10,*

24   *5*08 F. 3d at 1164.  In all events, Defendants here made no effort to commercially exploit the

25   Excerpt; while a trivial amount of revenue could have been generated from Pampango's post, it

26

27

28   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [5] The importance of public commentary also demonstrates the "public interest" in the use at issue—another factor the
     Court should consider in determining fair use. *See, e.g., Perfect 10*, 508 F.3d at 1166.

1    stemmed from the simple fact that all forums on the website contain advertising.[6]   Moreover, if

2    Righthaven were to attempt a claim of secondary liability, it would be *Pampango's* use that

3    would be relevant, and that was wholly non-commercial.[7]   Democratic Underground provides

4    posters, like Pampango, no financial benefit or payment for their posting of material to the forum.

5    Allen Decl. ¶ 10. As a highly transformative, minimally commercial use, the first factor strongly

6    supports a finding of fair use.

7                    **2.      The Highly Factual, Politically Important, and Previously Published
                              Nature of the Article Supports Fair Use**

8

9            In assessing the "nature of the work" used, "[t]he law generally recognizes a greater need

10   to disseminate factual works than works of fiction or fantasy."  *Harper & Row, Publrs. v. Nation*

11   *Enters.,* 471 U.S. 539, 563 (1985) (also noting greater fair use rights for works of a published

12   nature).  Accordingly, where the work copied is largely composed of factual material, a finding of

13   fair use is more likely.  *See, e.g., L.A. News Serv. v. CBS Broad., Inc.*, 305 F.3d 924 (9th Cir.

14   2002) (republication of a video depicting a news report was a fair use because it was

15   informational rather than creative).  It was these firmly established principles that led Judge Hicks

16   to conclude that a similar excerpt of a largely factual news report in the *LVRJ* in the *Realty One*

17   case constituted fair use.  *See Realty One*, 2010 U.S. Dist. LEXIS 111576, at *5.

18           Here, too, the Excerpt posted was highly factual:  an account of poll results in the 2010

19   Nevada Senate Republican Primary.  Compl. Ex. 3.  Much as in *Realty One*, the five sentences

20   actually copied from the article represent little more than pure factual reporting.  Compl. Ex. 3.

21   Moreover, in the present case, the nature of the Excerpt also involved core issues of political

22   discourse which deserve the greatest fair use protection.  The scope of the fair use doctrine is

23

24   ───────────────
     [6] At most the DU Website generated approximately $2 connected to the post. Allen Decl. ¶ 20. This in no way
     undermines the first factor's strong support of fair use.  *See, e.g., Campbell*, 510 U.S. at 584 ("If . . . commerciality

25   carried a presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative
     uses listed" in 17 U.S.C. § 107).  *Realty One* likewise followed this rule in holding that a real estate sales blog with a
     mixed commercial and educational character was entitled to a finding of fair use as a matter of law.  *See Righthaven
     LLC v. Realty One Group, Inc.*, 2010 U.S. Dist. LEXIS 111576, at *4-5 (D. Nev. Oct. 19, 2010).

26   [7] If secondary liability were asserted, the proper focus for analysis of fair use is the use made by the person who
     could be a potential direct infringer, here the poster Pampango.  *Sony Corp. of Am. v. Universal City Studios, Inc.*,

27   464 U.S. 417 (1984) (analyzing whether end user's time shift was a fair use to determine secondary liability).  This
     does not mean however that courts do not also recognize the possibility of an independent fair use defense for
     potential indirect infringers.  *See Netcom*, 907 F. Supp. at 1378 (fair use analysis based on Netcom's actions); *Sega

28   Enters.*, 948 F. Supp. at 934 (citing *Netcom* for proposition that service provider has independent fair use rights).

1   wider where, as here, the use relates to issues of public concern.  *Consumers Union of U.S., Inc.*

2   *v. Gen. Signal Corp.*, 724 F.2d 1044 (2d Cir. 1983), *cert. denied*, 469 U.S. 823 (1984).  This

3   factor also weighs strongly in favor of fair use.

4           **3.**      **The Small Amount of the Work Taken Supports a Finding of Fair Use**

5        The third factor asks "whether the amount and substantiality of the portion used in relation

6   to the copyrighted work as a whole . . . are reasonable in relation to the purpose of the copying."

7   *Campbell*, 510 U.S. at 586.  Courts recognize that some amount of copying is necessary in order

8   to identify "the subject matter of a writing . . .  before any useful comment may be made about

9   it."  *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1375 (2d Cir. 1993).

10        Here, the amount of the work copied was minimal: 5 sentences of a 50 sentence article, or

11   10%.  *Compare* Complaint, Ex. 3 *to* Ex. 2.  Moreover, rather than copying the whole article, the

12   post provided a link to the full article at the *LVRJ* site.  Compl. Ex. 3.   This amount of copying

13   was indisputably reasonable for the purpose of engendering discussion.  Copying a small portion

14   of the story was important to allow others to understand and comment with adequate context.

15   Without this factual background, commentary would be essentially meaningless.  *See Twin Peaks*

16   *Prods., Inc.*, 996 F.2d at 1375.  Indeed, the alternative of publishing *nothing* would prevent

17   entirely the productive, transformative use being made.

18        Numerous cases have upheld findings of fair use based on copying of similarly small

19   excerpts.  *See, e.g., New Era Publ'ns Int'l ApS v. Carol Publ'g Group*, 904 F.2d 152, 158-159 (2d

20   Cir. 1990) (excerpts of between 5%-8% of works found fair use, especially where portions taken

21   were merely the initial sections of the work that "set the tone for the sections they precede.");

22   *Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194, 206 (4th Cir. 1998) (copying approximately 6% of

23   work and paraphrasing substantially more was found to be fair use for purposes of criticism

24   noting further that "criticism of a book will require the critic to quote and paraphrase from the

25   work."); *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1263 (2d Cir. 1986) (excerpts of 4.3%

26   of book considered fair use); *see also Sony Corp.*, 464 U.S. at 449-50 (copying even 100% of a

27   work can still constitute fair use).   In *Realty One*, Judge Hicks concluded that for a blog, copying

28   only the first eight sentences of a thirty sentence *LVRJ* article, or 26%, was sufficiently small to

1    warrant dismissal on fair use grounds.  *See Realty One*, 2010 U.S. Dist. LEXIS 111576, at *5.

