LAURENCE F. PULGRAM (CA State Bar No. 115163) (*pro hac vice*)
lpulgram@fenwick.com
CLIFFORD C. WEBB (CA State Bar No. 260885) (*pro hac vice*)
cwebb@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, California 94104
Telephone:     (415) 875-2300
Facsimile:     (415) 281-1350

KURT OPSAHL (CA State Bar No. 191303) (*pro hac vice*)
kurt@eff.org
CORYNNE MCSHERRY (CA State Bar No. 221504) (*pro hac vice*)
corynne@eff.org
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street
San Francisco, California 94110
Telephone:     (415) 436-9333
Facsimile:     (415) 436-9993

CHAD BOWERS (NV State Bar No. 7283)
bowers@lawyer.com
CHAD A. BOWERS, LTD
3202 West Charleston Boulevard
Las Vegas, Nevada 89102
Telephone:     (702) 457-1001
Attorneys for Defendant and Counterclaimant
DEMOCRATIC UNDERGROUND, LLC, and
Defendant DAVID ALLEN

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| RIGHTHAVEN LLC, a Nevada limited liability company,<br><br>            Plaintiff,<br><br>    v.<br><br>DEMOCRATIC UNDERGROUND, LLC, a District of Columbia limited-liability company; and DAVID ALLEN, an individual,<br><br>            Defendants.<br><br>DEMOCRATIC UNDERGROUND, LLC, a District of Columbia limited-liability company,<br><br>            Counterclaimant,<br><br>    v.<br><br>RIGHTHAVEN LLC, a Nevada limited liability company, and STEPHENS MEDIA LLC, a Nevada limited-liability company,<br><br>            Counterdefendants. | Case No. 2:10-01356-RLH (GWF)<br><br>**DEFENDANTS' REPLY IN SUPPORT OF SUPPLEMENTAL MEMO ADDRESSING RECENTLY PRODUCED EVIDENCE RELATING TO PENDING MOTIONS** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTRODUCTION

Production of the Strategic Alliance Agreement ("SAA") revealed Righthaven's relationship with Stephens Media to be what was always suspected:  an illegitimate attempt to vest an entity with nothing more than the right to prosecute actions for copyright infringement. As the Ninth Circuit recognized in *Silvers*, Congress prohibited such arrangements under the Copyright Act.  Righthaven makes a half-hearted argument that for it to agree in the SAA that Stephens Media "shall retain" an "exclusive license" to all rights under the copyright *other* than the right to sue, Righthaven must have first held, for a nanosecond, all the rights it licensed back. Hogwash.  The exclusive license by which Stephens Media "retained" the real ownership in the copyright occurred *simultaneously* with its grant of any purported Assignment.   The reality is inescapable:  Stephens Media always retained the exclusive rights.  When Righthaven filed this action against Defendants, it had no rights other than the right to sue, and accordingly no standing to pursue any claims of copyright infringement.

In an effort to paper over this hole, Righthaven and Stephens Media have attempted an 11th-hour gambit:  on the same day they filed their brief, nine months after filing this lawsuit, they entered into a "Clarification and Amendment" of the SAA (the "Amendment"), attempting to create the illusion of ownership by Righthaven.  But no Amendment could cure this defect. Jurisdictional facts establishing standing must exist at the outset of litigation. They cannot be subsequently invented.  For these reasons, alone, rejection of Righthaven's claims is warranted.

In any event, the Amendment's efforts to "retroactively" recharacterize the SAA—as though all that matters is what the parties call their transaction, rather than its real effect—only reinforces the phony nature of Righthaven's purported ownership.  Recognizing that Stephens Media's possession of an exclusive license meant that Righthaven had none of the rights required to sue, the Amendment collusively renames Stephens Media as a "non-exclusive licensee."  But just changing the label does not vest Righthaven with genuine ownership or control.  Even under the Amendment, Stephens Media continues to dictate (i) whether any lawsuit can be filed by its agent, Righthaven; (ii) whether to reclaim the copyright at any time it wishes (for a nominal

1   payment of $10); and (iii) whether Righthaven can enter any other license—which Righthaven

2   has no demonstrated intention to do, and which the Amendment allows Stephens Media to veto.

