# EXHIBIT 1

# OPERATING AGREEMENT

## OF

## RIGHT*HAVEN* LLC

## A NEVADA LIMITED-LIABILITY COMPANY

**Confidential**
**Attorneys Eyes only**

THE INTERESTS DESCRIBED AND REPRESENTED BY THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "SECURITIES ACT" OR ANY APPLICABLE STATE SECURITIES LAWS ("STATE ACTS") AND ARE RESTRICTED SECURITIES AS THAT TERM IS DEFINED IN RULE 144 UNDER THE SECURITIES ACT.  THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR QUALIFICATION UNDER THE SECURITIES ACT AND APPLICABLE STATE ACTS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND APPLICABLE STATE ACTS, THE AVAILABILITY OF WHICH IS TO BE ESTABLISHED TO THE SATISFACTION OF THE COMPANY.

**Confidential**
**Attorneys Eyes only**

## TABLE OF CONTENTS

Article 1. DEFINITIONS AND INTERPRETATIONS ................................................. 1
    1.1        Terms. ............................................................................................. 1
    1.2        Definitions. ...................................................................................... 1

Article 2. FORMATION OF COMPANY ................................................................ 1
    2.1        Formation. ....................................................................................... 1
    2.2        Name. .............................................................................................. 1
    2.3        Place of Business. ........................................................................... 2
    2.4        Registered Office and Registered Agent. ......................................... 2
    2.5        Term. .............................................................................................. 2

Article 3. LEGAL AUTHORITY OF THE BUSINESS OF THE COMPANY &
PURPOSE OF THE COMPANY ........................................................................... 2
    3.1        Scope Of Legal Authority Of The Business Of The Company ............. 2
    3.2        The Company's Focus. ..................................................................... 3

Article 4. NAMES, ADDRESSES AND RESPECTIVE MEMBERSHIP
INTERESTS OF THE MEMBERS ........................................................................ 4
    4.1        Names and Addresses. ..................................................................... 4
    4.2        Membership Interests. ..................................................................... 4

Article 5. RIGHTS AND DUTIES OF MANAGER ................................................. 5
    5.1        Management. .................................................................................... 5
    5.2        Certain Powers of the Manager. ...................................................... 5
    5.3        Limitations on Authority. ................................................................ 7
    5.4        Liability for Certain Acts. ............................................................... 8
    5.5        Bank Accounts. ............................................................................... 9
    5.6        Indemnity of the Manager, Employees and Other Agents. ................ 9
    5.7        Resignation. .................................................................................... 9
    5.8        Removal. ......................................................................................... 9
    5.9        Vacancies. ..................................................................................... 10
    5.10      Reimbursement, Organization Expenses. ....................................... 11
    5.11      Right to Rely on the Manager. ...................................................... 11

Article 6. APPOINTMENT OF OFFICERS, AUTHORITY AND
COMPENSATION ............................................................................................. 11
    6.1        Appointment and Termination. ...................................................... 11
    6.2        CEO. ............................................................................................. 12
    6.3        Authority of the CEO. ................................................................... 12
    6.4        COO. ............................................................................................. 14

i

**Confidential**
**Attorneys Eyes only**

SM000097

| | | |
|---|---|---|
| 6.5 | Authority of the COO. | 14 |
| 6.6 | CAO. | 14 |
| 6.7 | Authority of the CAO. | 15 |
| 6.8 | Expenses. | 15 |

Article 7. RIGHTS AND OBLIGATIONS OF MEMBERS ......... 15

| | | |
|---|---|---|
| 7.1 | Limitation of Liability. | 15 |
| 7.2 | List of the Members. | 15 |
| 7.3 | Members Have No Agency Authority | 16 |
| 7.4 | Company Books. | 16 |
| 7.5 | Priority and Return of Capital. | 16 |

Article 8. MEETING OF MEMBERS ......... 16

| | | |
|---|---|---|
| 8.1 | Annual Meetings. | 16 |
| 8.2 | Quarterly Meetings. | 17 |
| 8.3 | Special Meetings. | 17 |
| 8.4 | Place of Meetings. | 17 |
| 8.5 | Notice of Meetings. | 17 |
| 8.6 | Meetings of all Members. | 18 |
| 8.7 | Record Date. | 18 |
| 8.8 | Quorum. | 18 |
| 8.9 | Manner of Acting. | 18 |
| 8.10 | Proxies. | 19 |
| 8.11 | Action by Members Without a Meeting. | 19 |
| 8.12 | Waiver of Notice. | 19 |
| 8.13 | Manager Participation In Member Meetings. | 19 |

Article 9. CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS ...... 20

| | | |
|---|---|---|
| 9.1 | Members' Capital Contributions. | 20 |
| 9.2 | Capital Accounts. | 20 |

Article 10. RESERVED ......... 20

Article 11. ALLOCATIONS, INCOME TAX, DISTRIBUTIONS, ELECTIONS AND REPORTS ......... 20

| | | |
|---|---|---|
| 11.1 | Allocations of Profits and Losses. | 20 |
| 11.2 | Distributions. | 20 |
| 11.3 | Accounting Principles. | 21 |
| 11.4 | Interest on and Return of Capital Contributions. | 21 |
| 11.5 | Accounting Period. | 21 |
| 11.6 | Records and Reports. | 21 |
| 11.7 | Returns and other Elections. | 22 |
| 11.8 | Tax Matters Partner. | 22 |

ii

**Confidential**
**Attorneys Eyes only**

SM000098

Article 12. CONFIDENTIALITY AND NONCOMPETITON .......................................22

Article 13. BUDGET...........................................................................................24

Article 14. RESERVED........................................................................................24

Article 15. TRANSFERABILITY ...........................................................................24
    15.1        General. ........................................................................................24
    15.2        Right of First Refusal. ....................................................................24
    15.3        Transfers Not Recognized in Absence of Consent. ...........................26
    15.4        Additional Conditions to Recognition of Transferee.........................27
    15.5        Change of Control Forfeiture. .........................................................28

Article 16. ISSUANCE OF MEMBERSHIP INTERESTS.............................................28

Article 17. DISSOLUTION AND TERMINATION .....................................................28
    17.1        Dissolution.....................................................................................28
    17.2        Effect of Dissolution. .....................................................................29
    17.3        Winding Up, Liquidation and Distribution of Assets. .........................29
    17.4        Filing or Recording Statements........................................................30
    17.5        Return of Contribution Nonrecourse to Other Members......................30

Article 18. MISCELLANEOUS PROVISIONS ..........................................................30
    18.1        Notices..........................................................................................30
    18.2        Books of Account and Records. ........................................................30
    18.3        Business Reports. ...........................................................................31
    18.4        Application of State Law. ................................................................31
    18.5        Waiver of Action for Partition. ........................................................31
    18.6        Amendments. ................................................................................31
    18.7        Execution of Additional Instruments.................................................32
    18.8        Effect of Inconsistencies with the Act...............................................32
    18.9        Reserved. ......................................................................................32
    18.10      Rights and Remedies Cumulative......................................................32
    18.11      Severability....................................................................................32
    18.12      Heirs, Successors and Assigns. ........................................................33
    18.13      Creditors. ......................................................................................33
    18.14      Counterparts...................................................................................33
    18.15      Reserved. ......................................................................................33
    18.16      Power of Attorney. .........................................................................33
    18.17      Investment Representations. .............................................................34
    18.18      Representations and Warranties. .......................................................35

Article 19. SECURITIES MATTERS........................................................................37

iii

**Confidential**
**Attorneys Eyes only**

SM000099

19.1.      No Parole Reliance..........................................................................37
19.2.      Own Account. ...............................................................................38
19.3.      Accurate Information. ....................................................................38
19.4.      Risk Factors Disclosure. ................................................................38

SCHEDULE 1 - DEFINITIONS..................................................................1
EXHIBIT 5.8        ARBITRATION
EXHIBIT 6          EMPLOYMENT AGREEMENTS
EXHIBIT 9.1        INITIAL CAPITAL CONTRIBUTIONS
EXHIBIT 9.1(A)     ASSIGNMENT
EXHIBIT 13         BUDGET
EXHIBIT 18.1       NAME, ADDRESS AND MEMBERSHIP INTEREST

**Confidential**
**Attorneys Eyes only**

SM000100

THIS Operating Agreement (the "Agreement") is made and entered into this 18th day of January, 2010 (the "Effective Date"), by and amongst Right*haven* LLC, a Nevada limited-liability company (the "Company"), Net Sortie Systems, LLC, a Nevada limited-liability company ("Net Sortie") and SI Content Monitor LLC, an Arkansas limited-liability company ("Stephens"). In consideration of the mutual covenants herein contained and for other good and valuable consideration, the Members and the Company hereby agree as set forth below.

## ARTICLE 1.
### DEFINITIONS AND INTERPRETATIONS

1.1     Terms.

Certain terms used herein shall have the meanings set forth in Schedule 1.

1.2     Definitions.

All the defined terms as set forth in Schedule 1, if defined in the singular or present tense, shall also retain such general meaning if used in the plural or past tense, and if used in the plural or past tense, shall retain the general meaning if used in the singular or present tense, and the masculine gender shall include the feminine and neuter genders and vice versa.

## ARTICLE 2.
### FORMATION OF COMPANY

2.1     Formation.

In January 2010, the Company was organized as a limited-liability company pursuant to the Act by executing and delivering articles of organization to the Nevada Secretary of State in accordance with and pursuant to the Act. The Company and the Members hereby forever discharge the organizer, and the organizer shall be indemnified by the Company and the Members from and against, any expense or liability actually incurred by the organizer by reason of having been the organizer of the Company.

2.2     Name.

The name of the Company is Right*haven* LLC, a Nevada limited-liability company.

1

**Confidential**
**Attorneys Eyes only**                              SM000101

2.3    Place of Business.

The principal place of business of the Company shall be 7201 West Lake Mead Boulevard, Suite 580, Las Vegas, Nevada or at such other place that the Manager may deem appropriate from time to time (any such location shall be known herein as the "Principal Place of Business"). The Manager may create additional offices from which the Company may conduct Business as the Manager may deem appropriate from time to time (the "Additional Offices"). The Manager shall promptly provide Notice to all Members of any change in the Principal Place of Business as well as all Additional Offices.

2.4    Registered Office and Registered Agent.

The Company's initial registered office and the name of the registered agent at such address shall be as set forth in the Articles of Organization. The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Nevada Secretary of State pursuant to the Act.

2.5    Term.

The Company shall continue in existence until the Company terminates in accordance with the provisions of this Agreement or the Act (with such date upon which such termination occurs, if ever, known herein as the "Termination Date").

**ARTICLE 3.**
**LEGAL AUTHORITY OF THE BUSINESS OF THE COMPANY & PURPOSE OF THE COMPANY**

3.1    Scope Of Legal Authority Of The Business Of The Company.

The business of the Company (the "Business") shall be to:

(a)    engage in any lawful activity, including, without limitation, any and all activities in the effectuation, furtherance and fostering of the Focus;

(b)    exercise all other powers necessary to, or reasonably connected with, the Business which may be legally exercised by limited-liability companies under the Act; and

(c)    engage in all activities necessary, customary, convenient, or incident to any of the foregoing.

2

**Confidential**
**Attorneys Eyes only**

SM000102

3.2    The Company's Focus.

The Company shall be unfettered in the Company's ability to conduct the Business; provided, however, that the Company shall devote the Company's full energies to the following activities which are recognized by the Members as the focus of the Company (the "Focus"), and which shall only be changed upon an affirmative vote of the Members holding at least a Super-Majority Interest (provided, further, that nothing in this Section 3.2 shall restrict the Manager and/or the officers from conducting Business operations that are reasonable expansions of, and upon, the Focus and/or reasonably related Business operations):

(a)    provide the means to third Persons to address and remedy copyright infringements consistent with the approach set forth in this Section 3.2;

(b)    solicit from third Persons the self-identified existence of copyright infringements ("Self-Identified Infringements");

(c)    identify for third Persons copyright infringements ("Company Identified Infringements" and Self-Identified Infringements and Company Indentified Infringements known herein as "Identified Infringements") to receive a limited, revocable assignment (with a license-back) of copyrights from third Persons in order to enable the Company to recover damages associated with Identified Infringements;

(d)    submit applications for copyright registrations with relevant national copyright offices in relevant nations throughout the world in order to effect copyright registrations that will serve as a basis of the recoveries of damages associated with Identified Infringements whereby those applications will identify the Company as the owner of the copyright and whereby the Company's respective customer that respectively assigned said copyrights would ultimately enjoy the copyright registration upon revocation of the assignment of said respective copyrights to the Company;

(e)    pursue through all reasonable legal means the recovery of damages (sounding in actions grounded exclusively in copyright infringement) arising out of Identified Infringements;

(f)    provide licenses for a fee to third Persons (the "Mark Licensees") of the Company's service mark (as a certification mark) to place on third Persons media indicating to the public at large that the Mark

3

Licensees are provided protective service by the Company to
address copyright infringements;

(g)     be a means through which third Persons may repose with the
Company the rights required to enable the Company to effect use-
based licenses to other third Persons for a royalty whereby the
Company is permitted to receive a percentage of said royalties in
consideration of the Company's service in this regard; and

(h)     do all other acts, acquire all property, hire all employees, engage all
subcontractors and/or service providers necessary, appropriate
and/or desirable to effect, further and/or administer all of the items
set forth in this Section 3.2(a) through Section 3.2(g).