2    This is a far greater percentage than the 10% of the Article that was posted by Pampango.  Even

3    Righthaven itself has acknowledged that use of excerpts *greater* in proportion than here would be

4    fair use.[8]  This factor overwhelmingly supports fair use here.

5                  **4.      The Lack of Potential or Actual Market Harm Supports Fair Use**

6                  The fourth factor is the potential effect of the use on the market for the work.  17 U.S.C.

7    § 107(4).  The focus of this factor is the extent to which the use at issue could stand as a realistic

8    market substitute for the original work (*see Perfect 10,* 508 F.3d at 1168), and whether it can

9    supplant the demand for the original.  *See Campbell*, 510 U.S. at 598.

10                 As a highly transformative use, Pampango's posting of the Excerpt cannot be presumed to

11   have any market harm.  *Campbell*, 510 U.S. at 591 ("No 'presumption' or inference of market

12   harm . . . is applicable to a case involving something beyond mere duplication for commercial

13   purposes.");[9] *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 631 (9th Cir. 2003)

14   ("The more transformative the new work, the less likely the new work's use of copyrighted

15   materials will affect the market for the materials.").

16                 Nor is any market harm remotely likely.  The practice of posting small *portions* of articles

17   to blogs for comment—even assuming it to be widespread—poses no genuine threat of market

18   harm to the original articles.  Like the use of thumbnails in *Perfect 10*, the use of a five sentence

19   excerpt from the Article does not supplant the original.  *See Perfect 10*, 508 F.3d at 1168.

20   Instead, by providing the short Excerpt along with a link to the original Article on the *LVRJ*

21   website, the posting *encourages* users to view the original, augmenting the market rather than

22   supplanting it.[10]  *See* Complaint, Ex. 3.  This much is all but acknowledged by Stephens Media's

23   own policy for the *LVRJ* website, which encourages users to share articles on at least 18 different

---

[8] In opposition to the motion to dismiss in *Realty One*, Righthaven asserted that had the copying been limited to the first two paragraphs of the article it would likely have constituted a fair use.  *See Righthaven LLC v. Realty One Group, Inc.*, Case. No. 2:10-cv-01036-LRH-PAL, Dkt. 12 at 10-11.  In that case, the first two paragraphs contained three sentences of the 28 sentence article, more than the 10% copied here.  *See id*. Dkt. 1, Exs. 2, 3.

[9] Moreover, even assuming a focus on DU as opposed to the poster, the small amount of revenue attributable to the use warrants no presumption of any market harm.

[10] *See, e.g.*, Eric Goldman, *Search Engine Bias and the Demise of Search Engine Utopianism*, 8 Yale J. L. & Tech. 188 (Spring 2006) (discussing search engine's use of "popularity metrics" in their algorithms which increase the ranking of websites based on the number and popularity of other websites linking to them)

1    third-party Internet resources and to email, save, or print the article.  Opsahl Decl. ¶ 4.  That

2    practice undermines any suggestion that publicizing and disseminating links to the original

3    Article over the Internet along with teaser excerpts somehow diminishes the Article's value.

4          Moreover, in this specific case, the Excerpt could not substitute for the original because it

5    does not contain the heart of the work, including the actual poll numbers at issue.  Not

6    surprisingly, Judge Hicks ruled, on the pleadings, that an excerpt of a significantly larger portion

7    of a *LVRJ* article on a similar blog could not "satisfy a reader's desire to view and read the article

8    in its entirety" and, when published with a link to the original article, constituted fair use.  *See*

9    *Realty One*, 2010 U.S. Dist. LEXIS 111576, at *6.

10          Finally, although the *LVRJ* has a paid archive, the Article has always been, and still is

11   today, available for free on the *LVRJ website*.  Opsahl Decl. ¶ 3.  Thus, the posting of the Excerpt

12   did not deprive Stephens Media of any fees for use, since it was charging none.  Likewise,

13   Righthaven has no market for the Article, because it is not a news publisher, but a "technology

14   company whose *only job* is to protect copyrighted content."  *Id*. Ex. B.  Nor do Righthaven's

15   litigation settlements in other cases evidence a market.  *See Video-Cinema Films, Inc. v. CNN,*

16   *Inc*., 2001 U.S. Dist. Lexis 25687, at *9 (S.D.N.Y. Nov. 28, 2001) (finding no market harm when

17   only payments were settlements to avoid litigation).

18          Accordingly, this, like all of the other factors, weighs in favor of a finding of fair use.

19   Given that every factor points to a finding of fair use, as does the public interest, the Court should

20   grant summary judgment of non-infringement to the Defendants.  *See Mattel, Inc. v. Walking Mt.*

21   *Prods.*, 353 F.3d 792, 800 (9th Cir. 2003) (fair use is a mixed question of fact and law and where

22   the material facts are not in dispute summary judgment is appropriate).

23                    **5.      The *Realty One* Decision Was Not a Change in the Law that Could**
                              **Excuse Righthaven's Pursuit of this Baseless Lawsuit**
24

25          The pretext for Righthaven's Motion—that the decision in *Realty One* represents some

26   kind of change in the legal landscape that suddenly warrants a voluntary dismissal—is just silly.

27   As the above analysis makes clear, the fact that Judge Hicks *followed* longstanding and bedrock

28   principles hardly excuses Righthaven for filing claims that, from their inception, *ignored* the same

1   principles.  Indeed, Righthaven has not cited a single case in any court in which users of a blog or

2   forum excerpting only 10% of a factual, news article was found unfair.

3       **C.    Plaintiff's Demand for Domain Name Transfer Represents Another Baseless,**
        ***In Terrorem* Tactic**

4

5       The Court should also reject Righthaven's *in terrorem* request for an order transferring the

6   domain name of the DU Website.  Righthaven has included such a demand for transfer as a

7   matter of course in its 179 lawsuits, apparently intending to scare operators of websites who fear

8   losing one of their most critical assets.[11]  But such relief is unavailable as a matter of law.  *See*

9   *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010).  "The remedies for

10  infringement 'are *only* those prescribed by Congress,'" *Sony Corp.*, 464 U.S. at 431 (quoting

11  *Thompson v. Hubbard*, 131 U.S. 123, 151 (1889)), and they do not include transfer of domain

12  names.  Indeed, Righthaven has now admitted, in its lawsuit against another EFF-represented

13  entity, that "such relief is not authorized under the Copyright Act."  *Righthaven LLC v. DiBiase*,

14  Case No. 2:10-cv-01434-RLH-PAL, Dkt 29 at 5:26-27.

15      Righthaven asserted in the *DiBiase* matter that the Court may nonetheless order seizure of

16  a domain name as part of its general equitable powers.  *Id.* 6-7.  That proposition is frivolous.