3   Stephens Media's right to control any decision with respect to the copyright, including any

4   license to anyone else, shows that, regardless of wordplay, it is still the exclusive licensee.

5   This Court is obligated to look at the practical reality of the transaction, not merely the

6   labels employed in an attempt to evade the *Silvers* rule.  *See Nafal v. Carter*, 540 F. Supp. 2d

7   1128 (C.D. Cal. 2007), *aff'd* 388 Fed. Appx. 721 (9th Cir. 2010); *accord Righthaven v.*

8   *Majorwager.com*, 2010 WL 4386499, at *2 n.2 (D.Nev. Oct. 28, 2010) ("Regardless of the

9   assignment's assertions, if only a right to sue was transferred; Plaintiff may lack standing.").  The

10  very machinations orchestrated in the Amendment reveal Righthaven's "ownership" to be a sham.

11  ## I.      RIGHTHAVEN HAS NO STANDING UNDER THE ORIGINAL SAA

12  A plaintiff's standing is "an essential and unchanging part of the case-or-controversy

13  requirement of Article III."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  As such,

14  standing must be considered by the court in all cases, even where the parties fail to raise it.

15  *United States v. Hays*, 515 U.S. 737, 742 (1995).  Standing is not determined in the abstract, but

16  rather by the specific claims that a party brings.  *Allen v. Wright*, 468 U.S. 737, 752 (1984).

17  Only the "legal or beneficial owner of an exclusive right under a copyright is entitled . . .

18  to institute an action for any infringement."  17 U.S.C. § 501(b).  Section 501(b) limits standing

19  to pursue infringement actions to only those who possess one of the exclusive rights under 17

20  U.S.C. § 106.  *See Silvers v. Sony Pictures Entm't., Inc*., 402 F.3d 881, 890 (9th Cir. 2005) (*en*

21  *banc*).  *Silvers* explicitly rejected the notion that bare assignment of the right to sue, without even

22  one of the exclusive rights under Section 106, is sufficient.  *Id*.  In so doing, the Ninth Circuit

23  continued longstanding practice, reaching back to the 1909 Copyright Act, of unifying the right to

24  sue for infringement and ownership of some or all of the rights under copyright.  *Id*. at 886.

25  ### A.      There Was Never Any Transfer of Rights Under the SAA to Righthaven

26  Righthaven's argument that it ever legitimately possessed any exclusive rights under the

27  Assignment ignores both the clear language of the SAA and the practical reality of the

28  transaction.  Prior to the execution of any purported Assignment, Stephens Media held all of the

1    exclusive rights under Section 106 and the right to sue.  After the purported Assignment, as

2    defined by the SAA, Stephens Media continued to own these rights, and all that changed is that

3    Righthaven now claimed to have a right to sue for infringement.  No matter how Righthaven tries

4    to spin the transaction, in real terms it is still nothing but a bare assignment of the right to sue, a

5    transaction that *Silvers* specifically forbids.  *Silvers*, 402 F.3d at 890.

6         Righthaven's Response tries to push these facts under the rug by focusing almost

7    exclusively on the Assignment itself in isolation, claiming that "[a]t the moment of the

8    Assignment, Righthaven became the owner of the Work."  *See* Dkt. 100 ("Response") at 6.  This

9    is pure misdirection, as the SAA, by its terms, governs all assignments from Stephens Media to

10   Righthaven.  Hinueber Decl. Ex. 2 ("SAA") § 7.1.  The SAA makes clear that Righthaven never

11   obtained *any* rights under *any* Assignment, other than the right to sue.  Section 7.2 simultaneously

12   provides that Stephens Media "***shall retain***" "an exclusive license" to Exploit the work

13   purportedly assigned, and denies Righthaven any rights to Exploit the assigned works other than

14   by litigation.  SAA § 7.2 (emphasis added).  Under this structure, no rights under Section 106

15   ever actually change hands, not even for a nanosecond.