## ARTICLE 4.
## NAMES, ADDRESSES AND RESPECTIVE MEMBERSHIP INTERESTS OF THE MEMBERS

4.1     Names and Addresses.

The names and addresses (unless otherwise designated by the initial Members) of
the initial Members are as follows:

| NAME | ADDRESS |
|------|---------|
| Net Sortie | 9506 West Flamingo Road, Suite 101<br>Las Vegas, Nevada  89147 |
| Stephens | 111 Center Street, Suite 2500<br>Little Rock, Arkansas 72201 |

The names and addresses of all of the Members shall be maintained by the Manager as
provided under Section 11.6.

4.2     Membership Interests.

The respective percentage of ownership by each Member of the equity interest of
the Company shall be equal to the percentage listed by each Member's name on
Exhibit 18.1 (such respective percentage interest of ownership shall be known herein as
a "Membership Interest").

4

**Confidential**
**Attorneys Eyes only**

SM000104

## ARTICLE 5.
## RIGHTS AND DUTIES OF MANAGER

5.1     Management.

The Business and affairs of the Company shall be managed by the Company's Manager. Subject to Section 5.8, the Manager of the Company shall be Net Sortie. Except for situations in which the approval of the Members is expressly required by this Agreement or by non-waivable provisions of applicable law, the Manager shall have full and complete authority, power and discretion to manage and control the Business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts and activities customary or incident to the management of the Business. The Manager shall have the authority to act on behalf of the Company, and to legally bind the Company, and to delegate to any Officer, in writing, authority to make disbursements out of Company accounts with financial institutions. Unless authorized to do so by this Agreement or by the Manager, no Officer, employee or other agent of the Company, other than the Manager, shall have any power or authority to bind the Company in any way, to pledge the Company's credit or to render the Company liable pecuniarily for any purpose. Notwithstanding the foregoing, as provided further in Article 6, the Manager hereby delegates full power and authority to the CEO (as defined in Article 6) to implement all policies and decisions made by the Manager with respect to the day-to-day management and operation of the Business and affairs of the Company (including, without limitation, those powers set forth in Section 5.2, subject to the provisions of Section 5.3 and other provisions of this Agreement requiring approval by Members holding at least a Super-Majority Interest.

5.2     Certain Powers of the Manager.

Without limiting the generality of Section 5.1 but subject to the limitations of Section 5.3, the Manager shall have full power and authority, on behalf of the Company:

(a)     to acquire property from any Person as the Manager may determine;

(b)     to borrow money for the Company from banks, other lending institutions, the Manager, the Members, or Affiliates of the Manager or the Members on such terms as the Manager deems appropriate, and in connection therewith, to hypothecate, encumber and grant security interests in Company Property to secure repayment of the borrowed sums;

(c)     to purchase liability and other insurance to protect the Company Property and the Business of the Company;

5

**Confidential**
**Attorneys Eyes only**                                    SM000105

(d)     to hold and own any and all Company Properties in the name of the Company;

(e)     to invest any Company funds in time deposits, short-term governmental obligations, commercial paper or other investments;

(f)     to execute on behalf of the Company all instruments and documents, including, without limitation, checks; drafts; notes and other negotiable instruments; mortgages or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of Company property; assignments; bills of Transfer; leases; partnership agreements, operating (or limited-liability company) agreements of other limited-liability companies; and any other instruments or documents necessary or appropriate, as determined in the discretion of the Manager, to the conduct of the Business of the Company;

(g)     to employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from Company funds;

(h)     to enter into any and all other agreements on behalf of the Company, with any other Person for any purpose, in such forms as the Manager may approve;

(i)     to execute and file such other instruments, documents and certificates which may from time to time be required by the laws of the State of Nevada or any other jurisdiction in which the Company shall determine to do Business, or any political subdivision or agency thereof, to effectuate, implement, continue and defend the valid existence of the Company;

(j)     to file any and all registrations necessary or appropriate, in the sole discretion of the Manager, to protect Intellectual Property rights of the Company;

(k)     to do and perform all other acts as may be necessary or appropriate to the conduct of the Business;

(l)     to hire employees necessary and/or appropriate to conduct the Business;

(m)     to terminate employees in the Manager's sole and absolute discretion;

6

**Confidential**
**Attorneys Eyes only**

SM000106

(n)     to appoint Officers; provided, however, that the Manager shall provide prompt Notice ("Officer Notice") to all Members of any appointment of any Officer (other than the Officers instituted by virtue of this Agreement); provided, further, that in any Officer Notice the Manager shall indicate both the name of the individual that is the subject of an Officer appointment as well as the title of such Officer; and

(o)     to terminate any Officer; provided, however, that the Manager shall provide prompt Notice to all Members of any termination of any Officer.

Nothing set forth above in this Section 5.2 shall preclude the Manager from engaging in any transaction with an Affiliate of the Manager on an arm's length basis.

5.3     <u>Limitations on Authority</u>.

Notwithstanding any other provision of this Agreement, the Manager shall not cause or commit the Company to do any of the following without the express written consent of Members holding at least a Super-Majority Interest:

(a)     mortgage, pledge, hypothecate, encumber or grant a security interest of (collectively, "Pledge") any Company Property to the extent that the secured indebtedness from such Pledge would exceed $100,000.00;

(b)     incur or refinance any indebtedness for money borrowed by the Company, whether secured or unsecured and including any indebtedness for money borrowed from a Member if, after such financing, the aggregate indebtedness of the Company would exceed $100,000.00;

(c)     lend money to or guaranty or become surety for the obligations of any Person, except for reasonable advances of salaries of Officers and other employees of the Company;

(d)     cause the Company to commence a voluntary case as debtor under the United States Bankruptcy Code;

(e)     any merger, consolidation, Reorganization or recapitalization involving the Company;

(f)     any Transfer of substantially all of the assets of the Company;

7

**Confidential
Attorneys Eyes only**

SM000107

(g)     any dissolution, liquidation or voluntary termination of the Company;

(h)     any repurchase or redemption of any Membership Interests;

(i)      any purchase, acquisition or otherwise becoming the holder, beneficially or of record, of any interest in any Person or purchase or acquisition of any such Person by means of any transaction or series of related transactions (including, without limitation, any merger, consolidation or recapitalization, or acquisition of all or any substantial portion of the assets of any such Person);

(j)      any entry into any transaction with any Officer, employee, Member, or affiliate of the Company, or any affiliate or relative of the foregoing (other than the transactions pursuant to, acknowledged in, arising out of and/or described in this Agreement, inclusive, but not limited to, the Exhibits, as well as any other attachments incorporated herein);

(k)     any material changes in the terms of the employment, including compensation, of senior management;

(l)      any conversion of the Company to a corporation or any election to be taxable as a corporation; and

(m)    any establishment of any joint venture, partnership, limited liability company or other similar relationship between the Company and any third Person (other than the transactions pursuant to, acknowledged in, arising out of and/or described in this Agreement, inclusive of, but not limited to, the Exhibits, as well as any other attachments incorporated herein).

5.4     Liability for Certain Acts.

5.4.1     The Members stipulate that neither the Company nor the Manager, in any way, covenants, represents or guarantees that the operations of the Company will be profitable or that any Member will receive a return of or on any Member's Capital Contributions, at any point in time or over any period of time.

5.4.2     The Members hereby covenant that the Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member (or successor thereto), except to the extent, if any, that

8

**Confidential**
**Attorneys Eyes only**

**SM000108**

the loss or damage shall have been the result of gross negligence, fraud, willful misconduct, or a willful material breach of this Agreement, by the Manager.

5.5     Bank Accounts.

The Manager may from time to time open bank and/or financial institution accounts in the name of the Company, and the Manager shall be the sole signatory thereon; provided, however, that the Manager may authorize by way of a signed writing, kept by the CAO in the Company's books and records, one or more Officers to have signatory authority thereon, with full disbursement authority, subject to Article 13.

5.6     Indemnity of the Manager, Employees and Other Agents.

The Company shall indemnify (including, without limitation, by way of making advances for expenses to the maximum extent permitted under the Act for the benefit of, so long as the recipient of such advances undertakes to repay such advances in the event that a court or other controlling authority determines that the Company is not liable by the terms of this Agreement to so indemnify) the Manager, Officers, employees and/or agents of the Company with respect to any Claim brought by any Person with respect to any act and/or omission committed and/or services performed within the scope of furthering the Business of the Company so long as said act, omission or provision of services was not the subject of intentional misconduct.

5.7     Resignation.

The Manager may resign at any time by giving three (3) days Notice to the Members. The resignation of the Manager shall take effect upon receipt of Notice thereof or at such later time as shall be specified in such Notice. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member.

5.8     Removal.

At a meeting of the Members called, in writing, in accordance with Article 8, expressly for such purpose, the Manager may be removed:  (a) if any of the following occur: (i) the conviction of or any plea of no contest by the Manager to a felony, (ii) the commission of an act or willful omission by the Manager involving fraud, embezzlement, or financial dishonesty, (iii) engaging in duties required of the Manager by individuals acting on behalf of the Manager under the influence of alcohol or illegal drugs, the use of illegal drug (whether or not at the workplace) or other repeated conduct causing the Company substantial public disgrace, disrepute, or economic harm, (iv) gross dereliction of duty to the Company or any of its affiliates, (v) the repeated refusal or failure by the Manager to follow the lawful and reasonable directives of the Members, or (vi) the material breach of the Manager of any of the Manager's other

9

obligations hereunder which continues uncured for more than thirty (30) days after the Manager receives written notice thereof from the Company, and (b) by the affirmative vote of Members holding at least a Super-Majority Interest determined without regard to any Voting Interest held by such to-be-removed Manager or any Affiliate of such to-be-removed Manager; provided, however, if the Manager is a non-natural Person and if the Manager is declared by a court of competent jurisdiction bankrupt or otherwise dissolves, then in either such event, said Manager shall be automatically removed as Manager without any further action on the part of the Members.  If there is a Deadlock on the decision to remove the Manager (a "Removal Deadlock"), then any of the Member(s) who desire removal of the Manager (the "Claimant(s)") may commence arbitration proceedings regarding whether Misconduct occurred pursuant to the procedures set forth in Exhibit 5.8 (the "Misconduct Arbitration Proceedings") by providing Notice within five (5) Business Days (such fifth (5th) Business Day known herein as the "Arbitration Commencement Date") after a Removal Deadlock to all Members of the Claimant's desire to commence arbitration proceedings.  During the pendency of the Misconduct Arbitration Proceedings and until a definitive arbitration decision is announced (the "Period of Arbitration"), the Manager who is the subject of the Misconduct Arbitration Proceedings (the "Suspended Manager") shall be suspended from performing the role of Manager throughout the Period of Arbitration.  The Members shall designate an interim Manager (the "Interim Manager"), following the procedures set forth in Section 5.9, to act as the Manager during the Period of Arbitration.  Upon an arbitration decision that there was no Misconduct, then the Suspended Manager shall immediately resume the role of Manager and the Interim Manager shall no longer perform the role of Manager at any level and in any regard.  The removal *per se* of a Manager who is also a Member shall not affect the Manager's rights as a Member.