17  Could any Court genuinely entertain the proposition that, in the name of "equity," DU Website's

18  location should be shutdown and transferred to Righthaven because 10% of one *LVRJ* article was

19  published in one post out of 52 million on the site?[12]  Of course, not. Again, Righthaven's domain

20  name claims represent nothing beyond a transparent effort to intimidate.

21      Finally, a domain-name seizure would violate Democratic Underground's First

22  Amendment rights.  A domain name itself represents protected speech.  *See Taubman Co. v.*

23  *Webfeats*, 319 F.3d 770, 778 (6th Cir. 2003) ("The rooftops of our past have evolved into the

24  internet domain names of our present . . . the domain name is a type of public expression, no

25

26  [11] As Righthaven CEO Steve Gibson explained, Righthaven sees the domain name threat as "something available to deter infringements." Opsahl Decl. Ex. K.

27  [12] Moreover, the Court's equitable power to issue injunctions is constrained by the Federal Rules of Civil Procedure, which preclude orders binding individuals or entities not identified by Rule 65(d)(2).  *See, e.g., Med. Mut. Ins. Co. of*

28  *Maine v. Indian Harbor Ins. Co*., 583 F.3d 57, 64 (1st Cir. 2009).  Accordingly, the Court could not issue the injunction Righthaven seeks against the non-party registrar of the domain name.

1   different in scope than a billboard or a pulpit . . . .").  If Righthaven wants to restrain that speech,

2   it must allege facts demonstrating that the domain name *itself* falls outside of the First

3   Amendment's protections.  *See, e.g., Jefferson Cty. Sch. Dist. v. Moody's Investor's Servs.*, 175

4   F.3d 848, 860-61 (10th Cir. 1999) (affirming dismissal of complaint that attacked protected

5   speech and failed to plead any facts that would overcome First Amendment protection).  It has not

6   and cannot.  Further, a domain-name transfer would allow Righthaven to control the entirety of

7   DU's Website, not just the miniscule amount of content about which Righthaven complains.[13]

8   Vesting a copyright plaintiff with that kind of power over First Amendment-protected speech

9   would be massively overbroad and patently unconstitutional.  *See, e.g., Tory v. Cochran*, 544 U.S.

10  734, 738 (2005) ("An 'order' issued in 'the area of First Amendment rights' must be 'precis[e]'

11  and narrowly 'tailored' to achieve the 'pin-pointed objective' of the 'needs of the case'") (quoting

12  *Carroll v. President and Comm'rs of Princess Anne*, 393 U.S. 175, 183-84 (1968)).

13          For the above reasons, both Righthaven's claim for domain name seizure, as well as the

14  other claims in the Complaint, are subject to summary judgment based on the undisputed facts.

15  **II.    THE COURT SHOULD NOT GRANT THE MOTION FOR VOLUNTARY
16          DISMISSAL ABSENT A CONDITION THAT DEFENDANTS MAY APPLY FOR
        THEIR ATTORNEYS' FEES**

17          While Plaintiff's lawsuit is ripe for summary judgment, the Court would not need to reach

18  that decision *if* Righthaven had agreed to cover Defendants' reasonable attorneys' fees as part of a

19  voluntary dismissal with prejudice.  Righthaven has refused that course.  Righthaven's effort to

20  dismiss while preventing Defendants from even seeking an award of attorneys' fees is wholly

21  without merit.

22          **A.    Where Attorneys' Fees are Afforded to a Prevailing Party by an Independent
23                 Statute, Conditioning a Dismissal with Prejudice on Denial of Those Fees
                 Would be Contrary to Law**

24          Righthaven admits that Defendants will be the prevailing parties if it dismisses with

25  prejudice—indeed, it argues that such dismissal "effects a full and final judgment on the merits in

26  _____

27  [13] Essentially, a domain name is like "a street sign in the real world, indicating the location of the Internet merchant
    and the nature of his business."  George C.C. Chen, *A Cyberspace Perspective on Governance, Standards and
    Control*, 16 J. Marshall J. Computer & Info. L. 77, 113 (1997); *see also Shell Trademark Mgmt. BV v. Canadian

28  AMOCO*, 2002 U.S. Dist. LEXIS 9597, at **10-11 (N.D. Cal. May 21, 2002) (analogizing domain names to road
    signs).  With a transfer of a domain, the street sign would point to a new location.

1   the Defendants' favor, just as if the defendants were to prevail at trial."  Motion at 3; *see also*

2   *Zenith Ins. Co. v. Breslaw,* 108 F.3d 205, 207 (9th Cir. 1997) (defendant is prevailing party upon

3   voluntary dismissal with prejudice).  In such circumstances, the availability of a cost award to the

4   prevailing party may not be negated.  *Mother & Father v. Cassidy*, 338 F.3d 704 (7th Cir. 2003)

5   (reversing denial of Rule 54 costs after voluntary dismissal with prejudice); *see also Riviera*

6   *Distribs., Inc. v. Jones*, 517 F.3d 926, 928 (7th Cir. 2008); *Wells v. Cal. Home Loan Solutions,*

7   2007 U.S. Dist. Lexis 74291, at *4 (S.D. Cal. 2007) (citing *Zenith Ins.*).  "Nothing in the language

8   of Rule 41 suggests that the prevailing defendant [who is voluntarily dismissed with prejudice]

9   should not enjoy the normal benefits of a final judgment in its favor." *Mother & Father,* 338 F.3d

10   at 710.

11        The same logic applies to an award of attorneys' fees here, where Section 505 of the

12   Copyright Act prescribes an award of "reasonable attorney's fee to the prevailing party *as part of*

13   *the costs.*" 17 U.S.C. § 505 (emphasis added).  Judge Easterbrook explained this rule in reversing

14   a denial of attorneys' fees in a copyright suit after plaintiff's dismissal with prejudice:

15        [Defendant] obtained a favorable judgment. That this came about when [plaintiff]
         threw in the towel does not make [defendant] less the victor than it would have
16        been had the judge granted summary judgment or a jury returned a verdict in its
         favor.  [Plaintiff] sued; [Defendant] won; no more is required. . . . Because
17        [Defendant] is the prevailing party for regular costs, it must be the prevailing party
         for the purpose of § 505, which allows an award of attorneys' fees as part of costs.
18

19   *Riviera,* 517 F.3d at 928.