16        Righthaven misreads the SAA in arguing that it was granted, if only for a moment, rights

17   in the work—rights that it concedes it simultaneously transferred back to Stephens Media.  *See*

18   Response at 8.  Ignoring the word "retain[s]," Righthaven hangs its hopes on the fiction of a

19   nanosecond of ownership, contending that "there can be no license [granted back to Stephens

20   Media] until ***after*** the assignment of ownership rights and the right to sue."  *Id*. (emphasis in

21   original).   Of course, since the "Assignment" and Stephens Media's retaining of its right to

22   exploit occurred *simultaneously* through the SAA, not even a nanosecond passed.  But whether a

23   nanosecond passed or not, that is not the kind of unity of exclusive rights and the right to sue

24   required under American copyright law for the last century.  *See Silvers*, 402 F.3d at 886.  If

25   anything, such a construct only thumbs its nose at the *Silvers* rule.[1]

---

26   [1] In arguing that it had a nanosecond of ownership, Righthaven effectively concedes that, after all the Section 106
rights are transferred "back" to Stephens Media, Stephens Media is by definition the exclusive owner, leaving

27   Righthaven nothing left of the exclusive rights under Section 106.  *See* 17 U.S.C. § 101 (definition of "transfer of
copyright ownership" as including a transfer of exclusive license); *see also Campbell v. Trustees of Stanford Univ.*,

28   817 F.2d 499 (9th Cir. 1987); *US Naval Institute v. Charter Comm's*, 936 F. 2d 692, 695 (2d Cir. 1991).

1    The SAA is also littered with confirmation that even any ephemeral ownership by

2  Righthaven would be a fiction.  After an "Assignment," Stephens Media still has: the "unfettered

3  and exclusive ability" to "use, make, sell, or otherwise exploit in any manner whatsoever" the

4  work "for any lawful purpose" (SAA § 7.2); the sole right to "receipt of royalties from the

5  Exploitation" (*id*.); the right to "sell, grant any Encumbrance on or in or assign, any of Stephens

6  Media Assigned Copyrights to any third Person" (*id*. § 9.3); the right to choose whether or not an

7  alleged infringer will be sued at all (*id.*§ 3.3); and a right or automatic reversion should

8  Righthaven decide *not* to pursue an infringement action.  *Id*. § 3.3.   Perhaps most starkly,

9  Stephens Media maintains "the right at any time to terminate, in good faith, any Copyright

10  Assignment . . . and enjoy a right of complete reversion to the ownership."  *Id*. § 8.[2]  These rights

11  are, by their nature, incidents of ownership.  Their investment in Stephens Media undermines any

12  suggestion that Righthaven is the real owner.

13    The bogus nature of this set up goes deeper than just the SAA, however.  Righthaven's

14  Operating Agreement ("RHOA"), part of an "integrated transaction" with the SAA that governs

15  Righthaven's operation as an LLC (SAA § 2), describes its "Focus"—that is, the *only* activity it

16  may engage in (absent a vote of the members—which has not been asserted here).  Declaration of

17  Laurence Pulgram ("Pulgram Decl.") Ex. 1 ("RHOA") at § 3.  Pursuant to the RHOA,

18  Righthaven was created "to receive a limited, revocable assignment (with a license-back) of

19  copyrights from third Persons in order to enable the Company to recover damages associated with

20  Identified Infringements." *Id.* § 3.2(c).  While Righthaven would submit copyright registration

21  applications that identify itself as the owner, its charter provides that any "customer that

22  respectively assigned said copyrights would ultimately enjoy the copyright registration upon

23  revocation of the assignment."  RHOA § 3.2(d); *see also* SAA § 8 (referencing "registrations of

24  copyrights made and/or procured by Righthaven for the benefit of Stephens Media.").  This Focus

25

---
26  [2] Righthaven contends that Stephens Media's right of reversion "has no impact on Rigthhaven's current ownership status . . . unless and until Stephens Media exercises its right of reversion . . . [and] that there is nothing *in the record*
27  to suggest it will."  Response at 7 (emphasis added). While Section 3.2(d) of the Righthaven's Operating Agreement was not then "in the record," it clarifies that the entire plan was always that Stephens Media would revoke the
28  assignment and enjoy the benefit of any copyright registration that Righthaven secures.

on bringing lawsuits reconfirms that Righthaven's purported "ownership" served no purpose

other than to litigate, thereby precluding its standing to sue when this case was filed.