   5.9   Vacancies.

   Any vacancy in the office of Manager (including, without limitation, the occurrence of a Suspended Manager) shall be filled by the affirmative vote of Members holding at least a Super-Majority Interest.  In the event an affirmative vote of the Members holding at least a Super-Majority Interest to fill any such vacancy cannot by obtained within fifteen (15) days of the removal of the Manager, the CEO shall call a Special Meeting of the Members.  At such Special Meeting, Net Sortie and Stephens (and no other Members, or Transferees thereof) shall each produce a list of five (5) proposed candidates (the "Candidates") to fill the office of Manager (a "Managers List"), ranked according to preference with one being the indication of the highest preference and five being the indication of the lowest preference, and disclose said list and such preferences to each other.  If any of the Candidates are chosen both by Stephens and by Net Sortie (a "Match") and there is only one Match, then the Match shall become the new Manager.  If there is more than one Match, then the Match with the highest aggregate numerical preference rating ("the Highest Aggregate Rank")

10

**Confidential**
**Attorneys Eyes only**                              SM000110

taking into consideration both the rankings indicated by Stephens and Net Sortie shall become the New Manager.  If there are Matches that share the Highest Aggregate Rank (the "High-Ranked Matches"), then the new Manager shall be designated by process of a coin toss (with Stephens flipping the coin and one Candidate designated as heads and the other designated as tails), or if necessary there shall be multiple coin tosses in the event of several High-Ranked Matches.  If there are no Matches and the occurrence of the vacancy was due to a removal pursuant to Section 5.8, then Net Sortie shall have the right to choose the new Manager amongst any of the five-ranked Stephen's Candidates. If there are no Matches and the occurrence of the vacancy was not due to a removal pursuant to Section 5.8, then there shall be a coin toss (with Stephens flipping the coin and Net Sortie calling heads or tails) and the winner of the coin toss shall be entitled to choose as the new Manager from amongst the five-ranked Candidates chosen by the Member who lost the coin toss.

    5.10   Reimbursement, Organization Expenses.

The Company, within five (5) Business Days after the Effective Date, shall reimburse the Net Sortie in the amount of twenty-one thousand dollars ($21,000) for the expenses, in part, incurred in connection with the formation, organization and capitalization of the Company.

    5.11   Right to Rely on the Manager.

Any Person dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by the Manager as to:

        (a)   the identity of the Manager or any Member;

        (b)   the existence or nonexistence of any fact or facts which constitute a condition precedent to acts on behalf of the Company by the Manager or which are in any other manner germane to the affairs of the Company;

        (c)   the Persons who are authorized to execute and deliver any instrument or document of the Company; or

        (d)   any act or failure to act by the Company or any other matter whatsoever involving the Company or any Member.

**ARTICLE 6.**
**APPOINTMENT OF OFFICERS, AUTHORITY AND COMPENSATION**

    6.1   Appointment and Termination.

11

**Confidential**
**Attorneys Eyes only**

The Manager shall appoint all officers of the Company.  The Manager shall have the right to terminate any or all of the officers and appoint replacement officers in the exercise of the Manager's discretion; provided, however, that the Manager shall terminate any officer if any of the following occur: (i) the conviction of or any plea of no contest by an Officer to a felony, (ii) the commission of an act or willful omission by an Officer involving fraud, embezzlement, or financial dishonesty, (iii) engaging in duties required hereby under the influence of alcohol or illegal drugs, the use of illegal drug (whether or not at the workplace) or other repeated conduct causing the Company substantial public disgrace, disrepute, or economic harm, (iv) gross dereliction of duty to the Company or any of its affiliates, (v) the repeated refusal or failure by an Officer to follow the lawful and reasonable directives of the Manager, or (vi) the material breach of an Officer of any of said Officer's other obligations hereunder which continues uncured for more than thirty (30) days after the Manager receives written notice thereof from the Company ("Officer Misconduct"), and in the event of the Manager's failure to terminate any Officer who engages in Officer Misconduct, then the Members holding at least a Super-Majority Interest shall have the right to so terminate any such Officer who engages in Officer Misconduct.



    6.3    <u>Authority of the CEO</u>.

12

**Confidential**
**Attorneys Eyes only**

The CEO shall have the general powers and duties of management usually vested in the office of president of a corporation, subject to Section 5.1 and Section 5.3, and shall have such other powers and duties as may be prescribed by the Manager or this Agreement. Subject to the control of the Manager and with respect to Company matters requiring approval of the Manager pursuant to and arising out of this Agreement, the CEO is the operational manager of the Company, shall have supervising authority over and may exercise general executive power concerning the supervision, direction and control of the day-to-day Business and affairs of the Company and shall carry out the decisions approved by the Manager and/or by the Members, with the authority from time to time and at any time to delegate to any other officer or executive employee of the Company such executive powers and duties as the CEO may deem advisable. Subject to the terms and provisions of this Section 6.3, the CEO shall have authority to do all things necessary to carry on the day-to-day Business and affairs of the Company and hereby is authorized to take any action of any kind and to do anything and everything that the CEO deems necessary and appropriate with respect to the day-to-day Business affairs of the Company in accordance with the terms and provisions of this Agreement and applicable Law. In addition to the general authority provided to the CEO in this Section 6.3, and without limiting the generality of the foregoing, except as otherwise directed by the Manager, in accordance with policies and decisions set forth by the Manager, the CEO shall have the authority provided to the Manager in Sections 5.1 and 5.2, subject to the limitations on the Manager's authority set forth in Section 5.3 and the other provisions of this Agreement.

      6.3.1      Steven A. Gibson, an individual who is currently part owner of Net Sortie ("Gibson"), is hereby designated as the CEO of the Company, subject to the other provisions of this Agreement.

13

**Confidential**
**Attorneys Eyes only**

6.4    <u>COO</u>.

David A. Brownell, an individual who is currently ten percent (10%) part owner of Net Sortie (subject to divestment), subject to the sole discretion of the CEO, shall be the chief operating officer ("COO") of the Company.



6.5    <u>Authority of the COO</u>.

Subject to the direction of the Manager and the CEO, the COO shall have the powers and duties for conducting and overseeing the Company's day-to-day operations usually vested in the office of chief operating officer of a corporation and shall have such other powers and duties as may be prescribed by the Manager or the CEO.  Such powers shall, in no case, exceed the authority granted under the provisions of this Agreement to the Manager or the CEO.



14

**Confidential**
**Attorneys Eyes only**

SM000114

### 6.7    Authority of the CAO.

Subject to the direction of the Manager, the CEO and the COO, the CAO shall have the powers and duties over day-to-day administrative matters of the Company usually vested in the office of administrative vice president of a corporation, including, without limitation, supervision of non-managerial staff, and shall have such other powers and duties as may be prescribed by the Manager, CEO or the COO.  Such powers shall, in no case, exceed the authority granted under the provisions of this Agreement to the Manager, the CEO or the COO.

### 6.8    Expenses.

Upon the submission of appropriate documentation, each Member shall be reimbursed by the Company for reasonable out-of-pocket expenses incurred on behalf of, or at the request of, the Company.  Officers of the Company shall be paid semi-monthly, in arrears, on the 15th and last day of each calendar month, or the preceding Business Day, in each case, if such days are not Business Days.  In addition to the compensation otherwise set forth in this Article 6, the officers of the Company shall be eligible for annual bonuses, payable on December 20th (or the first Business Day thereafter) of each calendar year in such amounts reasonably proposed by the Manager to the Members and approved, if at all, by an affirmative vote of the Members holding at least a Super-Majority Interest.  In addition to the provisions of this Article 6, the terms of employment of the initial officers (set forth below in this Article 6), shall be governed by the terms of the employment agreements attached hereto as Exhibit 6.

### ARTICLE 7.
### RIGHTS AND OBLIGATIONS OF MEMBERS

### 7.1    Limitation of Liability.

Except as otherwise provided by the non-waivable provisions of the Act or by this Agreement, no Member shall be liable for an obligation of the Company solely by reason of being or acting as a Member.

### 7.2    List of the Members.

Upon written request of any Member made in good faith and for a purpose reasonably related to the Member's rights as Member under this Agreement (which reason shall be set forth in the written request), the Manager shall provide a list showing the names, addresses and Membership Interests of all of the Members, as set

15

**Confidential**
**Attorneys Eyes only**

forth in Exhibit 18.1.  Members shall have no further rights to information under this Section 7.2.

   7.3    <u>Members Have No Agency Authority</u>.

   Except as expressly provided in this Agreement, the Members (in their capacity as Members) shall have no agency authority on behalf of the Company.

   7.4    <u>Company Books</u>.

   The Manager shall maintain and preserve, during the term of this Agreement, and for five (5) years after dissolution of the Company, all accounts, books, and other relevant Company documents.  Upon reasonable request, each Member shall have the right, during ordinary business hours, to inspect and copy such Company documents at the requesting Member's expense.

   7.5    <u>Priority and Return of Capital</u>.

   No Member shall have priority over any other Member, either as to the return of Capital Contributions or as to Profits, Losses or Distributions; provided, however, that this Section 7.5 shall not apply to loans (as distinguished from Capital Contributions) which a Member has made to the Company.

**ARTICLE 8.**
**MEETING OF MEMBERS**

   8.1    <u>Annual Meetings</u>.

   The Members shall be required to hold an annual meeting in person (each such meeting an "Annual Meeting").  Each Annual Meeting shall be commenced on the seventh (7th) Business Day of December, beginning in 2010 and repeated for each year thereafter during the Term, and shall continue until all of the business of the Members required at each such Annual Meeting is reasonably concluded.  At each Annual Meeting, the Members shall:  (a) adopt each respective Budget for the next Fiscal Year in accordance with Article 13, (b) determine and declare Distributions in accordance with Section 11.2, and (c) address any other matters any Member reasonably believes, consistent with the provisions of this Agreement, the Members should address.

16

**Confidential**
**Attorneys Eyes only**

**SM000116**

8.2    Quarterly Meetings

The Members shall be required to hold quarterly meetings during the Term (each a "Quarterly Meeting").  The Quarterly Meetings shall fall respectively on the second Friday (and if not a Business Day, on the next succeeding Business Day) of each respective April, July and October of each year during the Term; provided, however, that there shall be no need for a fourth Quarterly Meeting as all of the business conducted at the Annual Meeting negate the need for a fourth Quarterly Meeting.  At each Quarterly Meeting, the Members shall:  (a) determine whether any change is required to the Budget and shall enact such change only upon an affirmative vote of the Members holding at least a Super-Majority Interest, (b) determine and declare Distributions in accordance with Section 11.2, and (c) address any other matters any Member reasonably believes, consistent with the provisions of this Agreement, the Members should address.

8.3    Special Meetings.

Either the Manager or any Member holding at least fifteen percent (15%) of the Voting Interests (the "Special Member Meeting Caller") shall have the right to call a meeting of the Members (each such meeting known herein as a "Special Meeting") for the purpose of addressing any matter that this Agreement provides is the proper subject of the attention of the Members.

8.4    Place of Meetings.

Each Member Meeting shall be held at the Principal Place of Business unless the Members holding at least a Super-Majority Interest provide two weeks' Notice to all Members that such Members holding at least a Super-Majority Interest have determined that any Member Meeting shall be held at a location other than the Principal Place of Business whereby such different location shall be the location of the Member Meeting which is the subject of said Notice.

8.5    Notice of Meetings.

With respect to any Special Meeting, except as provided in Section 8.4, the Special Member Meeting Caller shall provide Notice (stating the day and hour of the Special Meeting and the purpose or purposes for which the Special Meeting is called) to each Member entitled to vote at such Special Meeting not less than three (3) nor more than fifty (50) days before the date of the Special Meeting.

17

**Confidential**
**Attorneys Eyes only**

**SM000117**

8.6    Meetings of all Members.

If all of the Members shall meet at any time and place, either within or outside of the State of Nevada, and consent, in writing, to the holding of a Special Meeting at such time and place, such Special Meeting shall be valid without call or notice, and at such Special Meeting lawful action may be taken.

8.7    Record Date.

For the purpose of determining Members entitled to Notice of or to vote at any Member Meeting, or Members entitled to receive payment of any Distribution, or in order to make a determination of Members for any other purpose, the date on which Notice of the meeting is mailed or the date on which the resolution declaring such Distribution is adopted, as the case may be, shall be the record date for such determination of Members.

8.8    Quorum.

Members holding at least a Super-Majority Interest, represented in person or by proxy, shall constitute a quorum at any meeting of Members.  In the absence of a quorum at any such meeting, a majority of the Voting Interests so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further Notice.  However, if the adjournment is for more than sixty (60) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a Notice of the adjourned meeting shall be given to each Member of record entitled to vote at the meeting.  At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally Noticed.  The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Voting Interests whose absence would cause less than a quorum.

8.9    Manner of Acting.

If a quorum is present, the affirmative vote of Members holding at least a Super-Majority Interest shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Act, by the Articles of Organization, or by this Agreement.  Unless otherwise expressly provided herein, Members who have an interest in the outcome of any particular matter upon which the Members vote or consent may vote or consent upon any such matter and their Voting Interest, vote or consent, as the case may be, shall be counted in the determination of whether the requisite matter is approved by the Members.

18

**Confidential**
**Attorneys Eyes only**

8.10   <u>Proxies</u>.

At all meetings of the Members, a Member who is qualified to vote may vote in person or by proxy executed in writing by the Member or by a duly authorized (written power of attorney) attorney-in-fact, accepted in writing by the Manager.  Such proxy shall be filed with the Manager before or at the time of the meeting.  No proxy shall be valid after eleven (11) months from the date of the proxy's execution, unless otherwise provided in the proxy.