20        *Riviera* teaches that, although Rule 41(a)(2) by *its* terms vests discretion in the Court to

21   determine conditions for a voluntary dismissal, it by no means allows the Court to negate a

22   statutory authorization of fees to a prevailing party.  Other courts hue to the same rule, awarding

23   attorneys' fees following a voluntary dismissal with prejudice where an independent statutory

24   authority allows them.  *See Quadrozzi v. The City of N.Y.*, 127 F.R.D. 63, 78 n.25 (S.D.N.Y.

25   1989) (awarding attorneys' fees based on independent statutory authority); *Degussa Admixtures,*

26   *Inc. v. Burnett,* 471 F. Supp. 2d 848 (W.D. Mich. 2007), *aff'd,* 277 Fed. Appx. 530, 2008 U.S.

27   App. Lexis 10017, at *6 (6th Cir. May 5, 2008) (granting plaintiff's motion for voluntary

28   dismissal with prejudice and awarding attorneys' fees to defendants under Uniform Trade Secrets

1    Act); *Colombrito v. Kelly,* 764 F.2d 122, 134 (2d Cir. 1985) (independent statutory authority

2    affords attorneys' fees to defendant where plaintiff voluntarily dismisses with prejudice);

3    *Lawrence v. Fuld,* 32 F.R.D. 329, 331-32 (D. Md. 1963) (same).  These cases reflect that it would

4    be legal error to make it a condition of dismissal that Defendants *cannot* petition for the fees to

5    which they are statutorily entitled to seek as prevailing parties.  *See Mother & Father,* 338 F.3d at

6    710; *Riviera,* 517 F.3d at 928.

7           While the Ninth Circuit recognizes a plaintiff's ability to reject conditions imposed under

8    Rule 41 if the court's conditions are too "onerous," an award of costs provided by an *independent*

9    *statute* is not an "onerous" condition or one for which a party has the right to withdraw dismissal.

10   *See, e.g., Degussa Admixtures,* 277 Fed. Appx. at 535 (6th Cir. 2008)(affirming dismissal with

11   prejudice and award of attorneys' fees to defendants where award was based on independent

12   statutory authority, not simply as a condition under FRCP 41(a)(2)).  For this reason, Plaintiff's

13   reliance on *Lau v. Glendora Unified Sch. Dist.*, 792 F. 2d 929 (9th Cir. 1986) is entirely

14   misplaced.  The condition that the plaintiff was entitled to reject in that case was a court's

15   discretionary grant of fees under Rule 41, not an award authorized by an independent statute.  For

16   these reasons, this Court may not ignore Section 505's mandate to consider an application for

17   attorney's fees, nor may Plaintiff condition its dismissal on this Court's granting immunity from

18   that statute.

19           **B.    The Court Should Authorize a Request For Attorneys' Fees Regardless of**
                     **Whether Plaintiff Would Have a "Right" to Withdraw its Motion**
20

21           Even assuming Righthaven had a right to withdraw its motion to dismiss (which it does

22   not), the Court should still not approve a dismissal that immunizes it from a fee claim under

23   Section 505.  Requiring payment of attorneys' fees upon a voluntary dismissal with prejudice is

24   entirely appropriate where, as here, one or more of the following circumstances are present:  (a)

25   exceptional circumstances justify an award of fees in order to do justice; (b) plaintiffs' claim is

26   frivolous and/or pursued in bad faith; and/or (c) an independent statute authorizes attorneys' fees.

27   *See York v. Ferris State Univ.,* 36 F. Supp. 2d 976, 980 (W.D. Mich. 1998); *AeroTech, Inc. v.*

28   *Estes,* 110 F.3d 1523, 1528 (10th Cir. 1997).  Each of those bases exists here.

1

### 1.   The Court Should Not Be Held Hostage by Plaintiff's Refusal to Dismiss Where Justice Requires Award of Fees

2

3      Even in the absence of a statutory authorization, Rule 41 allows attorneys' fees as a

4   condition to a voluntary dismissal in exceptional circumstances where they are needed "in order

5   to do justice." *York,* 36 F. Supp. 2d at 980 (citing *Smoot v. Fox,* 353 F.2d 830, 833 (6th Cir.

6   1965).  One example of an exceptional circumstance is "when a litigant makes a repeated practice

7   of bringing claims and then dismissing them with prejudice after inflicting substantial litigation

8   costs on the opposing party and the judicial system." *AeroTech, Inc.*, 110 F.3d at 1528.  Plaintiff

9   Righthaven's litigation machinery, which has filed almost 179 lawsuits in six months, certainly

10   qualifies as "exceptional," and in a manner that requires an award of fees to do justice.

11      Righthaven's model starts by intentionally proliferating litigation—suing first, rather than

12   providing notice and opportunity to take down alleged infringements.  The suits themselves then

13   pursue scare tactics such as threatening to seize domain names, alleging statutory damages to

14   $150,000, and demanding Righthaven's attorneys' fees, in an effort to bully out of state victims

15   into settling for a lesser cost than defending the suit.  Plaintiff  banks on its ability to voluntarily

16   dismiss with prejudice and avoid paying fees, even when Defendants prevail in full.  Allowing

17   Righthaven to walk away from losing claims would afford them all the power of judicial process

18   without any accountability for its misuse.  Under these circumstances, justice requires that

19   attorneys' fees be awarded.  *See AeroTech, Inc.* 110 F.3d at 1528; *York,* 36 F. Supp. 2d at 980.

20

### 2.   Payment of Defendants' Fees is Appropriate Here Because the Case Was Frivolous and/or Pursued in Bad Faith

21

22      Likewise, attorneys' fees would be appropriately awarded, even apart from a statutory

23   authorization, where dismissed claims were frivolous or pursued in bad faith. *Lawrence,* 32

24   F.R.D. at 331-32; *Quadrozzi*, 127 F.R.D. at 78-80.  As to frivolousness, as discussed above, this

25   case was devoid of merit under at least the volitional act and fair use doctrines.