## II.   BECAUSE RIGHTHAVEN HAD NO STANDING WHEN IT FILED ITS COMPLAINT, ITS CLAIM MUST BE DISMISSED

Regardless of the Amendment's terms, the fact that Righthaven had no standing to pursue

this action at the time it filed its complaint disposes of its claim.  In determining standing, the

existence of federal jurisdiction ordinarily depends on the facts as they exist at the time the

complaint is filed.  *Lujan*, 504 U.S. at 569.  While a court may allow the amendment of a

defective *allegation* of jurisdiction, it cannot allow an amendment of defects in the jurisdictional

*facts* themselves; if the underlying facts when filed cannot create jurisdiction, the case must be

dismissed regardless of whether jurisdiction is manufactured later.  *See, e.g., Gaia Techs., Inc. v.

Reconversion Techs., Inc.*, 93 F.3d 774, 779-80 (Fed. Cir. 1996).

Accordingly, a decision remarkably similar to the present case rejected an attempt to

sidestep *Silvers'* ban on the assignment of the bare right to sue, holding that a later transfer of

Section 106 rights could not cure the lack of standing at the outset.  *Benchmark Homes, Inc. v.

Legacy Home Builders LLC*, 2006 U.S. Dist. LEXIS 53879, at *16 (D. Neb. Jan. 26, 2006).

Likewise with patents and trademarks, where a plaintiff initiates an action without rights in the

intellectual property, even where they subsequently obtain those rights, their lack of standing

cannot be cured and the case should be dismissed.  *See, e.g. Gaia Techs.*, 93 F.3d at 779-80

(reversing trial court's failure to dismiss where a party lacked ownership of a patent and

trademark at outset of litigation but subsequently executed a *nunc pro tunc* assignment); *Enzo

Apa & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1092-94 (Fed. Cir. 1998) (granting summary

judgment where the plaintiff had initiated the suit as a non-exclusive patent licensee with no

standing, despite subsequent grant of an exclusive licensee purporting to have retroactive effect).[3]

---

[3] The cases cited by Righthaven do not dictate a contrary result.  The majority address the situation where an oral assignment of rights was later ratified by the required written agreement (*Billy-Bob Teeth, Inc v. Novelty, Inc.*, 329 F.3d 586 (7th Cir. 2003); *Imperial Residential Design, Inc. v. The Palms Dev. Group, Inc.*, 70 F.3d 96, 99 (11th Cir. 1995); *Arthur Rutenberg Homes, Inc. v. Drew Homes, Inc.*, 29 F.3d 1529, 1532 (11th Cir. 1994)); or address a situation in which an assignment was simply silent on the matter of the right to sue for past infringement.  *Intimo, Inc. v. Briefly Stated, Inc.*, 948 F. Supp. 315 (S.D.N.Y. 1996); *Infodek, Inc. v. Meredith-Webb Printing Co., Inc.*, 830 F. Supp. 614 (N.D. Ga. 1993).  Crucially, none deal with the type of situation here where a plaintiff initially enters an illegitimate transaction and later tries to back fill its lack of any semblance of rights to pursue an action.

REPLY IN SUPPORT OF DEFENDANT'S                    5                    CASE NO. 2:10-cv-01356-RLJ (GWF)
SUPPLEMENTAL MEMO

1    Because Righthaven definitively lacked any exclusive rights at the time the complaint was

2    filed, as in *Benchmark*, it cannot cure this defect by later machinations.[4]

3    **III.    RIGHTHAVEN'S AMENDMENT DOES NOT PROVIDE IT STANDING, BUT
         MERELY RECONFIRMS THE SHAM NATURE OF ITS "OWNERSHIP"**

4
5    In a tacit acknowledgement of the flaws inherent in the SAA, Righthaven and Stephens

6    Media signed the Amendment to the SAA on the very day Righthaven's Response was filed, May

7    9, 2011. *See* Hinueber Decl. Ex. 3. Righthaven claims that the purpose of the Amendment is to