8.11   <u>Action by Members Without a Meeting</u>.

Action required or permitted to be taken at a meeting of the Members may be taken without a meeting if the action is evidenced by one or more written consents or approvals describing the action taken and signed by Members holding sufficient Voting Interests, as the case may be, to approve such action had such action been properly voted on at a duly called meeting of the Members.  Action taken under this Section 8.11 is effective when Members with the requisite Voting Interests have signed the consent or approval, unless the consent specifies a different effective date.  The record date for determining Members entitled to take action without a meeting shall be the date the first Member signs a written consent.

8.12   <u>Waiver of Notice</u>.

When any Notice is required to be given to any Member, a waiver thereof in writing signed by the Person entitled to such Notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

8.13   <u>Manager Participation In Member Meetings</u>.

The Manager shall attend all Member Meetings; provided, however, that the Manager may be temporarily excluded from attendance at the Member Meeting by the Members, through a Majority Vote, with respect to any subject matter wherein the Manager *per se* is the subject of the Member Meeting; provided, however, that the Manager shall be permitted to rejoin the Member Meeting at the immediate conclusion of the discussion and/or vote by Members regarding issues with respect to the Manager *per se*.

19

**Confidential**
**Attorneys Eyes only**

SM000119

## ARTICLE 9.
## CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS

9.1     <u>Members' Capital Contributions</u>.

As of the Effective Date, each Member shall contribute such amount, in cash or in kind, as is set forth in Exhibit 9.1 hereto as the Member's share of the Initial Capital Contribution (as set forth on Exhibit 9.1).



## ARTICLE 10.
## RESERVED

## ARTICLE 11.
## ALLOCATIONS, INCOME TAX, DISTRIBUTIONS, ELECTIONS AND REPORTS

11.1     <u>Allocations of Profits and Losses</u>.

The Profits and Losses for each Fiscal Year shall be allocated to each Member on an equal basis.

11.2     <u>Distributions</u>.

11.2.1       The Manager shall distribute all Distributable Cash to the Members on a basis of each Member's Respective Distribution Entitlement by no later than fifteen (15) Business Days after each respective Distribution Meeting.

20

**Confidential**
**Attorneys Eyes only**

SM000120

11.2.2     Each Member shall be entitled to Distributions on a pro-rata basis in accordance with each Member's respective Membership Interest (the "Respective Distribution Entitlement").

11.3    Accounting Principles.

For financial reporting purposes, the Company shall use accounting principles applied on a consistent basis using a cash basis method of accounting, unless a different method of accounting for federal income tax purposes is required, in which case that method of accounting shall be the Company's method of accounting.

11.4    Interest on and Return of Capital Contributions.

No Member shall be entitled to interest on the Member's Capital Contribution or the return of the Member's Capital Contribution, except as otherwise specifically provided for herein.

11.5    Accounting Period.

The Company's accounting period shall be the Fiscal Year.

11.6    Records and Reports.

At the expense of the Company, the Manager shall maintain records and accounts of all operations and expenditures of the Company.  At a minimum, the Company shall keep at the Principal Place of Business the following records:

(a)    a current list of the full name and last known business, residence, or mailing address of each Member and Manager, both past and present;

(b)    a copy of the Articles of Organization and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(c)    copies of the Company's federal, state, and local income tax returns and reports, if any, for the four (4) most recent Fiscal Years;

(d)    copies of the Company's currently effective written operating agreement, copies of any writings permitted or required with respect to a Member's obligation to contribute cash, property or services, and copies of any financial statements of the Company for the three (3) most recent Fiscal Years;

21

**Confidential**
**Attorneys Eyes only**

SM000121

(e)   minutes of every Member Meeting and court-ordered meeting of the Members; and

(f)   any written consents obtained from Members for actions taken by Members without a meeting.

11.7   Returns and other Elections.

11.7.1   The Manager shall cause the preparation and timely filing of all tax returns required to be filed or delivered to the Members by the Company pursuant to the Code, including, without limitation, Internal Revenue Service K-1 forms, and all other tax returns deemed necessary and required in each jurisdiction in which the Company does Business.  Copies of such returns, or pertinent information therefrom, shall be furnished to the Members within a reasonable time after the end of each Fiscal Year.

11.7.2   All elections permitted to be made by the Company under federal or state laws shall be made by the Manager in his sole discretion; provided, however, that the Manager shall make any tax election requested by the Members holding at least a Super-Majority Interest.

11.8   Tax Matters Partner.

Unless otherwise determined by the Manager, Net Sortie is hereby designated the Tax Matters Partner ("TMP") as defined in Section 6231(a)(7) of the Code.  The TMP and the other Members shall use their reasonable efforts to comply with the responsibilities outlined in Sections 6221 through 6233 of the Code (including any Regulations promulgated thereunder), and, in doing so, shall incur no liability to any other Member.

## ARTICLE 12.
## CONFIDENTIALITY AND NONCOMPETITON

12.1   During the Term, no Member shall Disclose any Confidential Information to any Person, except as necessary in order to conduct the Business.

12.2   While in possession or control of Confidential Information, or any Media embodying same, the Members shall take all reasonable efforts to keep such Confidential Information reasonably inaccessible from Persons who are not otherwise authorized to view the Confidential Information.  While in possession or control of any of Company Trade Secrets, or any Media embodying same, the Members shall use the Members' best efforts to keep all Company Trade Secrets inaccessible from Persons who are not authorized to view same.  The Members shall not make, or permit or allow

22

**Confidential**
**Attorneys Eyes only**                    **SM000122**

to be made, copies of any Media containing, in full or in part, Confidential Information unless such copies are necessary in order to conduct the Business.

12.3   If any Member is requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process) to Disclose any of the Confidential Information, such Member shall provide the Company with prompt written notice of such request or requirement so that the Company may seek protective orders or other appropriate remedies and/or waive compliance with the provisions of this Agreement. If, in the absence of a protective order or other remedy or the receipt of a waiver by the Company, any Member is nonetheless legally compelled to Disclose Confidential Information to any court or tribunal or else would stand liable for contempt or suffer other censure or penalty, such Member may, without liability herein, Disclose to such court or tribunal only that portion of the Confidential Information which the court or tribunal requires such Member to Disclose, provided that such Member exercises such Member's best efforts to preserve the confidentiality of the Confidential Information, including, without limitation, by cooperating with the Company to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information by such court or tribunal.

12.4   Notwithstanding any other provision of this Agreement, the Members hereby acknowledge that the Company owns the exclusive right, title and interest in and to the Company Intangibles embodied in, relating to, based upon or arising from Confidential Information.

12.5   The Members hereby waive any Causes of Action of infringement of any right, title or interest of any Member (whether based on any Intellectual Property right, title or interest, other proprietary interest whatsoever or applicable fiduciary theory) in, to or respecting any Company Confidential Information and agree that the Members shall never challenge nor dispute the Company's right, title and interest in and to Company Confidential Information or Company Intellectual Property.

12.6   During the Term, no Member shall, directly or indirectly, engage in a business that engages in activities within the scope of the Focus (the "Competitive Activities") and shall not, alone or in association with others, own any interest in, manage, operate, control, or be connected in any manner, directly or indirectly, with the ownership, management, operation or control of any entity engaging, in whole or in part, in a business that engages in Competitive Activities within the Restricted Territory, other than by and through the Company, including, without limitation, serving as an agent, associate, Affiliate, consultant, partner, co-venturer, independent contractor or investor of or with any entity or person engaged in the Competitive Activities within the Restricted Territory.

23

**Confidential**
**Attorneys Eyes only**

12.7    The provisions of this Article 12 shall apply also to any Affiliate of any Member.

## ARTICLE 13.
## BUDGET

The initial Budget, hereby approved by the Members, is set forth in Exhibit 13 and is for the period commencing on the Effective Date and ending December 31, 2010. Thirty (30) days prior to each Distribution Meeting, the Manager shall propose the Budget for the Members with respect to each succeeding relevant period of time.  Each Budget must be approved by the Members holding at least a Super-Majority Interest.  In the event of a Deadlock, the Budget then in effect shall continue until a new Budget is approved by the Members holding at least a Super-Majority Interest.

## ARTICLE 14.
## RESERVED

## ARTICLE 15.
## TRANSFERABILITY

15.1    General.

15.1.1    Except as otherwise specifically provided herein, no Member shall have the right to Transfer the Member's Membership Interest.

15.1.2    Each Member hereby acknowledges the reasonableness of the restrictions on Transfer and Gift of Membership Interests imposed by this Agreement in view of the Company purposes and the relationship of the Members.  Accordingly, the restrictions on Transfer and Gift contained herein shall be specifically enforceable.

15.1.3    No Member shall Pledge any Members' Membership Interest as security for repayment of a liability, and any such Pledge shall be void *ab initio*.

15.2    Right of First Refusal.

15.2.1    Subject to Section 15.3, any Transferring Member which desires to Transfer all or any portion of the Members' Membership Interest to a third party purchaser, including, without limitation, another Member, shall obtain from such third party purchaser ("Third Party Purchaser") a bona fide written offer to purchase such interest, stating the terms and conditions upon which the purchase is to be made and the consideration offered therefor ("Third Party

24

**Confidential**
**Attorneys Eyes only**

SM000124

Offer"). The Transferring Member shall give written notification ("Notice of Transfer") to the Company and the other Members who are Members (the "Remaining Members"), by certified mail, of the Transferring Members' intention to so transfer such Membership Interest (the "Offered Interest"). The Notice of Transfer shall be accompanied by a copy of the Third Party Offer. If any portion of the purchase price offered by such third party purchaser consists of consideration other than cash or a promissory note ("Non-cash Consideration"), then: (1) the Notice of Transfer also shall be accompanied by a good faith estimate by the Transferring Member of the fair market value of the Non-cash Consideration, and (2) for purposes of Section 15.2.2 and 15.2.3 the purchase price of the Offered Interest (the "Purchase Price") shall be adjusted as set forth below.

      15.2.1(a)    The Purchase Price shall be decreased by the Non-cash Consideration.

      15.2.1(b)    The Purchase Price shall be increased by an amount equal to either (aa) the Transferring Member's good faith estimate of the fair market value of the Non-cash Consideration ("Transferer's Estimate") or (bb) in the discretion of the Manager, the appraised fair market value of the Non-cash Consideration determined by an independent appraiser selected by the Manager in his sole discretion. The Manager shall have the sole discretion to choose between the amount determined pursuant to clauses (aa) and (bb) of this subsection 15.2.1(b). If the appraised fair market value of the Non-cash Consideration is not determined within twenty (20) days after the Notice of Transfer, then such fair market value shall be equal to the amount of the Transferer's Estimate.

      15.2.2    The Remaining Members shall have the option ("Buy Option") to purchase all, but not less than all, of the Offered Interest, on a pro-rata basis in accordance with the respective Membership Interest of the Remaining Members exercising such option pursuant to this Section 15.2.2 or shall have the option (the "Tag-Along Option") to participate on a pro-rata basis in the terms of the Transfer (even if that Transfer is to another Member) that is the subject of the Notice of Transfer (both the Buy Option and the Tag-Along Option known herein as the "Participation Options"). Either of the Participation Options may be exercised by one or more of the Remaining Members by giving written notification (the "Participation Notice") to the Transferring Member within thirty (30) days after receiving the Notice of Transfer (the "Option Period"). Each Remaining Member which timely gives a Participation Notice electing the Buy Option ("Buying Member") shall purchase such portion of the Offered Interest, pursuant to the timeframes set forth in Section 15.2.3, which is equal to the relative Membership Interest of all of all the Buying Members. If

25

there are no Buying Members, the Buy Option shall terminate and at any time within ninety (90) days following the expiration of the Option Period, and, except as provided in Section 15.3, the Transferring Member shall be entitled to consummate the Transfer of the Offered Interest to the Third Party Purchaser or one or more of the Third Party Purchaser's Affiliates upon terms no less favorable than are set forth in the Third Party Offer; provided, however that each Remaining Member which timely gives a Participation Notice electing the Tag-Along Option ("Tag-Along Member") shall be entitled to and required to effect all transactions at the same time and in the same manner as the Transferring Member.

15.2.3    If there is at least one Buying Member: (a) the Buying Members shall designate the time, date and place of closing, provided that the date of closing shall be within thirty (30) days after the receipt of the Buy Notice, and (b) at the closing, the Buying Members shall purchase, and the Transferring Member shall Transfer, the Offered Interest for an amount equal to the Purchase Price (as modified in accordance with Section 15.2.1(a) and 15.2.1(b)) and in accordance with such other terms and conditions set forth in the Third Party Offer.