26      Moreover, Righthaven has pursued this litigation in bad faith.  First, Plaintiff's threat to

27   seize the domain name of the DU Website was not only contrary to the Copyright Act (as Plaintiff

28   has now admitted) but also an obvious effort to instill fear of consequences completely

1   disproportionate to the issues in the case.  Similarly, Plaintiff's inclusion of David Allen as an

2   individual defendant was an unnecessary scare tactic seeking unnecessarily to ratchet up the

3   stakes.  Righthaven had neither any factual basis to subject Mr. Allen to liability, nor any need to

4   have him in the case, other than to punish him personally or coerce him to fold like many other

5   defendants it has sued.  Such unjustifiable tactics authorize the court to award Defendants

6   attorneys' fees.  *See Lawrence,* 32 F.R.D. at 331-32; *Quadrozzi,* 127 F.R.D. at 78-80.

7                    **3.       Attorneys' Fees and Costs Will Be Warranted Under Section 505**

8           Finally, Defendants will also be entitled to their fees under the independent statutory

9   authority of the Copyright Act.  Under Section 505, an award of fees is proper when either

10   successful prosecution or successful defense of the action furthers the purposes of the Copyright

11   Act.  *See Fantasy, Inc. v. Fogerty*, 94 F.3d 553, 558 (9th Cir. 1996) ("[A] successful defense of a

12   copyright infringement action may further the policies of the Copyright Act every bit as much as

13   a successful prosecution of an infringement claim by the holder of a copyright") (*quoting*

14   *Fogerty v. Fantasy, Inc*., 510 U.S. 517, 524 (1994)).  In vindicating the right to fair use  provided

15   by Section 107, Defendants will further the policies of the Act.  The standards for evaluating

16   whether an award is proper are the same regardless of which party prevails. *Id*. at 534.

17           Courts have identified non-exclusive factors to guide a district court's discretion in

18   awarding attorneys' fees under Section 505: "(1) the degree of success obtained; (2)

19   frivolousness; (3) motivation; (4) objective unreasonableness (both in the factual and in the legal

20   components of the case); and (5) the need, in particular circumstances, to advance considerations

21   of compensation and deterrence." *Entm't Research Group v. Genesis Creative Group*, 122 F.3d

22   1211, 1229 (9th Cir. 1997).  To award fees, not all of these factors must be met; fees may be

23   based on a single factor. *See Robinson v. Lopez*, 69 U.S.P.Q. 2d (BNA) 1241 (C.D. Cal. 2003).

24                    **a.       The Degree of Success Supports an Award of Attorneys' Fees**

25           If Righthaven dismisses with prejudice (or if this Court grants summary judgment),

26   Defendants' success will be total.  It is ironic for Plaintiff to claim otherwise in their argument

27   about this factor (Motion at 14-15), given the concession elsewhere in its Motion that dismissal

28   will be "a full and final judgment on the merits in Defendants' favor."  Motion at 3; *see also*

1    *Riviera*, 517 F.3d at 928 (voluntary dismissal of copyright claim with prejudice entitles a

2    defendant to Section 505 fees).  Righthaven's suggestion that Defendants' total success should be

3    tempered by the *Realty One* decision is less than feeble.  Motion at 14-15.  As discussed above,

4    the *Realty One* decision could in no way be a surprise to anyone with even a passing familiarity

5    with fair use law.  But regardless, the fact is that Plaintiff has given up, declining to pursue this

6    case against this opponent, and conceding complete defeat, with prejudice.  This factor strongly

7    supports an award of attorneys' fees.

8                        **b.       Righthaven's Lawsuit Was Frivolous and Unreasonable**

9            Righthaven's claims justify an award of attorneys' fees as either, or both, "frivolous" or

10   "objectively unreasonable."  It speaks volumes that, in its efforts to rebut the unreasonableness of

11   its claims, Righthaven focuses entirely on its allegation of the "prime facie" case for copyright

12   infringement, while ignoring the dispositive issues.  Motion at 16, 19.  Righthaven never

13   mentions the element of volition, although—as a party filing 179 cases, all subject to Rule 11's

14   pre-filing inquiry—it surely is not unfamiliar with this basic rule that has been followed in

15   Internet cases since the *Netcom* decision in 1995.  On fair use, Righthaven asserts only that

16   "reasonable minds may differ," while failing to present any analysis of fair use that might

17   "reasonably" support its claim, and failing to mention that it admitted in another case that a

18   *higher* percentage of an article would be fair use. *Realty One*, Dkt. 12 at 10-11. Whether a lawsuit

19   is legally or factually unreasonable is measured by an *objective* standard.  *See Fogerty*, 510 U.S.

20   at 534 n.19; *Perfect 10, Inc. v.CCBill LLC,* 488 F.3d 1102, 1120 (9th Cir. 2007).  Plaintiff's

21   lawsuit is both factually *and* legally unreasonable, weighing doubly in favor of an award of fees.

22           As to fair use, a party bringing a copyright infringement suit has an obligation to assess

23   any possible fair uses at the outset, even before sending a DMCA takedown notice.  *Lenz v.*

24   *Universal Music Corp.*, 572 F. Supp. 2d 1150, 1156 (N.D. Cal. 2008).[14]  Righthaven certainly

25   failed to make that assessment here, when it undertook to sue a discussion forum for a third party

26   posting using only 10% of the original Article—an instance that no one could reasonably dispute

27
     _____

28   [14] The Digital Millennium Copyright Act provides a safe harbor (not asserted here) against copyright infringement
     claims for internet service providers who timely respond to takedown notices and who have registered copyright
     agents with the U.S. Copyright Office.  *See generally* 17 U.S.C. § 512.

1  was fair use.[15]  By failing to take even this most basic step, it ran the risk of  being subject to an

2  award of fees.  Indeed, where a fair use may be "reasonably perceived," it is objectively

3  unreasonable to bring infringement claims.  *See Mattel, Inc. v. Walking Mt. Prods.*, 2004 U.S.

4  Dist. LEXIS 12469, at **4-5 (C.D. Cal. June 24, 2004).  Plaintiff's effort to punish a fair use was

5  objectively unreasonable and warrants a fee award.

6        The same can be said for Plaintiff's failure to allege any volitional act of infringement.  It

7  has been clear since *Netcom* that no viable claim for direct infringement can lie in this context.

8  *See* Argument Part I.A., *supra*.  Likewise, as explained above, it was wholly frivolous for

9  Plaintiff to seek seizure of the Democratic Underground domain name.[16]  Having brought wholly

10  unreasonable claims seeking frivolous remedies, Righthaven cannot now avoid the consequences

11  of its actions by threatening not to "consent" to dismissal if it is held accountable.