8    "cure any possible doubt as to whether Righthaven has full ownership in an assigned copyright,"

9    and, accordingly, standing to pursue this and its hundreds of other suits. Response at 3. The

10   Amendment fails in its purpose for at least three reasons. First, as explained above, regardless of

11   the Amendment's effect now, Righthaven had no standing at the time the complaint was filed, a

12   defect that cannot be fixed *nunc pro tunc*. Second, as explained below, the Amendment's

13   cosmetic rewording does not change the reality that Stephens Media is still the holder of all of the

14   exclusive rights in the copyright with full control over Righthaven's actions. Finally, even

15   assuming the Amendment technically sufficed to vest some indicia of ownership in Righthaven,

16   an inquiry beneath that window dressing reveals its entirely sham nature.

17   **A.    Stephens Media Still Retains Actual Ownership Under the Amendment**

18   The most substantial, and at the same time most transparent, change is the Amendment to

19   Section 7.2. As noted, Section 7.2 of the original SAA provided that, simultaneously with

20   execution of an assignment from Stephens Media to Righthaven, Stephens Media would "retain

21   (and Righthaven hereby grants) an exclusive license" to exploit the assigned work. SAA § 7.2.

22   Amended Section 7.2 now reads that, simultaneously with assignment, "Stephens Media is

23   granted a non-exclusive license to Exploit [the work] to the greatest extent permitted by law in

24   consideration of payment [of] $1.00." Amendment § 7.2. This artful wordplay and token grant

25   of consideration attempts to manufacture the illusion of some transfer of interest greater than the

26   original SAA. But analysis of the Amendment reveals the insertion of the "non" before

---

27   [4] Righthaven's suggestion that Democratic Underground cannot challenge its standing to sue as a non-party to the
     SAA finds its answer and rebuttal in *Silver* and the other cases cited above, like *Gaia Technologies* or *Benchmark*,
28   which necessarily allowed such challenges either by the parties or the court itself.

1    "exclusive" to be a change in optics only.  Stephens Media still controls all exclusive rights, and

2    the Righthaven shakedown will continue to operate exactly as it has before, with Righthaven's

3    interest remaining only pursuit of litigation, and nothing more.

4          Even in defining the rights that Righthaven receives, Section 7.2 of the Amendment

5    effectively nullifies them.  Specifically, although Righthaven now purportedly holds some rights

6    to "Exploit" the work beyond litigation, it cannot do so in any manner without giving Stephens

7    Media 30 days notice and opportunity to object.  *Id*. § 7.2.  Transparently, this provision preserves

8    Stephens Media's authority to make all decisions about exploitation of the work, since it may

9    "within 14 days of providing notice" reclaim "all right, title and interest" in the copyright through

10   payment of a nominal $10 fee to Righthaven.  *Id*. § 8.1.  Righthaven lacks even the option to

11   license in breach of Stephens Media's right to pre-approve and to pay contract damages.  Rather,

12   consistent with its status as the true owner, Stephens Media has an uncontestable right to enjoin

13   such use.  *Id.*  (Righthaven's failure to give notice is "a material breach of this Agreement and

14   would cause Stephens Media irreparable harm," remedial by an injunction).  In reality, Stephens

15   Media remains that exclusive licensee even after the Amendment:  it not only has unlimited rights

16   to use the work, it retains the *exclusive* rights to the work until *it decides to approve* exploitation

17   by another—an event not even alleged to have happened.

18         Moreover, any attempt by Righthaven to exploit the work on its own behalf would be

19   inconsistent with its own charter.   The only provision of the RHOA that authorizes non-litigation

20   conduct allows Righthaven to license other person's works on a commission basis, not to license

21   works on its own behalf.  *See* RHOA § 3.2(g) (third parties may "repose" rights in Righthaven for

22   it to collect royalties, only under a structure whereby Righthaven would "receive a percentage of

23   said royalties in consideration of the Company's service in this regard").  Righthaven has neither

24   authority nor legal capacity to exploit any rights without Stephens Media's approval.