15.2.4    A Transfer of an Offered Interest pursuant to Section 15.2 shall be subject to Sections 15.3 and 15.4.

15.3    Transfers Not Recognized in Absence of Consent.

15.3.1    If the Members holding at least a Super-Majority Interest do not approve, in writing, with the Members hereby agreeing to be reasonable in such vote, the proposed Transfer of the Transferring Member's Membership Interest to a transferee, such Transfer shall be null and void *ab initio*, and the transferee shall possess no Membership Interest, Voting Interest or Economic Interest in the Company. Any Gift of a Membership Interest is void *ab initio* absent the written approval of Members holding at least a Super-Majority Interest, and the Members hereby agree to be reasonable in such vote.

15.3.2    Upon and contemporaneously with any Transfer or Gift authorized hereunder of a Member's Membership Interest, the Transferring Member shall cease to have any residual rights associated with the Membership Interest transferred to the transferee.

26

**Confidential**
**Attorneys Eyes only**

15.4    Additional Conditions to Recognition of Transferee.

15.4.1        If a Transferring Member Transfers or Gifts a Membership Interest to any Person, authorized hereunder, as a condition to recognizing one or more of the effectiveness and binding nature of such Transfer or Gift (subject to Section 15.3 above), the remaining Members may require the Transferring Member and the proposed successor-in-interest to execute, acknowledge and deliver to the Manager such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and to perform all such other acts which the Manager may deem necessary or desirable to accomplish any one or more of the following:

(a)    constitute such successor-in-interest as a Member;

(b)    confirm that the proposed successor-in-interest to be admitted as a Member, has accepted, assumed and agreed to be subject to and bound by all of the terms, obligations and conditions of this Agreement, as the same may have been further amended;

(c)    preserve the Company after the completion of such Transfer, Transfer, assignment, or substitution under the laws of each jurisdiction in which the Company is qualified, organized or does Business;

(d)    maintain the status of the Company as a "partnership" for federal income tax purposes; and

(e)    assure compliance with any applicable state and federal laws, including securities laws and regulations.

15.4.2        Any Transfer or Gift of a Membership Interest and admission of a Member in compliance with this Article 15 shall be deemed effective as of the last day of the calendar month in which the remaining Members' consent thereto was given , as provided in this Article 15, above. The Transferring Member hereby indemnifies the Company and the remaining Members against any and all loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of any transfer or purported transfer in violation of this Article 15.

27

**Confidential
Attorneys Eyes only**

15.5   Change of Control Forfeiture.

If either Stephens or Net Sortie experience a Change of Control (the "Changed Member") without the prior written consent of the other Member (the "Non-Changing Member"), then the Changed Member shall automatically and immediately forfeit all the Changed Member's Membership Interests to the Non-Changing Member and have no further right, title or interest in and to the Company or pursuant to or arising out of this Agreement.  Stephens covenants, represents and warrants that as of the Effective Date, Stephens is Controlled by members of the family of Warren A. Stephens and trusts for the benefit of such individuals.  Net Sortie covenants, represents and warrants that as of the Effective Date, Net Sortie is Controlled by Gibson.

## ARTICLE 16.
## ISSUANCE OF MEMBERSHIP INTERESTS

From the Effective Date, any Person acceptable to Members holding at least a Super-Majority Interest may become a Member in the Company by the issuance by the Company of Membership Interests for such consideration as the Members holding at least a Super-Majority Interest shall determine, subject to the terms and conditions of this Agreement; provided, however, that Stephens and Net Sortie hereby covenant that in the event of the addition of any new Member, this Agreement shall require amendment for at least the following purposes:  accommodating appropriate attributions to the Capital Account, providing for proper treatment of Profits and Losses as well as addressing proper allocations for Distributions.

## ARTICLE 17.
## DISSOLUTION AND TERMINATION

17.1   Dissolution.

17.1.1      The Company shall be dissolved only by the express, written agreement of the Members holding at least a Super-Majority Interest, and notwithstanding anything to the contrary in the Act, the Company shall not be dissolved upon the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member.

17.1.2      As soon as possible following the occurrence of an agreement specified in Section 17.1.1 effecting the dissolution of the Company, the Manager shall execute all documents required by the Act at the time of dissolution and file or record such statements with the appropriate officials.

28

**Confidential**
**Attorneys Eyes only**

17.2   Effect of Dissolution.

Upon dissolution, the Company shall cease to carry on Business, except insofar as may be necessary for the winding up of the Business, but the Company's separate existence shall continue until winding up and Distribution is completed.

17.3   Winding Up, Liquidation and Distribution of Assets.

17.3.1   Upon dissolution, the Manager shall promptly proceed to effect the legal cessation of all Business in an orderly manner and in a manner to minimize the creation of any undue liability to any third Person on the part of the Company, the Manager shall promptly take the following further actions in the following order:

(a)   The Manager shall Transfer or otherwise liquidate (to the extent viable) all of the non-cash Company Property as promptly as practicable on the open market and to the extent that the Manager cannot within a reasonable period of time liquidate on the open market all of the non-cash Company Property (the "Remainder"), then the Members shall be provided an equal opportunity to bid (on an open bid basis) on the purchase of any and all of the Remainder until all of the Remainder is liquidated to the successfully bidding Member(s);

(b)   The Manager shall discharge all liabilities of the Company, other than liabilities to Members for Distributions and the return of capital, and establish a reasonable reserve of cash as may be reasonably necessary to provide for contingent liabilities of the Company; and

(c)   The Manager shall then disburse any cash which remains in the Company, after the steps undertaken pursuant to Section 17.3.1(a) and Section 17.3.1(b) are given effect, to the Members on a pro-rata basis in accordance with each Member's respective Membership Interest.

17.3.2   Upon completion of the procedures winding up, liquidation and Distribution of the assets, the Company shall be deemed terminated.

17.3.3   The Manager shall comply with any applicable requirements of applicable law pertaining to the winding up of the affairs of the Company and the final Distribution of the Company's assets.

29

**Confidential**
**Attorneys Eyes only**

SM000129

17.4    Filing or Recording Statements.

Upon the conclusion of winding up, the appropriate representative of the Company shall execute all documents required by the Act at the time of completion of winding up and file or record such statements with the appropriate officials.

17.5    Return of Contribution Nonrecourse to Other Members.

Except as provided by law or as expressly provided in this Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of the Company's Capital Contribution.  If the Company Property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Members shall have no recourse against any other Member.

## ARTICLE 18.
## MISCELLANEOUS PROVISIONS

18.1    Notices.

Any notice (a "Notice"), demand, or communication required or permitted to be given by any provision of this Agreement shall be deemed to have been sufficiently given or served if sent by both certified first class mail, postage prepaid, return receipt requested, and certified first class mail, and addressed or sent to the Member's and/or Company's address, as set forth in Exhibit 18.1.  Any Member or the Company may change the respective Member's or Company's address by giving notice in writing to the Company and the other Members of the respective Member's or Company's new address.

18.2    Books of Account and Records.

Proper and complete records and books of account shall be kept or shall be caused to be kept by the COO, in which shall be entered fully and accurately, in all material respects, all transactions and other matters relating to the Business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company.  The books and records shall at all times be maintained at the Principal Place of Business and shall be open to the reasonable inspection and examination by the Members, the CEO and the Manager during reasonable Business hours.

30

**Confidential**
**Attorneys Eyes only**                    **SM000130**

18.3   Business Reports.

Periodically, the COO shall develop regular business reports regarding the operations of the Company, including, without limitation: (a) the number of infringements each month in which action is recommended, (b) the number of infringements each month in which action has been taken, (c) monthly revenues, (d) monthly costs, (e) aged accounts receivable, (f) the number of active infringement cases, (g) the number of new clients in the month, (h) the number of total clients in the month, (i) the number of active copyright registrations held by the Company, (j) the number and nature of resolutions of infringements on a licensed-basis involving the payment of an ongoing royalty, and (k) resolved infringement cases in the month (the "Reports"). The COO shall provide the Reports to the CEO and the Manager on a monthly basis. The COO shall also provide the Reports, as well as any other report of general business activity routinely prepared by the COO in the normal course of business that is intended to be viewed by the Manager in order to create or change the policies or direction of the Company, by way of electronic mail (and each such Member shall advise the COO the most appropriate electronic mail address for such purpose), to each Member holding at least a twenty percent (20%) Membership Interest.

18.4   Application of State Law.

This Agreement, and the application and interpretation hereof, shall be governed exclusively by the Agreement's terms and by the laws of the State of Nevada, and specifically the Act.

18.5   Waiver of Action for Partition.

Each Member irrevocably waives during the term of the Company any right that it may have to maintain any action for partition with respect to the Company Property.

18.6   Amendments.

This Agreement may be amended only with the written consent of the Members holding at least a Super-Majority Interest and only if such amendment has a proportionate effect on all Members (or in the case of a redemption of Membership Interests or issuance of additional Membership Interests, an amendment which has a proportionate effect on all Members immediately after such redemption or issuance) with respect to their rights to Distributions.

31

**Confidential**
**Attorneys Eyes only**

SM000131

18.7    Execution of Additional Instruments.

Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

18.8    Effect of Inconsistencies with the Act.

It is the express intention of the Members and the Company that this Agreement shall be the sole source of agreement among them, and, except to the extent that a provision of this Agreement expressly incorporates federal income tax rules by reference to sections of the Code or Regulations or is expressly prohibited or ineffective under the Act, this Agreement shall govern, even when inconsistent with, or different than, the provisions of the Act or any other law or rule. In the event that the Act is subsequently amended or interpreted in such a way to make valid any provision of this Agreement that was formerly invalid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.  The Members and the Company hereby agree that the duties and obligations imposed on the Members as such shall be those set forth in this Agreement, which is intended to govern the relationship among the Company and the Members, notwithstanding any provision of the Act or common law to the contrary.

18.9    Reserved.

18.10   Rights and Remedies Cumulative.

The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies.  Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

18.11   Severability.

If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.  Without limiting the generality of the foregoing sentence, to the extent that any provision of this Agreement is prohibited or ineffective under the Act or common law, this Agreement shall be considered amended to the smallest degree possible in order to make the Agreement effective under the Act or common law.

**Confidential**
**Attorneys Eyes only**

SM000132

18.12 <u>Heirs, Successors and Assigns</u>.

Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors and assigns.

18.13 <u>Creditors</u>.

None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company.

18.14 <u>Counterparts</u>.

This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

18.15 <u>Reserved</u>.

18.16 <u>Power of Attorney</u>.

Each Member hereby irrevocably makes, constitutes and appoints the Manager, with full power of substitution, so long as the Manager is acting in such a capacity (and any successor Manager thereof so long as such Manager is acting in such capacity), the Member's true and lawful attorney, in such Member's name, place and stead (it is expressly understood and intended that the grant of such power of attorney is coupled with an interest) to make, execute, sign, acknowledge, swear and file with respect to the Company:

    (a)    all amendments of this Agreement adopted in accordance with the terms hereof;

    (b)    all documents which the Manager deems necessary or desirable to effect the dissolution and termination of the Company;

    (c)    all such other instruments, documents and certificates which may from time to time be required by the laws of the State of Nevada or any other jurisdiction in which the Company shall determine to do Business, or any political subdivision or agency thereof, to effectuate, implement, continue and defend the valid existence of the Company; and

**Confidential**
**Attorneys Eyes only**

SM000133

(d)     all instruments, documents and certificates which the Manager deems necessary or desirable in connection with a Reorganization which has been authorized in accordance with the terms of this Agreement.

This power of attorney shall not be affected by and shall survive the bankruptcy, insolvency, death, incompetency, or dissolution of a Member and shall survive the delivery of any assignment by the Member of the whole or any portion of the Member's Membership Interest. Each Member hereby releases the Manager from any liability or claim in connection with the exercise of the authority granted pursuant to this power of attorney, and in connection with any other action taken by the Manager pursuant to which the Manager purports to act as the attorney-in-fact for one or more Members, if the Manager believed in good faith that such action taken was consistent with the authority granted to it pursuant to this Section 18.16.

18.17   Investment Representations.

18.17.1     The Members, understand that:  (1) the Membership Interests evidenced by this Agreement have not been registered under the Securities Act of 1933, the State of Nevada Securities Act or any other state securities laws (the "Applicable Securities Acts") because the Company is issuing these Membership Interests in reliance upon the exemptions from the registration requirements of the Applicable Securities Acts providing for issuance of securities not involving a public offering; (2) the Company has relied upon the fact that the Membership Interests are to be held by each Member for investment; and (3) exemption from registrations under the Applicable Securities Acts would not be available if the Membership Interests were acquired by a Member with a view to distribution.