12        **c.        Righthaven's Claims Were Improperly Motivated and Require
              Compensation to Defendants as a  Deterrence to Future Abuse**

13

14        Righthaven's motivation in filing this action and over 178 others was not to remedy a

15  wrong, but to profit from inventing one.  It bears remembering that Righthaven possesses no

16  claim whatsoever until it chooses to buy assignments of copyrights, after already knowing that the

17  alleged infringement has occurred.  Its motive is purely mercenary.  It has built a business model

18  with Stephens Media around bringing hundreds of strike suits for use of excerpts or copies of

19  *LVRJ* articles, month after month.  Opsahl Decl. ¶ 17-21.  Armed with statutory remedies that

20  overwhelm the actual value of the uses challenged, they seek to leverage economic pressure that

21  can be offset only by the Court's imposition of economic responsibility.

22        As the present case and *Realty One* exemplify, Righthaven brings these suits without

23  making any fair assessment of whether the excerpts at issue are actually infringing.  Although its

24  counsel's declaration claims that there are only 4 suits now pending with less than 75% of an

25  original used, in fact there have been at least 9 lawsuits filed based on excerpts of less than 50%.

26  ─────────────────
[15] This is despite the fact that Righthaven's former counsel recognizes its obligation to consider fair use at the outset. Opshal Decl. ¶ 6.

27  [16] Righthaven's assertion that this Court has previously "agreed that Righthaven's copyright cases are objectively reasonable" and "repeatedly validated [their] factual and legal merit" overstates reality.  The four cases cited in the Motion  (at 20-22) concluded merely that Righthaven had *pleaded* sufficient *allegations* to allow standing to begin

28  litigation, not that any claim had merit.

1   *Id.* ¶ 19.  Nor may Righthaven curry the Court's leniency by including in an unsworn brief the

2   hedged statement that "[i]t is Righthaven's *current* belief that, for the *foreseeable* future, *nearly*

3   *all Righthaven copyright cases*" will not be like this present one.  Motion at 6 (emphasis added).

4   Righthaven still does not commit that it *will not sue against partial excerpts*, and that it *will not*

5   *sue hosts of third party commentary.*  Motion at 7.  The Court's imposition of financial

6   responsibility for a meritless suit like this one is necessary to deter similar suits, and is the only

7   way to compensate those willing to stand up to Righthaven's shake down.

8           Under similar circumstances, courts have repeatedly recognized that the motivations

9   underlying these types of serial nuisance suits are not supported by the Copyright Act and

10  accordingly must be deterred and recompensed by an award of attorneys' fees.  *See, e.g., Video-*

11  *Cinema Films, Inc. v. CNN, Inc.*, 2003 U.S. Dist. LEXIS 4887, at *15-16 (S.D.N.Y. Mar. 31,

12  2003); *Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 896 (6th Cir. 2004)

13  (attorneys' fees were appropriate where plaintiff's "choice to sue hundreds of defendants all at the

14  same time, regardless of the strength of the individual claims" resulted in their "dragnet inevitably

15  [sweeping] up parties against whom they had little or no chance of succeeding").

16          In *Video-Cinema*, much as here, the plaintiff had brought a series of copyright

17  infringement lawsuits against news organizations for having used excerpts of the movie *G.I. Joe*

18  in television obituaries for the actor Robert Mitchum.  *Id.* at *13-14.  Just as with Righthaven, it

19  was only after these excerpts were used that the plaintiff acquired the rights to the copyright in

20  "an elaborate scheme to place himself in a position to sue."  *Id.*  Plaintiff then proceeded to

21  demand quick settlements from numerous news organizations, and the court concluded that airing

22  the excerpts was a fair use.  *Id.* Addressing motivation, the court concluded that "Plaintiff's

23  conduct was nothing more than an obvious effort to use the Copyright Act to secure payment

24  from Defendants for their fair use," a motivation the court unequivocally termed "improper."  *Id.*

25  at 15.  Given this, the court concluded that "fees are appropriate . . . to deter future copyright

26  owners from using the threat of litigation to chill other fair uses."  *Id.* at 15-16.

27          Here, too, fees are surely appropriate.  Righthaven, much like in *Video-Cinema*, is

28  operating as a copyright troll:  waiting for any organization to make use of an *LVRJ* article,

1   acquiring the copyright, and bringing suit regardless of whether that use is fair in an attempt to

2   extract quick settlements with the threat of high statutory damages and improper *in terrorem*

3   remedies like domain name seizure.  Where this copyright dragnet ensnares innocent uses, as

4   here, it is especially egregious.  Unless Righthaven faces the deterrence of attorneys' fees awards

5   to successful defendants, the likelihood that fair uses will be chilled is as good as certain.  That

6   chilling effect is already evident here, where the DU Website had to remove Pampango's

7   perfectly fair posting as a precautionary measure, and another user of the DU Website also pulled

8   its posting from the *LVRJ* out of fear of being targeted.  Allen Decl. Ex. C.

9       Courts routinely award attorneys' fees under Section 505 where defendants prevail on fair

10   use defenses, as "[t]o hold otherwise would diminish any incentive for defendants to incur the

11   often hefty costs of litigation to defend the fair use doctrine.  *See Video-Cinema,* 2003 U.S. Dist.

12   LEXIS 4887, at *15-16; *see also Tavory v. NTP, Inc.*, 297 Fed. Appx. 986, 991 (Fed. Cir. 2008)

13   (awarding fees to a prevailing defendant on a fair use defense); *Compaq Computer Corp. v.*

14   *Ergonome, Inc.*, 387 F.3d 403, 411 (5th Cir. 2004) (same); *Bond v. Blum*, 317 F.3d 385, 398 (4th

15   Cir. 2003) (same); *Mattel, Inc.*, 2004 U.S. Dist. LEXIS 12469, at *4-5 (same).  Courts recognize

16   the importance of "encouraging the creators of works of commentary and criticism to litigate the

17   fair use defense . . . by compensating them for their legal expenses [as this] will enrich the public

18   by increasing the supply and improving the content of commentary and criticism."  *Hofheinz v.*

19   *AMC Prods., Inc.*, 2003 U.S. Dist. LEXIS 16940, at *20-21 (S.D.N.Y. Sep. 3, 2003).   For exactly

20   these reasons, the purposes of the Copyright Act require an award of fees to Defendants for their

21   defense against Righthaven's claims.