25         Perhaps as significant as what the Amendment did change is what it did not.  It did not

26   alter Stephens Media's absolute authority to decide whether or not to sue (SAA §3.3); to receive

27   reversion of the assignment if Righthaven declines to sue (*id.*); to halt any litigation and reclaim

28   the copyright at any time (*id.* § 8.2); and to encumber the copyright it purportedly does not own.

*Id.* §9.3.  Even under the Amendment, all incidents of ownership and control stay with Stephens Media, nullifying Righthaven's contrary claim.[5]  *See, e.g., In re Computer Eng'g Assoc., Inc.,* 337 F. 3d 38, 46 (1st Cir. 2003) ("[t]o be an effective assignment, the assignor must divest itself of all right, interest, and control in the property assigned").

### B.   Even If the Amendment Were Technically Effective, It Only Confirms the Sham Nature of the Assignment and Cannot Confer Standing

Even were this Court to conclude that the Amendment technically vested Righthaven with some exclusive rights under Section 106, this would not change the fact that the Amendment should be disregarded as a sham, created for the sole purpose of manufacturing standing.  The Court has the duty to look behind an arrangement purporting to conform with *Silvers* to determine the actual substance of the transaction—a task best exemplified by Judge Wilson's opinion in *Nafal v. Carter*, 540 F. Supp. 2d 1128 (C.D. Cal. 2007), *aff'd* 388 Fed. Appx. 721 (9th Cir. 2010).

Nafal claimed standing to sue to enforce a copyright in an Egyptian melody allegedly infringed in the song "Big Pimpin."  As here, Nafal had originally entered into an arrangement providing no standing to sue—a "Joint Venture" with the exclusive licensee of the melody to prosecute suits for its infringement.  540 F. Supp. at 1133.  Several years later, Nafal entered an additional agreement, signed by the exclusive licensee and the original copyright holder, purportedly to become "co-exclusive licensee" in the copyright (a status that would confer the right to sue), receiving "an undivided one-half (50%) of [the] rights, title and interest."  *Id.* at 1141.  In fact, however, just as here, Nafal's actual rights were substantially controlled by his grantor.  Specifically, the court found that "(1) he has no discretion to decide when an alleged infringer should be sued; (2) . . . Plaintiff's 'interest' in [the work] would have been terminable if a lawsuit had not been filed within 180 days; (3) [and] nearly every effort by Plaintiff to exploit [the work] must be approved in advance by [the assignor]."  *Id.* at 1143.

---

[5] Righthaven's suggestion that its entitlement to $1 per year from Stephens Media creates a beneficial ownership is specious.  *See* Response at 10.  A "beneficial owner" is "an author who had parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees."  *Cortner v. Israel*, 732 F.2d 267, 271 (2d Cir. 1984) (*quoting*, H.R. Rep. No. 1476, 94th Cong., 2d Sess. 159, reprinted in 1976 U.S. Code Cong. & Ad. News 5659, 5775).  The beneficial owner, as assignor, is entitled to assert an equitable interest because its revenue will fall if the *assignee* does not take care of the copyright.  Righthaven claims to be an owner, not an assignor.  Nor does its interest depend on licensing by Stephens Media.  It will get its right to a dollar no matter what.  Amendment § 7.

1    Judge Wilson rejected this attempt to dodge the *Silvers* rule, finding the parties description

2    of an "Assignment Agreement" as creating joint ownership of the exclusive license "not

3    dispositive." Instead, the nature of the transaction was "'governed by the substance of what was

4    given to the licensee and not the label that the parties put on the agreement.'" *Id.* at 1141-42

5    (*quoting Althin CD Med., Inc., v. West Suburban Kidney Ctr.*, 874 F. Supp. 837, 843 (N.D. Ill.

6    1994)). Despite the purported grant of an "exclusive license," the reality of the transaction was

7    that "Plaintiff has no standing because he is at best a glorified non-exclusive licensee to whom

8    [the grantor] may from time to time assign a cause of action." *Nafal*, 540 F. Supp. 2d at 1143-44.

9    "The Court is not required to accept the formalistic labels attached by [the contracting parties] to

10   their agreement, which would permit them to massage the underlying effect of their contractual

11   relationship." The Ninth Circuit affirmed, agreeing that "the documents were a disguised

12   assignment of a cause of action prohibited under *Silvers*." *Nafal*, 388 Fed. Appx. at 723.