18.17.2     Accordingly, each Member hereby confirms to the Company that such Member is acquiring the Membership Interests for such own Member's account, for investment and not with a view to the Transfer or distribution thereof. Each Member agrees not to Transfer or offer for Transfer any portion of the Membership Interests unless there is an effective registration or other qualification relating thereto under the Securities Act of 1933 and under any applicable state securities laws or unless the holder of Membership Interests delivers to the Company an opinion of counsel, satisfactory to the Company, that such registration or other qualification under such Act and applicable state securities laws is not required in connection with such Transfer or offer for Transfer. Each Member understands that the Company is under no obligation to register the Membership Interests or to assist such Member in complying with any exemption from registration under the Applicable Securities Acts if such Member should, at a later date, wish to dispose of the Membership Interest. Furthermore, each Member realizes that the Membership Interests are unlikely to qualify for disposition under Rule 144 of the Securities and Exchange

34

**Confidential**
**Attorneys Eyes only**

Commission unless such Member is not an "affiliate" of the Company, within the meaning of such Rule 144, and the Membership Interest has been beneficially owned and fully paid for by such Member for at least three years.

18.17.3     Each Member, prior to acquiring a Membership Interest, has made an investigation of the Company and the Business, and the Company has made available to each Member, all information with respect to the Company which such Member needs to make an informed decision to acquire the Membership Interest. Each Member considers himself, herself or itself to be a person possessing experience and sophistication as an investor, which are adequate for the evaluation of the merits and risks of such Member's investment in the Membership Interest.

18.18  Representations and Warranties.

18.18.1     In General. As of the date hereof, each of the Members hereby makes each of the representations and warranties applicable to such Member as set forth in this Section 18.18, and such warranties and representations shall survive the execution of this Agreement.

18.18.2     Representations and Warranties. Each Member, to the extent applicable, hereby represents and warrants that:

18.18.2(a)     Due Incorporation or Formation; Authorization of Agreement. Such Member is a corporation duly organized or a partnership or limited-liability company duly formed, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation and has the corporate, partnership or limited-liability company power and authority to own its property and carry on its business as owned and carried on at the Effective Date. Such Member is duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the failure to be so licensed or qualified would have a Material Adverse Effect on its financial condition or its ability to perform its obligations hereunder. Such Member has the corporate, partnership or limited-liability company power and authority to execute and deliver this Agreement and to perform the Agreement's obligations hereunder and the execution, delivery, and performance of this Agreement has been duly authorized by all necessary corporate, partnership or limited-liability company action. This Agreement constitutes the legal, valid, and binding obligation of such Member.

18.18.2(b)     No Conflict with Restrictions; No Default. Neither the execution, delivery, and performance of this Agreement nor the

35

**Confidential**
**Attorneys Eyes only**

SM000135

consummation by such Member of the transactions contemplated hereby: (1) will conflict with, violate, or result in a breach of any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator, applicable to such Member or any of the Member's Affiliates; (2) will conflict with, violate, result in a breach of, or constitute a default under any of the terms, conditions, or provisions of the articles of incorporation, bylaws, partnership agreement, limited-liability company agreement or operating agreement of such Member or any of the Member's Affiliates or of any material agreement or instrument to which such Member or any of the Member's Affiliates is a party or by which such Member, or any of the Member's Affiliates is or may be bound or to which any of the Member's material properties or assets is subject; (3) will conflict with, violate, result in a breach of, constitute a default under (whether with notice or lapse of time or both), accelerate or permit the acceleration of the performance required by, give to others any material interests or rights, or require any consent, authorization, or approval under any indenture, mortgage, lease agreement, or instrument to which such Member or any of the Member's Affiliates is a party or by which such Member or any of its Affiliates is or may be bound; or (4) will result in the creation or imposition of any lien upon any of the material properties or assets of such Member or any of its Affiliates.

    18.18.2(c)   <u>Government Authorizations</u>. Any registration, declaration, or filing with, or consent, approval, license, permit, or other authorization or order by, any government or regulatory authority, domestic or foreign, that is required in connection with the valid execution, delivery, acceptance, and performance by such Member under this Agreement or the consummation by such Member of any transaction contemplated hereby has been completed, made, or obtained on or before the effective date of this Agreement.

    18.18.2(d)   <u>Litigation</u>. There are no actions, suits, proceedings, or investigations pending or, to the knowledge of such Member or any of its Affiliates, threatened against or affecting such Member or any of its Affiliates or any of their properties, assets, or businesses in any court or before or by any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator which could, if adversely determined (or, in the case of an investigation could lead to any action, suit, or proceeding, which if adversely determined could) reasonably be expected to materially impair such Member's ability to perform the Member's obligations under this Agreement or to have a

36

**Confidential**
**Attorneys Eyes only**

SM000136

Material Adverse Effect on the consolidated financial condition of such Member; and such Member or any of the Member's Affiliates has not received any currently effective notice of any default, and such Member or any of the Member's Affiliates is not in default, under any applicable order, writ, injunction, decree, permit, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator which could reasonably be expected to materially impair such Member's ability to perform the Member's obligations under this Agreement or to have a Material Adverse Effect on the consolidated financial condition of such Member.

18.18.2(e)    Investment Company Act; Public Utility Holding Company Act.  Neither such Member nor any of the Member's Affiliates is, nor will the Company as a result of such Member holding a Membership Interest be, an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.  Neither such Member nor any of the Member's Affiliates is, nor will the Company as a result of such Member holding a Membership Interest be, a "holding company," "an affiliate of a holding company," or a "subsidiary of a holding company," as defined in, or subject to regulation under, the Public Utility Holding Company Act of 1935.

18.18.2(f)    Tax Status.  The Members and the Manager agree that the Company shall be treated as a partnership, for federal income tax purposes, by default, pursuant to Regulation Section 301.7701-3(b), and they each agree not to take any action or make any election not consistent with such partnership classification.

### ARTICLE 19.
### SECURITIES MATTERS

19.1.  No Parole Reliance.

Each Member covenants that:  (a) with respect to such Member, such respective Member has received various documentation and has engaged in various communications whereby the Business has been discussed and described, apart from this Agreement, prior to the Effective Date (the "Explanatory Communications") by and between Stephens and Net Sortie; (b) the Explanatory Communications were merely illustrative of the Business and in no manner is a representation, warranty or guarantee of performance or profitability nor may be used as a basis for an implied representation, warranty or guarantee of performance or profitability; (c) with respect to such Member, that such Member has performed such Member's own due diligence, investigation and analysis of the viability and/or non-viability of the Business and/or the Company in

37

**Confidential**
**Attorneys Eyes only**

acquiring the such Member's Membership Interests pursuant to this Agreement; (d) with respect to such Member, such Member has diligently reviewed the terms of this Agreement and has only relied upon the terms and provisions of this Agreement as the communication from the Company regarding the acquisition by such Member of such Member's Membership Interests; (e) with respect to such Member, that all documents, records, and books pertaining to the Company have been made available to such Member for inspection by the Member and /or the Member's advisor(s); and (f) with respect to such Member, such Member has had a reasonable opportunity to ask questions of, and receive answers from, the Company concerning such Member's acquisition of the Member's Membership Interests pursuant to this Agreement, and all such questions have been answered to the full satisfaction of such Member.  The Company hereby further makes available to the Members any and all books and records of the Company, upon reasonable notice, during reasonable business hours at the Principal Place of Business.

19.2.   Own Account.

Each Member hereby covenants, represents and warrants that the Member's Membership Interests are being purchased by the Member solely for the Member's own account and not for the account of any other Person nor with a view to, or for Transfer in connection with, any distribution, division, assignment, or resale to others, and that no other Person has a direct or indirect beneficial interest in the Member's Membership Interests.

19.3.   Accurate Information.

Each Member hereby covenants, represents and warrants that, with respect to such Member, all information which the Member has provided to the Company, whether by way of this Agreement or otherwise, concerning the Member's investor status, financial position, knowledge and experience in financial and business matters:

(a)   has been provided by the Member by representatives of the Member that are in a position within the Member to have adequate knowledge and experience in the Member's financial and business matters; and

(b)   is true, accurate and complete as of the Effective Date.

19.4.   Risk Factors Disclosure.

Each Member covenants that:

38

**Confidential**
**Attorneys Eyes only**

SM000138

(a)    the acquisition of such Member's respective Membership Interests involves highly speculative risks;

(b)    each Member, with respect to such Member, has the ability to accept highly speculative risks and is prepared to lose the entire investment in the Company;

(c)    as a start-up operation, there is a significant risk that the Company's perceived market receptivity to the proposed services will not be as substantial as in fact perceived;

(d)    the willingness of consumers to understand and agree to the assignment and license-back structure that is inherent in the Company's business structure may not be consistent or even prevalent;

(e)    as the Company becomes more successful, such success may actually reduce infringements and hence future revenue streams;

(f)    the successful pursuit of infringements can be heavily mitigated by the ability to recover funds from defendants that may not have adequate financial wherewithal to pay judgments or settlement fees;

(g)    many defendants may attempt to escape judgment and other defendants may escape civil prosecution; and

(h)    the Company is unable to preclude future, pure competitors from adopting the Company's business model and replicating the range of services offered by the Company and that these future competitors could attempt to undercut the Company's pricing structure and capture significant market share.

[SIGNATURE PAGE FOLLOWS]

39

**Confidential
Attorneys Eyes only**

**SM000139**

WHEREFORE, the parties hereto hereby executed this Agreement and that this Agreement is hereby adopted by the Members.

Right*haven* LLC,
a Nevada limited-liability company

By:  Net Sortie Systems, LLC, a Nevada
        limited-liability company, Manager

By:_____
        Steven A. Gibson, its Manager


MEMBERS:

Net Sortie Systems, LLC,
a Nevada limited-liability company


_____
        Steven A. Gibson, Esq.,
        Manager


SI Content Monitor LLC,
an Arkansas limited-liability company


By: _____
        Print Name


_____
        Signature

Its: _____


40

**Confidential**
**Attorneys Eyes only**

SM000140

## SCHEDULE 1 - DEFINITIONS

The following terms used in this Agreement shall have the following meanings (unless otherwise expressly provided herein);

"Act" shall mean Chapter 86 of the Nevada Revised Statutes.

"Additional Offices" shall have the meaning ascribed to such term in Section 2.3.

"Affiliate" shall mean, with respect to any Person, (i) any Person directly or indirectly controlling, controlled by, or under common control with such Person, (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting interests of such Person, (iii) any officer, director, or general partner of such Person, or (iv) any Person who is an officer, director, general partner, trustee, or holder of ten percent (10%) or more of the voting interests of any Person described in clauses (i) through (iii) of this sentence.  For purposes of this definition, the term "controls," "is controlled by," or "is under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of any such Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" shall mean this Operating Agreement as originally executed and as amended from time to time.

"Annual Meeting" shall have the meaning set forth in Section 8.1.

"Applicable Securities Acts" shall have the meaning set forth in Section 18.17.

"Article" shall mean an enumerated provision of this Agreement that may contain Sections.

"Articles of Organization" shall mean the Articles of Organization of the Company as filed with the Secretary of State of Nevada as the same may be amended from time to time.

"Budget" shall mean the expenditures approved by the Members at each respective Annual Meeting for the succeeding year, as possibly modified by the Members through action taken at Quarterly Meetings.

"Business" shall have the meaning set forth in Article 3.

"Business Day" shall mean any day, Monday through Friday, excepting Saturday and Sunday and also excepting any day on which federal chartered banks situated in Clark County, Nevada are generally not open for business.

**Confidential**
**Attorneys Eyes only**

**SM000141**

"Buy Notice" shall have the meaning set forth in Section 15.2.3.

"Buy Option" shall have the meaning set forth in Section 15.2.2.

"Buying Member" shall have the meaning set forth in Section 15.2.2.

"CAO" shall have the meaning set forth in Section 6.6.

"Calculation Quarter" shall mean the last full Quarter that precedes a given Distribution Meeting.

"Candidates" shall have the meaning set forth in Section 5.9.

"Capital Account" as of any given date shall mean the Capital Account of each Member as described in Section 9.2 and maintained to such date in accordance with this Agreement.

"Capital Contribution" shall mean any contribution to the capital of the Company in cash or property by a Member whenever made.

"Causes of Action" shall mean any demand, complaint, request for redress, assertion of a cause of action or other claim whatsoever.

"CEO" shall have the meaning set forth in Section 6.2.

"Change of Control" shall mean any circumstance, event or occurrence whereby Control passes from one Person (or if more than one Person maintains Control, several Persons) to one or more other Persons.

"Changed Member" shall have the meaning set forth in Section 15.5.

"Claim" shall mean any claim, demand, action, suit, institution of any legal or quasi-legal proceeding of any nature whatsoever.