22       Given Defendants' numerous bases for entitlement to fees under Section 505, the

23   exceptional nature of this case, and Plaintiffs improper prosecution of it, conditioning dismissal

24   on denial of attorneys' fees would be inappropriate.  If it does not grant summary judgment, the

25   Court should order that, upon entry of any voluntary dismissal of this action, Defendants may

26   submit a request for statutory attorneys' fees and costs.

27

28

III.   **THE COURT SHOULD NOT DISMISS THE COUNTERCLAIM, REGARDLESS OF WHETHER VOLUNTARY DISMISSAL OF THE COMPLAINT IS APPROVED**

A.   **Plaintiff Has No Right to Condition Its Voluntary Dismissal on any Action Respecting the Counterclaim**

Whatever Plaintiff's rights to withdraw its own Complaint under to Rule 41, Plaintiff does not control Democratic Underground's Counterclaim and has no right to compel its dismissal simply because Plaintiff has determined that its own claims should not be pursued. Rule 41(a)(2) contemplates that a counterclaim must continue pending after plaintiff's voluntary dismissal, providing that "[i]f a defendant has pleaded a counterclaim before being served with the plaintiff's motion to dismiss, an action may be dismissed over the defendant's objection *only if the counterclaim can remain pending for independent adjudication*." Thus, Plaintiff's demand that the Counterclaim "shall be dismissed" as a condition to the voluntary dismissal of its Complaint (Motion at 23) turns the rule on its head. Tellingly, Plaintiff has cited no authority for its ill-conceived condition, and the Court may simply ignore it.

B.   **The Counterclaim Would Not Be Disposed of by the Voluntary Dismissal of Righthaven's Original Complaint**

At the outset, Righthaven's argument that voluntary dismissal of its Complaint would dispose of Democratic Underground's Counterclaim ignores that the Counterclaim also states a claim against Stephens Media, which would not be bound by Righthaven's concession on the Complaint. Stephens Media has been alleged to be the actual holder of any copyright interest (ignoring the sham assignment), and indisputably possesses a reversionary interest in the copyright. *See* C.Claim ¶¶ 38-42; Stephens Media's Motion To Dismiss. Dkt. 38, Ex. 1 (assignment recites that it is "subject to Assignor's rights of reversion"). Absent a judgment binding Stevens Media, Democratic Underground could be sued again tomorrow for reactivating the Pampango post that it took down as a protective measure, or for postings of other excerpts. *See* Allen Decl. Ex. B; ¶ 25.

Moreover, as to Righthaven alone, dismissal of the Complaint with prejudice is no substitute for adjudication of the Counterclaim. In order to establish a definitive ruling on the

1   legality of Righthaven's conduct going forward, the Counterclaim specifically seeks a declaration

2   that there was no volitional act (C.Claim ¶ 186), only *de minimis* copying (¶ 189), fair use (¶

3   190), and failure to mitigate by Righthaven's failure to provide notice before suing.  ¶ 191.  It

4   also introduces numerous additional issues, including invalidity of the assignment, (¶¶ 38-40)

5   license resulting from the *LVRJ*'s invitation to share its works, and estoppel (¶¶ 83-101) , and it

6   incorporates those allegations into its request for a declaration that no infringement has occurred

7   "based on the circumstances described above."  ¶¶ 184, 196.  Dismissal of the Complaint would

8   not decide any of those issues.  Indeed, it is intended precisely to avoid a decision on the merits.

9          Declaration of rights on these issues is both necessary and reasonable to protect

10  Democratic Underground from harassing lawsuits by Righthaven and Stephens Media in the

11  future.  Righthaven continues to assert that it has valid claims based even on the minimal copying

12  that occurred here. *E.g.*, Motion at 4. It continues to assert Defendants' liability for third party

13  postings despite their lack of volitional acts, and despite what Defendants believe is the sham

14  nature of the assignments and a fatally defective failure to give notice.   Absent an adjudication of

15  fair use under the Counterclaim, Righthaven will be free, after dismissing, to sue again if

16  Democratic Underground restores Pampango's post since it could argue that the restoration now

17  satisfies the volitional act element.  Additionally, Righthaven may bring suit against Defendants

18  whenever another user makes a post to the DU Website.  In at least one instance, a DU Website

19  user already removed his own post for fear of being sued and replaced an article from the *LRVJ*

20  with one from the *Las Vegas Sun,* a newspaper that does not sue its readers.  Allen Decl. Ex. C.

21  Failure to decide the issues in the Counterclaim means continued chill not just of Defendant's

22  conduct, but of user postings necessary to fulfill the DU Website's mission.  Democratic

23  Underground thus has a live and legitimate basis to pursue a decision on the Counterclaim.

24         The courts have long provided declaratory relief in exactly this context, recognizing that

25  while one "defendant exonerated of  infringement may be content with such adjudication, another

26  may not . . . [since] the mere exoneration from infringement does not always meet the necessities

27  of a wrongfully accused defendant."  *Dominion Elec. Mfg. Co. v. Edwin L. Weigand, Co.,*126

28  F.2d 172, 174 (6th Cir. 1942) (declaratory judgment counterclaim allows defendant to "represent

1    not only himself, but in a sense, also the public" in freeing the restraint of invalid claims).

2    Counterclaims seeking a declaration of invalidity consistently survive resolution of infringement

3    claims.  *See Cardinal Chem. Co. v. Morton Int'l, Inc*., 508 U.S. 83 (1993) (holding that "case or

4    controversy" in patent suit survives the resolution of the infringement claim when a counterclaim

5    for invalidity still remains unresolved, as a "declaratory judgment of invalidity presents a claim

6    independent of the patentee's charge of infringement").  The same is true when an infringement

7    claim is resolved *with prejudice* against the plaintiff.  *See, e.g.*, *Diamonds.net LLC v. Idex Online,*

8    *Ltd.*, 590 F. Supp. 2d 593, 603 (S.D.N.Y. 2008) (noting "importance to the public *at large of*

9    *resolving questions of . . . validity"); AIR-vend, Inc. v. Thorne Indus., Inc.,* 625 F. Supp. 1123,

10   1126-27 (D. Minn. 1985).  The Supreme Court's reasoning in *Cardinal* applies equally in the

11   copyright context.[17]  Democratic Underground's Counterclaim presents "a claim independent of

12   [Righthaven's] charge of infringement," in that it seeks declaration of the underlying validity of

13   the rights asserted now—and that may be asserted in the future—against the DU Website and its

14   users.  *Cardinal, 508 U.S. at 96.  See also Vietnam Veterans of Am. v. CIA*, 2010 U.S. Dist.