13   The same analysis applies to the effort by Righthaven and Stephens Media to massage

14   their own contractual relationship to disguise the assignment of a cause of action. This Court

15   should see through the relabeling of an "exclusive license" as a lesser, "non-exclusive" license for

16   which Stephens Media must, perversely, now pay an additional $1 a year royalty. Even post-

17   Amendment, Righthaven, like Nafal, cannot prosecute any infringement claim unless pre-

18   approved by its "assignor." SAA § 3.3; *see also Althin*, 874 F. Supp. at 843 (no standing to sue

19   where original copyright owner, "retained the sole right to determine whether or not any

20   infringement actions would be brought"). As in *Nafal*, the copyright will be "reassigned" to

21   Stephens Media if Righthaven does not go forward with suit within 60 days. SAA § 3.3. And,

22   going even further than in *Nafal*, Stephens Media can reclaim the copyright even *after* suit is

23   brought for the nominal price of $10. The "disguised assignment of a cause of action" here is at

24   least as obvious, and no more enforceable, than in *Nafal*.[6]

_____

[6] Democratic Underground notes that it has asserted an affirmative defense of champerty, though it did not
affirmatively plead that cause of action in its Counterclaim. *See Del Webb Communities, Inc. v. Partington*, 2009
WL 3053709, at *3 (D. Nev. Sep. 18, 2009) (recognizing champerty cause of action in Nevada and describing it as
"maintaining a suit in return for a financial interest in the outcome"); Patry on Copyright, Section 5:136 (champerty
shown "where the assignment of the copyright was a sham designed to disguise the real intent of conveying the chose
in action"). It intends to amend its Counterclaim following decision of the outstanding motions to state such a claim
against Righthaven, and to the extent that leave to amend may be required, it respectfully so requests.

1    Remarkably, there is not even the pretense that, by relabeling Stephens Media's rights as

2    "non-exclusive," Righthaven will now start granting additional licenses to others.  To the

3    contrary, the declarations of Mr. Hinueber and Mr. Gibson attest only that the SAA was intended

4    to allow Righthaven to sue on Stephens Media's behalf, and that the intent of the Amendment is

5    to strengthen that possibility.  But that testimony ultimately backfires: it merely reconfirms that

6    the Amendment's purported reconstruction of some rights in Righthaven *other* than a naked right

7    to sue is slight of hand, designed to do nothing other than to skirt *Silvers*.

8    The very label of the Amendment as a purported "Clarification" evinces its disingenuity.

9    No one suggests that, when the SAA was signed, the parties intended the "exclusive" license to

10   Stephens Media actually to be "*non*-exclusive," or that Stephens Media would relinquish, rather

11   than "retain" all exclusive rights.  Nor, when the SAA expressly prohibited all exploitation of the

12   work by Righthaven, did the parties actually intend Righthaven to have the opposite rights. *See*

13   RHOA § 3.2(c).  No "clarification" was needed.  What the Amendment actually does is *reverse*

14   the language of the SAA, for no purpose other than to feign an ownership interest in Righthaven.

15   Examining the substance of this transaction, the sham is patent.  While a peppercorn may

16   be sufficient to constitute consideration for contract analysis, adding a nominal fee and the prefix

17   "non" is not enough to evade the requirement of an actual ownership interest in a copyright.

18   ## CONCLUSION

19   For all of the foregoing reasons, Defendants respectfully request the entry of judgment in

20   favor of Defendants on the Complaint and denial of the motion to dismiss the Counterclaim.[7]

21

22   Dated:    May 20, 2011                              FENWICK & WEST LLP

23                                                       BY: */s/ Laurence F. Pulgram*

24                                                       Laurence F. Pulgram

25                                                       Attorneys for Defendants

26

---

27   [7] To the extent the record is deemed not sufficient to grant judgment, Democratic Underground would be entitled to discovery regarding disputed facts, including those raised by the Hinueber and Gibson declarations.  In all events, dismissal of its Counterclaim could not be warranted absent such discovery.

28