"Claimant" shall have the meaning set forth in Section 5.8.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Company" shall have the meaning set forth in the initial paragraph of this Agreement.

"Company Identified Infringements" shall have the meaning set forth in Section 3.2 (c).

S-2

**Confidential**
**Attorneys Eyes only**

**SM000142**

"Company Intellectual Property" shall mean the Intellectual Property owned, Developed, held, used or licensed by Company.

"Company Property" shall mean all assets (real or personal, tangible or intangible, including cash) of the Company.

"Company Trade Secrets" shall mean Trade Secrets owned, Developed, held, used or licensed by Company, including, without limitation, the Methods.

"Competitive Activities" shall have the meaning set forth in Section 12.6.

"Confidential Information" shall mean all the Content that is the subject of the Assignment and all Content relating to, used in or arising out of the Business, finances or other operations and held by, owned, Developed, licensed, or otherwise possessed by the Company (whether held by, owned, Developed, licensed, possessed or otherwise existing in, on or about Company's premises or a Member's offices, residence(s) or facilities, including, without limitation, the Principal Place of Business, and regardless of how such Content came into being, as well as regardless of who Developed, created, generated or gathered the Content), including, without limitation, all Content contained in, embodied in (in any Media whatsoever) or relating to Company's ideas, creations, works of authorship, works of visual art, Business documents, contracts, licenses, Business and non-Business relationships, correspondence, operations, manuals, performance manuals, operating data, projections, bulletins, supplier and customer lists and data, Transfers data, cost data, profit data, strategic planning data, financial planning data, designs, logos, motifs, proposed trademarks or service marks, test results, product or service literature, product or service concepts, manufacturing or Transfers techniques, process data, specification data, know-how, show-how, Software, databases, research and development information and data; provided, however, that "Confidential Information" shall not include information or data "generally publicly known." The phrase in the previous sentence "generally publicly known" shall not be deemed to include the Content set forth in patents despite the fact that patents have been published by the federal government, unless such embodiment has otherwise been the subject of a publication for general public consumption (other than publication as a patent) or if that embodiment is otherwise utilized generally by Persons in the United States of America while Transferring products or services within the scope of the Maintenance, Repair or Renovation industries. All references to "Confidential Information" in this Agreement shall be deemed to also refer to "Company Trade Secrets" as well, but references to "Company Trade Secrets" shall not be deemed to automatically refer to "Confidential Information."

"Content" shall mean all material, information, matter, text, data, graphics, Documents, computer-generated displays and interfaces, images, photographs and works of whatsoever nature, including without limitation all compilations of the foregoing and all

**Confidential**
**Attorneys Eyes only**

**SM000143**

results of the expression of the foregoing whether in a format now known or hereinafter Developed.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any Person, or the power to veto major policy decisions of any such Person, whether through the ownership of voting securities, by contract, or otherwise.

"COO" shall have the meaning set forth in Section 6.4.

"Deadlock" shall mean the circumstance whereby a determination, by way of voting, by the Members is required by the provisions of this Agreement but said voting does not result in an ascertainable conclusion because of the non-occurrence of a simple Majority Vote to be reached or, where specifically required by this Agreement, a failure of an affirmative vote of the Members holding at least a Super-Majority Interest to be reached.

"Depreciation" shall mean, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

"Develop" shall mean develop, conceive, discover, reduce to practice, create, or otherwise arise out of a Person's efforts in any manner whatsoever and through any means whether now known or hereafter developed.

"Disclose" shall mean disclose, disseminate, transmit, publish, distribute, make available or otherwise convey.

"Distributable Cash" shall mean all cash possessed by the Company (other than cash that exists as a result of any Capital Contribution) on the last day of the Calculation Quarter with respect to a particular, respective Distribution Meeting minus both of the following: (a) the Total Reserve with respect to the Quarter succeeding said, respective Calculation Quarter, and (b) an amount equal to the account payables of the Company due and owing on the last day of the respective Calculation Quarter.

S-4

**Confidential**
**Attorneys Eyes only**

**SM000144**

"Distribution" shall mean the amount of Distributable Cash determined by the Members at each respective Distribution Meeting to be disbursed to the Members in accordance with the procedure set forth in Section 11.2.

"Distribution Meeting" shall mean each and every Quarterly Meeting and each and every Annual Meeting.

"Document" shall mean any form of tangible Media containing Content capable of being reduced to electronic form and reconstituted in tangible form.

"Economic Interest" shall mean a Member's share of one or more of the Profits, Losses and Distributions pursuant to this Agreement and the Act, but shall not include any right to participate in the management or affairs of the Company, including, the right to vote on, consent to or otherwise participate in any decision of the Members or the Manager.

"Effective Date" shall have the meaning set forth in the Introductory Clause.

"Entity" shall mean any general partnership, limited partnership, limited-liability company, corporation, joint venture, trust, business trust, cooperative or association or any foreign trust or foreign business organization.

"Explanatory Communications" shall have the meaning set forth in Section 19.1.

"Exploit" shall mean to use, make, Transfer or otherwise exploit in any manner whatsoever (through any means now known or hereafter Developed).

"Fiscal Year" shall mean the calendar year or any partial calendar year in which the Company conducts Business operations.

"Focus" shall have the meaning set forth in Section 3.2.

"Gift" shall mean a gift, bequest, or other transfer for no consideration, whether or not by operation of law, except in the case of bankruptcy.

"Gifting Member" shall mean any Member who gifts, bequeaths or otherwise transfers for no consideration (by operation of law or otherwise, except with respect to bankruptcy) all or any part of its Membership Interest.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

      (a)    The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined

S-5

**Confidential**
**Attorneys Eyes only**

SM000145

by the contributing Member and the Manager, provided that the initial Gross Asset Values of the assets contributed to the Company pursuant to Section 11.13.1 hereof shall be as set forth in Exhibit 9.1, and provided further that, if the contributing Member is a Manager, the determination of the fair market value of any other contributed asset shall require the consent of the other Members holding at least a Super-Majority Interest (determined without regard to the Voting Interest of such contributing Member);

(b)     The Gross Asset Values of all Company Property shall be adjusted to equal their respective gross fair market values, as reasonably determined by the Manager as of the following times: (i) the acquisition of an additional interest by any new or existing Member in exchange for more than a *de minimis* contribution of property (including money); (ii) the Distribution by the Company to a Member of more than a *de minimis* amount of property as consideration for a Membership Interest; and (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (i) and (ii) above shall be made only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(c)     The Gross Asset Value of any Company asset Distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of Distribution as reasonably determined by the distributee and the Manager, provided that, if the distributee is a Manager, the determination of the fair market value of the Distributed asset shall require the consent of the other Members holding at least a Super-Majority Interest (determined without regard to the Voting Interest of the distributee Member); and

(d)     The Gross Asset Values of Company Property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Section 734(b) or Section 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulation Section 1.704-1(b)(2)(iv)(m) and Section 9.3 and subparagraph (d) under the definition of Profits and Losses; provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (d) of this definition to the extent that the Manager determines that an adjustment pursuant to subparagraph (b) of this definition is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (d).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (a), (b) or (d) of this definition, then such Gross Asset Value shall

S-6

**Confidential**
**Attorneys Eyes only**

SM000146

thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Highest Aggregate Rank" shall have the meaning set forth in Section 5.9.

"Highest Ranked Matches" shall have the meaning set forth in Section 5.9.

"Identified Infringements" shall have the meaning set forth in Section 3.2 (c).

"Initial Capital Contribution" shall have the meaning set forth in Section 9.1.

"Intellectual Property" shall mean all foreign, federal, state and common law trademarks, service marks, domain names, Internet path names and addresses of whatsoever nature, trade dress, copyrights, know-how, show-how, patents, inventions, (whether or not patentable) mask works, Software, proprietary data, customer lists, strategic plans, financial data, Trade Secrets, all other intangible assets of whatsoever nature and all applications for registration and/or issuance with respect to all the foregoing and whether or not any of the foregoing is registerable or patentable, including, without limitation, with respect to all of the foregoing:  (a) all goodwill associated with any and all of the foregoing, (b) all parents, continuations, continuations in part, divisionals, reissues and extensions, and (c) all moral rights associated with any and all of the foregoing.

"Interim Manager" shall have the meaning set forth in Section 5.8.

"Internet" shall mean the largest set of computer based networks now known, as interconnected by routers.

"Laws" shall mean all laws, statutes, rules, regulations, ordinances, and other pronouncements having the effort of law of the United States or any state, county, city, possession or other political subdivision of any Government Authority.

"Majority Vote" shall mean one or more Voting Interests of the Members, which, taken together exceed fifty percent (50%) of the aggregate of all Voting Interests.

"Manager" shall have the meaning set forth in Section 5.1.

"Managers List" shall have the meaning set forth in Section 5.9.

"Mark Licensees" shall have the meaning set forth in Section 3.2 (f).

"Match" shall have the meaning set forth in Section 5.9.

S-7

**Confidential**
**Attorneys Eyes only**

"Material Adverse Effect" shall mean reasonable anticipation that the net worth of the Company would be reduced by more than five percent (5%) or such net worth is, in fact, reduced by more than five percent (5%).

"Media" shall mean television, telephony, radio, satellite, cable, wire, computer-based network, network, magnetic means, electronic means, Internet, intranet, print means, optical means and any other method (now known or hereinafter devised, invented or created) for the publication of Content, including without limitation, computer software, compact and laser disc, digital video displays, video cassettes, and multi-media means.

"Member" shall mean each of the parties who executes a counterpart of this Agreement as a member ("Member").

"Member Meeting" shall mean each, any and all Quarterly Meetings, Annual Meetings and/or Special Meetings.

"Membership Interest" shall mean a Member's ownership interest in the Company expressed as a percentage in relation to all other Members' ownership interest in the Company.

"Misconduct" shall have the meaning set forth in Section 5.8.

"Misconduct Arbitration Proceedings" shall have the meaning set forth in Section 5.8.

"Net Sortie" shall have the meaning set forth in the initial paragraph of this Agreement.

"Non-Cash Consideration" shall have the meaning set forth in Section 15.2.1.

"Non-Changing Member" shall have the meaning set forth in Section 15.5.

"Non-Executive Reserve" shall mean, with respect to a time period as expressed in this Agreement that also expressly references this defined term in a provision of this Agreement (each a "Non-Executive Reserve Relevant Time Period"), an amount of cash equal to the total expenditures for three (3) months as set forth on the Budget that is controlling for each such respective Non-Executive Reserve Relevant Time Period minus salaries to the CEO and the COO.

"Notice" shall have the meaning set forth in Section 18.1.

"Notice of Transfer" shall have the meaning set forth in Section 15.2.1.

"Officer" shall mean the CEO, the COO, the CAO as well as any other employee of the Company who is the subject of an Officer Notice pursuant to Section 5.2(n).

S-8

**Confidential**
**Attorneys Eyes only**

**SM000148**

"Officer Misconduct" shall have the meaning set forth in Section 6.1.

"Officer Notice" shall have the meaning ascribed to such term in Sect ion 5.2(n).

"Offered Interest" shall have the meaning set forth in Section 15.2.1.

"Option Period" shall have the meaning set forth in Section 15.2.2.

"Participation Notice" shall have the meaning set forth in Section 15.2.2

"Participation Options" shall have the meaning set forth in Section 15.2.2.

"Period of Arbitration" shall have the meaning set forth in Section 5.8.

"Person" shall mean any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

"Pledge" shall have the meaning set forth in Section 5.3(a).

"Principal Place of Business" shall have the meaning ascribed to such term in Section 2.3.

"Profits" and "Losses" shall mean for each Fiscal Year, or other applicable period, of the Company an amount equal to the Company's net taxable income or loss for such year as determined for federal income tax purposes (including separately stated items) in accordance with the accounting method and rules used by the Company, subject to the capital account maintenance rules set forth in Section 1.704-1(b)(2)(iv) of the Regulations, and in accordance with Section 703 of the Code, with and including the following adjustments:

    (a)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses (pursuant to this definition) shall be added to such taxable income or loss;

    (b)    Any expenditure of the Company described in Section 705(a)(2)(B) of the Code and not otherwise taken into account in computing Profits and Losses (pursuant to this definition) shall be subtracted from such taxable income or loss;

    (c)    In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraphs (b) or (c) of the definition of Gross Asset

**Confidential**
**Attorneys Eyes only**

SM000149

Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits and Losses;

(d)     Gain or loss resulting from any disposition of any Company asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed with reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

(e)     In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year; and

(f)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) or Section 743(b) of the Code is required pursuant to Section 1.704-1(b)(2)(iv)(m)(4) of the Regulations to be taken into account in determining Capital Accounts as a result of a Distribution other than in liquidation of a Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits and Losses.