15   LEXIS 3787, at *19 (N.D. Cal. Jan. 19, 2010 ) (declaratory relief regarding legality of secrecy

16   oaths could be pursed as it could "avoid potential future litigation by clarifying whether veterans

17   may discuss their experiences without facing consequences").[18]

18        Finally, the Counterclaim also seeks attorneys' fees and costs under the Copyright Act in

19   its own right, independent of the Complaint.  *Id.* at 25.  Righthaven claims that dismissal of the

20   Complaint with prejudice would amount to an "adjudication" on the merits of the Counterclaim,

21   and expressly "moves for the adjudication" of the Counterclaim in its Motion at 2:11,3-4.  Even

22   assuming this were proper (which it is not), "adjudication" in Counterclaimant's favor would then

23   trigger Democratic Underground's right to fees as prevailing party on the Counterclaim.  Plaintiff

24   ─────────────
     [17] The same rule applies in the trademark context.  *See, e.g., Stickrath v. Globalstar, Inc.*, 2008 U.S. Dist. LEXIS
25   95127 (N.D. Cal. May 13, 2008) (applying rule from *Cardinal* to trademark case; declining to dismiss counterclaim);
     *see also, Dominion Elec.*, 126 F.2d at 175.
     [18] The one case Righthaven cites does not require otherwise.  In *Smith v. Lenches*, 263 F.3d 972, 975, 977-78 (9th Cir.
26   2001) unlike the present case, the declaratory relief counterclaim covered separate supplemental state law claims,
     already pending in state court, that *would be litigated in state court regardless of the dismissal of the counterclaim.*
27   *See Id.* (holding that "the determination of whether California securities laws were violated will . . . be decided by
     California state courts . . . . So for the federal court to retain jurisdiction to give declaratory judgment of the same
     claims would result in a needless determinate of state law.").  *Smith* is, in fact, the exact opposition of the situation at
28   bar, where Righthaven contends that dismissal of the Counterclaim is warranted because the issue need *not* be
     independently litigated. Dkt. No. 36 at 23-24.

1   provides no support for the proposition that it may dispose of the Counterclaim by conceding its

2   merit, and yet avoid paying the fees the Counterclaim seeks and that Section 505 authorizes.

3         **C.      If the Original Complaint is Not Voluntarily Dismissed, the Counterclaim is
                   Not Subject to Dismissal as Redundant or Superfluous**

4

5         Righthaven's Motion concludes with a half-hearted suggestion that Democratic

6   Underground's Counterclaim is "superfluous," regardless of Plaintiff's dismissal of the

7   Complaint.  Motion at 24.  That argument is meritless.  Counterclaims for declaratory relief in

8   similar cases are allowed as a matter of course, even where they negate the claims in a complaint

9   or include issues raised as affirmative defenses, because they serve the added purpose of ensuring

10  adjudication of the issues that the Counterclaimant desires to resolve but that might not otherwise

11  be reached in adjudicating the complaint.  *See, e.g.*, *Leach v. Ross Heater & Mfg.  Co.*, 104 F.2d

12  88, 91-92 (2d Cir. 1939) (overruling district court's dismissal of counterclaim as duplicative of

13  underlying infringement claim); *Faulkner Press, LLC v. Class Notes, LLC*, 94 U.S.P.Q. 2d

14  (BNA) 1318 (N.D. Fla. Mar. 17, 2010) (refusing to dismiss counterclaim where it raised the

15  possibility of the copyright's invalidity); *MRSI Int'l, Inc. v. Bluespan, Inc.*, 2006 U.S. Dist.

16  LEXIS 68891, at *3-7 (D. Utah Sep. 21, 2006) (refusing to dismiss counterclaims as duplicative

17  of underlying claims or affirmative defenses because the court could potentially adjudicate the

18  underlying claims without reaching issues in declaratory relief claim); *United Wats, Inc. v.*

19  *Cincinnati Ins. Co.*, 971 F. Supp. 1375, 1381 (D. Kan. 1997) (rejecting as "without merit" motion

20  to dismiss counterclaims as redundant to underlying claim).   Indeed, because the answer

21  responds to the claims as the plaintiff frames them, the counterclaim is the opportunity for the

22  defendant to articulate the factual and legal bases that it claims need to be adjudicated and, in so

23  doing, define the issues subject to discovery, expert testimony, and adjudication.

24        Here, the Counterclaim alleges several different theories, in parallel with affirmative

25  defenses.  Many of these would not have to be addressed by the Court in rejecting Righthaven's

26  claims, as any one would suffice.  As the Supreme Court has put it, "an unnecessary ruling on an

27  affirmative defense is not the same as the necessary resolution of a counterclaim for declaratory

28  judgment."  *Cardinal*, 508 U.S. at 93-94; *see also Blackmer v. Shadow Creek Ranch Dev. Co.*,

1   2007 U.S. Dist. Lexis 99224, at *4-5 (S.D. Tex. June 26, 2007) (there is a "qualitative difference

2   between merely prevailing in Plaintiff's lawsuit, and receiving an affirmative declaration of

3   rights").  The Counterclaim therefore should proceed.[19]

4   ## CONCLUSION

5          For the reasons stated above, this Court should grant summary judgment in favor of

6   Defendants on the Complaint, deny the conditions proposed for the motion for voluntary

7   dismissal, deny the motion to dismiss the Counterclaim, and permit the Defendants to move for

8   attorneys' fees and costs pursuant to the Copyright Act.

9   Dated: December 7, 2010                FENWICK & WEST LLP

11                                         By:    /s/ Laurence F. Pulgram
                                                 LAURENCE F. PULGRAM, ESQ.
12                                               555 California Street, 12th Floor
                                                 San Francisco, California 94104
13                                               Telephone:  (415) 875-2300
                                                 Facsimile:   (415) 281-1350
14                                               lpulgram@fenwick.com

15                                         Attorneys for Defendant and Counterclaimant
                                           DEMOCRATIC UNDERGROUND, LLC, and
16                                         Defendant DAVID ALLEN

---

27   [19] The sole case that Plaintiff's cite in support of their "redundancy" argument does not undermine these conclusions.
     That case dealt with the narrow scenario, not present here, where the counterclaims and underlying claims
28   "overlap[ped] entirely" and where the relief sought was "indistinct."  *See Englewood Lending, Inc. v. G&G
     Coachella Invs., LLC*, 651 F. Supp. 2d 1141, 1143-44 (C.D. Cal. 2009).