"Proposed Budget" shall mean the proposed annual expenditures by the Company for the succeeding year proposed by the Manager to the Members for consideration at each respective Annual Meeting.

"Purchase Price" shall have the meaning set forth in Section 15.2.1.

"Quarterly Meeting" shall have the meaning set forth in Section 8.2.

"Regulations" shall include proposed, temporary and final regulations promulgated under the Code in effect as of the date of filing the Articles of Organization and the corresponding sections of any regulations subsequently issued that amend or supersede such regulations in their application to the Company.

"Remainder" shall have the meaning set forth in Section 17.3(a).

"Remaining Members" shall have the meaning set forth in Section 15.2.1.

"Removal Deadlock" shall have the meaning set forth in Section 5.8.

"Reorganization" shall mean the merger or conversion of the Company, or a Transfer or other disposition of assets of the Company, or Transfer or other disposition of

S-10

**Confidential**
**Attorneys Eyes only**

**SM000150**

Membership Interests, or other transaction pursuant to which a Person or Persons acquire all or substantially all of the assets of, or Membership Interests in, the Company in a single or series of related transactions, including without limitation, a merger or conversion of the Company into a corporation or other entity, whether or not such corporation or other entity has the same owners as the Company and whether or not additional capital is contributed to such corporation or other entity.

"Reports" shall have the meaning set forth in Section 18.3.

"Respective Distribution Entitlement" shall have the meaning set forth in Section 11.2.2.

"Restricted Territory" shall mean the known universe as of the Effective Date.

"Secretary of State" shall mean the secretary of state of the State of Nevada.

"Section" shall mean an enumerated part of any Article.

"Self Identified Infringements" shall have the meaning set forth in Section 3.2(b).

"Software" shall mean source code, object code, executable code, or other program or code format whatsoever, whether now known or hereinafter Developed.

"Special Meeting" shall have the meaning ascribed to such term in Section 8.3.

"Special Member Meeting Caller" shall have the meaning set forth in Section 8.3.

"Start-up Phase" shall have the meaning set forth in Section 6.2(a).

"State" shall mean the State of Nevada.

"Stephens" shall have the meaning set forth in the initial paragraph of this Agreement.

"Stephens Membership Interests" shall mean the Membership Interests acquired by Stephens pursuant to this Agreement.
"Strategic Alliance Agreement" shall have the meaning set forth in Article 20 of this Agreement.

"Super-Majority Interest" shall mean one or more Voting Interests of the Members, which, taken together exceed seventy-five percent (75%) of the aggregate of all Voting Interests.

"Suspended Manager" shall have the meaning set forth in Section 5.8.

S-11

**Confidential**
**Attorneys Eyes only**

**SM000151**

"Tag Along Member" shall have the meaning set forth in Section 15.2.2.

"Tag Along Option" shall have the meaning set forth in Section 15.2.2.

"Technology" shall mean electronic Service request generator via Internet, electronic report generation, display, techniques employed for the creation and maintenance of the Database, transmittal and printing operations regarding the provision of Services.

"Term" shall mean the period commencing on the Effective Date and ending upon the Termination Date.

"Termination Date" have the meaning set forth in Section 2.5.

"Third Party Offer" shall have the meaning set forth in Section 15.2.1.

"Third Party Purchaser" shall have the meaning set forth in Section 15.2.1.

"TMP" shall have the meaning set forth in Section 11.8.

"Total Reserve" shall mean, with respect to a time period as expressed in this Agreement that also expressly references this defined term in a provision of this Agreement (each a "Total Reserve Relevant Time Period"), an amount of cash equal to the total expenditures for three (3) months as set forth on the Budget that is controlling for each such respective Total Reserve Relevant Time Period.

"Trade Secrets" shall mean trade secrets as such term is defined in the Uniform Trade Secrets Act, as promulgated from time to time in Nevada.

"Transfer" shall mean a sale, assignment, exchange, or other transfer for consideration, pledge, hypothecation, or grant of a security interest, or change in ownership by reason of the merger, conversion or other transformation in the identity or form of business organization of the owner, regardless of whether such change or transformation is characterized by state law as not changing the identity of the owner, but shall not include a Gift.

"Transferring Member" shall mean a Transferring Member and a Gifting Member.

"Transferor's Estimate" shall have the meaning set forth in Section 15.2.1(b).

"Voting Interest" shall mean Membership Interest that are entitled to cast votes pursuant to or arising out of this Agreement expressed with respect to any given Member but expressed by a percentage by comparing such Member's relative

S-12

**Confidential**
**Attorneys Eyes only**

**SM000152**

Membership Interests (that are so entitled to cast votes) in relation to the aggregate Membership Interest (that are also entitled to cast votes).

S-13

**Confidential
Attorneys Eyes only**

**SM000153**

## EXHIBIT 5.8
## ARBITRATION

1.1     Certain terms used herein shall have the meanings ascribed to such terms as set forth in Section 1.10 of this Exhibit 5.8 to the extent not otherwise defined in this Agreement.

1.2     Net Sortie shall provide to Stephens and Stephens shall provide to Net Sortie, within fifteen (15) Business Days of the Arbitration Commencement Date, respective Arbitrator Lists (said fifteenth (15th) day known herein as the "Arbitration List Production Deadline"). Net Sortie and Stephens shall undertake respective reasonable efforts to determine that each individual on the respective Arbitrator List will be available during all relevant time periods to act as an Adjudicating Arbitrator. The hourly rates and other charges that each individual on the respective Arbitrator Lists will charge to be an Adjudicating Arbitrator shall be detailed by Net Sortie and Stephens.

1.3     Within ten (10) Business Days after the Arbitration List Production Deadline, Net Sortie and Stephens shall meet in person at the Principal Place of Business for the purpose of Adjudicating Arbitrator selection as follows:

(a)     If any of the Arbitrators are chosen both by Stephens and by Net Sortie (an "Arbitrator Match") and there is only one Arbitrator Match, then the Arbitrator Match shall become Arbitrator that adjudicates the Misconduct Arbitration Proceedings arising out of a particular Arbitration Commencement Date (the "Adjudicating Arbitrator");

(b)     If there is more than one Arbitrator Match, then the Arbitrator Match with the highest aggregate numerical preference rating (the "Highest Aggregate Ranked Arbitrator") taking into consideration both the rankings indicated by Stephens and Net Sortie shall become the Adjudicating Arbitrator;

(c)     If there are Arbitrator Matches that share the Highest Aggregate Rank (the "High-Ranked Arbitrator Matches"), then the Adjudicating Arbitrator shall be designated by process of a coin toss (with the Claimant flipping the coin and one of the High-Ranked Arbitrator Matches designated as heads and the other designated as tails), or, if necessary, there shall be multiple coin tosses in the event of several High-Ranked Arbitrator Matches; and

E5-1

**Confidential**
**Attorneys Eyes only**

SM000154

(d)     If there are no Arbitrator Matches, then Net Sortie shall have the right to choose the Adjudicating Arbitrator amongst any of the Arbitrators that appear on the Arbitrator List produced by Stephens.

1.4     If, due to incapacity, unwillingness or any other reason, the chosen Adjudicating Arbitrator becomes unavailable to fulfill the Adjudicating Arbitrator's duties, then procedures set forth in Section 1.3 of this Exhibit 5.8 shall be repeated until an available and serving Adjudicating Arbitrator is found.

1.5     Net Sortie and Stephens shall have forty-five (45) Business Days from the Arbitration Commencement Date to submit respective Arbitration Briefs to each other Member and the Adjudicating Arbitrator via electronic mail and U.S. Mail.

1.6     An Arbitration Hearing shall take place within sixty (60) Business Days after the Arbitration Commencement Date at a time reasonably designated by the Adjudicating Arbitrator and at a location within Chicago, Illinois reasonably designated by the Adjudicating Arbitrator.

1.7     The Adjudicating Arbitrator shall render and report to both Net Sortie and Stephens an Arbitration Decision within fifteen (15) Business Days after the Arbitration Hearing.

1.8     An Arbitration Decision shall be final and binding on the Members and shall bar any suit, action or proceeding instituted by any of the Members in any court or administrative tribunal or any jurisdiction, except for a decision on enforcement proceedings.

1.9     Net Sortie and Stephens shall each bear fifty (50%) of all costs of the Misconduct Arbitration Proceedings.

1.10    Definitions

"Adjudicating Arbitrator" shall have the meaning set forth in Section 1.3(a).

"Arbitration Brief" shall mean one document setting forth the respective memoranda of facts and applicable law regarding the issue of whether Misconduct occurred with a maximum page length (and a font size of Times Roman 12, with at least one inch margins) of thirty (30) pages, non-inclusive of relevant evidentiary attachments.

"Arbitration Commencement Date" shall have the meaning set forth in Section 5.8 of the Agreement.

E5-2

**Confidential**
**Attorneys Eyes only**

**SM000155**

"Arbitration Decision" shall mean a final determination of the Adjudicating Arbitrator as to whether Manager removal is or is not appropriate based upon the occurrence of Misconduct.

"Arbitration Hearing" shall mean a hearing occurring on a single day and lasting no more than seven (7) hours to be oriented in the reasonable discretion of the Adjudicating Arbitrator by under no circumstances whereby one Member is permitted more time to present such Members case as opposed to the other Member.

"Arbitration List Production Deadline" shall have the meaning set forth in Section 1.2.

"Arbitrator" shall mean any attorney-at-law licensed in the State of Illinois to engage in the practice of law that also has at least ten (10) years of experience at a Chicago-based law firm that employs (by way of equity partners, non-equity partners and associates) not less than one hundred (100) lawyers in the areas of corporate transactions and/or commercial litigation involving disputes involving corporate duties.

"Arbitrator List" shall mean a list of five (5) proposed Arbitrators, numerically ranked according to preference with the first rank signifying the highest preference and the fifth rank signifying the lowest preference.

"Arbitrator Match" shall have the meaning set forth in Section 1.3(a).

"High-Ranked Arbitrator Matches" shall have the meaning set forth in Section 1.3(c).

"Highest Aggregate Ranked Arbitrator" shall have the meaning set forth in Section 1.3(b).

E5-3

**Confidential**
**Attorneys Eyes only**

## EXHIBIT 6
## EMPLOYMENT AGREEMENTS

ATTACHED HERETO

E6-1

**Confidential**
**Attorneys Eyes only**

SM000157



E9-1

**Confidential**
**Attorneys Eyes only**

SM000158

## EXHIBIT 9.1(A)
### ASSIGNMENT

This Intellectual Property Assignment (this "Assignment") is made effective as of January 17, 2010 (the "Effective Date") by Net Sortie Systems, LLC, a Nevada limited-liability company ("Net Sortie") for the benefit of Right*haven* LLC, a Nevada limited-liability company ("Assignee").

Net Sortie hereby contributes, conveys, transfers and assigns to Assignee Net Sortie's entire right, title, license and interest in, to and under the business method related to and associated with the provision of copyright infringement identification and prosecution services to others **(the "Business Method IP")** with said right, title, license and interest to be held and enjoyed by Assignee, for Assignee's own use and benefit and for the use and benefit of Assignee's successors, assigns or other legal representatives, as fully and entirely as the same would have been held and enjoyed by Net Sortie if this contribution, conveyance, transfer and assignment had not been made.  This Assignment of Net Sortie's existing rights to the Business Method IP shall be automatically revoked and all such assigned rights shall revert to Net Sortie in the event of dissolution of the Company in accordance with the Operating Agreement.

**IN WITNESS WHEREOF, Net Sortie** hereby executes this Assignment on this 17th day of January, 2010.

**Net Sortie Systems, LLC,**
**a Nevada limited-liability company:**

_____
Steven A. Gibson, Manager

STATE OF NEVADA          )
COUNTY OF CLARK          )

Subscribed and sworn to before me by Steven A. Gibson this _____ day of
_____, 2010.

_____
Notary Public

E9(A)-1

**Confidential**
**Attorneys Eyes only**                    SM000159

## EXHIBIT 13
## BUDGET

ATTACHED HERETO

E13-1

**Confidential**
**Attorneys Eyes only**

SM000160

**Exhibit 18.1**
**Name, Address and Membership Interest**

| Name | Address | Membership Interest |
|------|---------|---------------------|
| Net Sortie Systems, LLC, a Nevada limited-liability company | 9506 West Flamingo Road, Suite 101 Las Vegas, Nevada 89147 Attn: Manager | 50% |
| SI Content Monitor LLC, an Arkansas limited-liability company | 111 Center Street Suite 2500 Little Rock, Arkansas 72201 Attn: Manager | 50% |

E18-1

**Confidential**
**Attorneys Eyes only**

SM000161