LAURENCE F. PULGRAM (CA State Bar No. 115163) (*pro hac vice*)
lpulgram@fenwick.com
CLIFFORD C. WEBB (CA State Bar No. 260885) (*pro hac vice*)
cwebb@fenwick.com
JENNIFER J. JOHNSON (CA State Bar No. 252897) (*pro hac vice*)
jjjohnson@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, California 94104
Telephone:   (415) 875-2300

KURT OPSAHL (CA State Bar No. 191303) (*pro hac vice*)
kurt@eff.org
CORYNNE MCSHERRY (CA State Bar No. 221504) (*pro hac vice*)
corynne@eff.org
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street, San Francisco, California 94110
Telephone:   (415) 436-9333

CHAD BOWERS (NV State Bar No. 7283)
bowers@lawyer.com
CHAD A. BOWERS, LTD
3202 West Charleston Boulevard
Las Vegas, Nevada 89102
Telephone:   (702) 457-1001

Attorneys for Defendant and Counterclaimant
DEMOCRATIC UNDERGROUND, LLC, and
Defendant DAVID ALLEN

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| RIGHTHAVEN LLC, a Nevada limited liability company,<br><br>Plaintiff,<br>v.<br>DEMOCRATIC UNDERGROUND, LLC, a District of Columbia limited-liability company; and DAVID ALLEN, an individual,<br><br>Defendants.<br>────────────────────────<br>DEMOCRATIC UNDERGROUND, LLC, a District of Columbia limited-liability company,<br><br>Counterclaimant,<br>v.<br>RIGHTHAVEN LLC, a Nevada limited liability company, and STEPHENS MEDIA LLC, a Nevada limited-liability company,<br><br>Counterdefendants. | Case No. 2:10-cv-01356-RLH (GWF)<br><br>**DEMOCRATIC UNDERGROUND'S REPLY TO RIGHTHAVEN'S RESPONSE TO ORDER TO SHOW CAUSE RE SANCTIONS** |

# INTRODUCTION

As this Court noted "Righthaven failed to disclose Stephens Media as an interested party in any of its approximately 200 cases filed in this District," despite the requirements of Local Rule 7.1–1. *Righthaven LLC v. Democratic Underground, LLC*, 2011 WL 2378186, *9 (D. Nev. 2011). Since there could hardly be a more direct pecuniary interest than a contractual right to a percentage of the recovery, the Court ordered Righthaven to explain "this flagrant misrepresentation." *Id.*

Instead, Righthaven chooses to ignore all of its Certificates of Interested Parties except the one filed in this litigation (Dkt. 5), and fails to explain what, if anything, could be a "direct, pecuniary interest" in a lawsuit, if half the recovery is not. Rather than accept responsibility, Righthaven presents three convoluted arguments that it hopes will get it off the hook. As explained in detail below, each is wrong.

First, Righthaven claims that it is "*understandable* how Local Rule 7.1-1 could have *arguably* been *reasonably* construed to not require the disclosure of Stephens Media's interest." OSC Response (Dkt. 127) at 2 (emphasis added). Its lack of confidence in this position is readily apparent—even Righthaven hesitates to say that it was *actually* a reasonable construction, or even *arguably* one, but rather hopes it is *understandable* how it *could be* arguable. In any event, Righthaven's claim is nonsense: there is no good faith argument in support of such a misinterpretation. A "direct, pecuniary interest" is a well-known and comprehensible term recently construed by the Supreme Court, among others, and the facts here are not an edge case that a lawyer might "reasonably" misconstrue.

Second, Righthaven tries to lay the blame solely on two of its former in-house counsel, even though Righthaven's CEO Steven Gibson, who negotiated and signed the Strategic Alliance Agreement, was counsel of record when the certification was filed. Mr. Gibson presents himself as a lawyer with nearly 20 years of experience, and who specializes in drafting intellectual

1  property contracts.[1]  He certainly can be expected to know that a 50/50 interest (less costs) in the
2  recovery is a direct, pecuniary interest and to take responsibility for his employees' actions.
3  　　　　Third, and most brazenly, Righthaven incorrectly asserts that it is beyond the sanction
4  power of this Court.  To the contrary, this Court has substantial power under the Local Rules, the
5  Federal Rules of Civil Procedure and its inherent power to address misrepresentations to the
6  Court.
7  　　　　Local Rule 7.1-1 is designed to enable the Court to determine whether recusal is
8  appropriate, and it is true, of course, that once Democratic Underground countersued Stephens
9  Media, at least its non-pecuniary interest in *this* action was known.  However, there are additional
10 interests at stake.  Righthaven's misrepresentation was part of a concerted effort to avoid
11 admitting Stephens Media's role in this litigation, which allowed the Counterdefendants to
12 pretend that there was no basis for the counterclaim.  Moreover, the misrepresentations in the
13 other actions—where Stephens Media was not made a party by counterclaim—not only concealed
14 the actually interested parties in those cases, but allowed Righthaven to continue to litigate
15 hundreds of cases for months over a right that it did not have, raising defense costs and resulting
16 in settlements that may never have happened if the truth had been known.

## ARGUMENT

### I.  RIGHTHAVEN'S PURPORTED INTERPRETATION OF "DIRECT PECUNIARY INTEREST" IS NEITHER REASONABLE NOR CREDIBLE, AND CONTRAVENES SUPREME COURT PRECEDENT

20 　　　　Righthaven contends that it understood Stephens Media's interest to be "indirect" because
21 of a supposed "two-step payment process":  the funds first go to Righthaven, and then a
22 percentage is distributed to Stephens Media.[2]  Essentially, Righthaven is attempting to re-write a
23 simple provision ("Within one (1) week after receipt of the Recovery, Righthaven shall pay to
24 Stephens Media a the [sic] percentage of the Recovery...") in a more convoluted way, as if the

---

[1]  *See* Dickinson Wright, Bio of Steven A. Gibson, available at http://www.dickinson-wright.com/ourpeople/pages/person.aspx?person=96835d9d-f7d2-430e-a836-92977532ec50.

[2]  Righthaven also argues that the pecuniary interest was "contingent" and was only "assuming any case resulted in a recovery."  OSC Response at 2-3.  This argument is meritless.  If the possibility that a party might lose obviated the disclosure requirement, LR 7.1-1 would become meaningless.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   sharing of proceeds was not directly mandated by the contract.  Strategic Alliance Agreement
2   (Dkt. 79-1) ("SAA") § 5.  In doing so, Righthaven also ignores Section 8 of the SAA which
3   contemplates that Stephens Media may directly receive a Recovery; Section 9.4 which
4   contemplates that Stephens Media might independently settle infringement claims, and Section
5   10.2, which expressly discusses what happens when a "Recovery Instrument [is] in Stephens
6   Media's name."  The SAA thus specifically contemplated and addressed the possibility of a "one-
7   step" payment to Stephens Media.  It is hard to imagine a more direct pecuniary interest by a
8   party not appearing in its own name and therefore required to make disclosure of its interest.

9   Righthaven attempts to excuse its non-disclosure by claiming that "[t]here is an absence of
10  case law or other decisional authority that defines 'direct, pecuniary interest' under Local Rule
11  7.1-1 *or otherwise*."  OSC Response at 6 (emphasis added).  This is simply incorrect.  To be sure,
12  the District of Nevada has not needed to expand upon this fairly self-explanatory term.  However,
13  other courts have, including a recent decision by the United States Supreme Court.

14  In *Caperton v. AT Massey Coal Co., Inc*., 129 S. Ct. 2252 (2009), the Supreme Court
15  considered whether a West Virginia Supreme Court Justice needed to recuse himself in a case
16  involving a campaign contributor.  The Court turned to the venerable decision in *Tumey v. Ohio*,
17  273 U.S. 510 (1927), the "early and leading case on the subject," to explain a "direct pecuniary
18  interest."  *Caperton* 129 S.Ct. at 2259.  In *Tumey*, the *Caperton* Court explained, the mayor of a
19  village had the authority to sit as a judge, and received a salary supplement for doing so.  *Id.* at
20  2260.  However, the funds for that compensation came from the fines assessed in a case.  Since
21  fines were not assessed upon acquittal, the mayor-judge received a salary supplement only if he
22  convicted the defendant.

23  Even under Righthaven's "two-step" characterization, Stephens Media still has an interest
24  that is *more* direct than the "direct pecuniary interest" described by the Supreme Court.  In *Tumey*
25  the mayor-judge did not even receive a percentage, it was just that his supplemental salary
26  depended on having at least some funds available.  Here, not only is the fund to pay Stephens
27  Media dependent on a recovery, it is mandated as a percentage of the recovery.
28

DEMOCRATIC UNDERGROUND'S REPLY TO
RIGHTHAVEN'S RESPONSE TO OSC RE SANCTIONS   3   CASE NO. 2:10-cv-01356-RLJ (GWF)

1   To illustrate how untenable Righthaven's argument is, consider a hypothetical. Imagine
2   that a plaintiff's contract provided payment of 50% of the recovery, less costs, to a company
3   owned by a judge or his family (instead of to Stephens Media). Under Righthaven's theory, if the
4   money went first to plaintiff before going to the judge's company, it would not need to be
5   disclosed, because it would be "indirect." Yet this would be the paradigmatic case for recusal.
6   No lawyer could seriously think that this interest need not be disclosed, whether they just passed
7   the bar or if they had nearly 20 years of experience.

There is no reasonable construction of existing law that would interpret LR 7.1-1 to exclude from disclosure a 50/50 split (less costs) in any recovery. Righthaven offers no argument for extending, modifying, or reversing existing law or for establishing new law. Its failure to disclose Stephens Media's interest was inexcusable.

## II. RIGHTHAVEN CANNOT AVOID RESPONSIBILITY BY BLAMING MR. COONS AND MR. CHU

Steven Gibson, Righthaven's CEO, was also Righthaven's counsel of record from the very beginning of this litigation. *See* Complaint (Dkt. 1). Surprisingly, Righthaven neglects to mention Mr. Gibson, choosing instead to focus attention solely on Charles Coons, its former Assistant General Counsel and Joseph Chu, a former in-house counsel. Righthaven then takes the position that it would be unfair to sanction Mr. Coons and Mr. Chu, arguing they should "be provided with notice and an opportunity to respond." OSC Response at 8. In other words, Righthaven is claiming the Court cannot now hold any attorney responsible for Righthaven's misrepresentation.[3]

This, too, is nonsense. Righthaven has offered no reason why Mr. Gibson is not both responsible and subject to this Court's sanction power. While Mr. Gibson is not presently counsel of record, (Righthaven moved to substitute Mr. Mangano in for Mr. Gibson in November 2010 (Dkt. 35)), the Certificate of Interested Parties was filed under Mr. Gibson's watch (Dkt.

---

[3] Mr. Gibson has had actual notice of the Court's order to show cause. The following week, Mr. Gibson was interviewed on *Face-To-Face with Jon Ralston* (KSNV-Channel 3 Las Vegas, June 22, 2011, 7:30 p.m., available at http://www.lasvegassun.com/videos/2011/jun/22/5268/). Mr. Gibson called Righthaven's misrepresentation a minor technical issue, and showed no remorse.

DEMOCRATIC UNDERGROUND'S REPLY TO
RIGHTHAVEN'S RESPONSE TO OSC RE SANCTIONS    4    CASE NO. 2:10-cv-01356-RLJ (GWF)

5).[4] Righthaven also fails to mention that Righthaven put Mr. Gibson's name on numerous Certificates of Interested Parties in other cases.[5] As the signatory to the SAA, Mr. Gibson certainly knew that Stephens Media had a direct pecuniary interest in the outcome of this litigation. Indeed, Mr. Gibson was the architect of the entire champertous scheme to get around *Silvers* and profit from litigating Stephens Media's copyrights in exchange for a cut of the proceeds. Remarkably, although Mr. Gibson submitted a declaration purporting to explain the SAA and to support Righthaven's standing in this action, he has supplied no declaration suggesting that he actually considered Stephens Media's interest to be "indirect" or not subject to disclosure.

Moreover, as CEO of Righthaven and its senior lawyer, Mr. Gibson was the supervisor of both Mr. Coons and Mr. Chu.[6] Pursuant to Nevada Rule of Professional Conduct 5.1, Mr. Gibson was responsible for ensuring that the lawyers he supervised conformed to the Rules of Professional Conduct, including the duty of candor to the Court. *See* Nev. R. Prof'l Conduct 3.3. Regardless of whether or not Mr. Coons or Mr. Chu misunderstood Local Rule 7.1-1 or simply did not know of the terms of the deal Mr. Gibson signed, he remained responsible for ensuring that the Certificate of Interested Parties was candid when first filed and for correcting any errors thereafter.

Finally, Local Rule 7.1-1 imposes not only a duty of disclosure at the outset of litigation, but also an ongoing and express duty to supplement the Certificate of Interested Parties. LR. 7.1-1(c). Pointing fingers at former in-house counsel does nothing to change Righthaven's continuing duty to ensure that the Certificate of Interested Parties is correct. *See also* Nev. R.

---

[4] This Court granted this motion on June 27, 2011 (Dkt. 123).

[5] *See e.g. Righthaven v. Majorwager*, Case 2:10-cv-00484-GMN–LRL (Dkt. 7), *Righthaven v. Industrial Wind Action*, 2:10-cv-00601-RLH -PAL (Dkt 8), *Righthaven v. Malik*, 2:10-cv-00636-RLH–RJJ (Dkt. 5); *Righthaven v. Ecological Internet*, 2:10-cv-00691-GMN-PAL (Dkt. 5); *Righthaven v. Valentine*, 2:10-cv-01157-JCM-GWF (Dkt. 6), etc.

[6] Pursuant to Righthaven's Operating Agreement (Dkt. 107-2) ("RHOA"), Mr. Gibson has "supervising authority over and may exercise general executive power concerning the supervision, direction and control of the day-to-day Business and affairs of the Company." RHOA, §§ 6.3, 6.3.1. In addition, Net Sortie Systems LLC, Mr. Gibson's shell company, is the Manager of Righthaven, with complete authority over Righthaven. *Id.* § 5.1 (Mr. Gibson is also the Manager of Net Sortie, *see* Dkt. 47-6). The Operating Agreement provides for a right to rely upon the Manager. *Id.* §5.11.

Prof. Conduct 3.3 (imposing a duty to correct a false statement of material fact or law). The breach of that duty, in this case and the hundreds of others, was inexcusable where Stephens Media's interest has been an issue brought front and center to counsel's attention since the filing of the counterclaim in September 2010 and litigation over the SAA and Stephens Media's status as real party in interest ever since.

### III. THIS COURT'S HAS AUTHORITY TO SANCTION RIGHTHAVEN UNDER RULE 11

Righthaven takes the position that it, as a company, is beyond the sanction power of the Court, because, in Righthaven's view, LR IA 4-1 limits the Court's sanction power to attorneys, not represented parties. OSC Response at 8. However, "[t]he Court draws its authority to impose sanctions from several sources," including Rule 11 and its inherent power. *Kwok v. Recontrust Company, N.A.*, No. 2:09-cv-2298-RLH-LRL, 2010 WL 4810704, *2 (D. Nev. Nov. 19, 2010).

Rule 11 allows sanctions against parties, and can be triggered by presenting any "paper" to the Court without an adequate factual and legal basis.[7] Fed.R.Civ.Proc. 11(c)(1) ("the court may impose an appropriate sanction on any attorney, law firm, or party"). Thus, failing to disclose an interested party in a Certificate of Interested Parties is both a violation of LR IA 7.1-1 and, if done without a proper factual or legal basis, a violation of Rule 11.

Nevertheless, in its Response to the OSC, Righthaven argues that it cannot be sanctioned for "misunderstanding" the applicable rule, asserting its purported good faith and citing *Zambrano v. Tustin*, 885 F.2d 1473 (9th Cir. 1989). *Zambrano* describes standards for the court's inherent sanction power and its power to sanction for violations of local rules.[8] Nothing in *Zambrano* supports a claim of good faith here.

---

[7] Specifically, Rule 11(b)(3) requires that Righthaven's "factual contentions have evidentiary support" and its "legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law."

[8] Righthaven now claims that the Court's inherent power is limited by *Zambrano*. Previously it argued "'This inherent power is deeply-rooted in the judiciary, and extends to a full range of litigation abuses.' *Fink v. Gomez*, 239 F.3d 989, 991 (9th Cir. 2001). This includes the power to impose sanctions 'on counsel who willfully abuse the judicial processes.' *U.S. v. Blodgett*, 709 F.2d 608, 610 (9th Cir. 1983) (internal quotation marks omitted)." *Righthaven v. Malik*, Opposition to Motion to Dismiss (Dkt. 11) at 6.

DEMOCRATIC UNDERGROUND'S REPLY TO RIGHTHAVEN'S RESPONSE TO OSC RE SANCTIONS     6     CASE NO. 2:10-cv-01356-RLJ (GWF)

Moreover, as explained above, Righthaven's Certificate of Interested Parties is also a "paper" subject to Rule 11. When Righthaven itself moved for this Court to issue sanctions pursuant to Rule 11 in the *Righthaven v. Malik* case, it had a much broader view of the sanction power:

> The current version of the rule "was intended to be a standard 'more stringent than the original good faith formula' so 'that a greater range of circumstances will trigger its violation.'" *Golden Eagle Dist. Corp. v. Burroughs Corp.,* 801 F.2d 1531, 1536 [(9th Cir. 1996)] (quoting Advisory Committee Note, 97 F.R.D. at 198-99).

*Righthaven v. Dr. Shezad Malik Law Firm*, Case No. Case 2:10-cv-00636-RLH-RJJ, Righthaven's Motion for Sanctions Pursuant to Federal Rule of Civil Procedure 11 (Dkt. 13), at 5. Righthaven also stated that "the subjective good faith of a party does not provide protection from the imposition of sanctions." *Id*. at 5-6 (*citing G.C. and K.B. Investments, Inc. v. Wilson*, 326 F.3d 1096, 1109 (9th Cir. 2003)). Finally, Righthaven argued that "[t]he Ninth Circuit has held that sanctions are appropriate when a party's frivolous filing is based upon a gross misconstruction of the applicable law" and that "the courts have clearly recognized that a party's blatant misstatement of applicable law, or the sheer ignorance of controlling precedent, may well amount to sanctionable conduct under Rule 11." *Id.* at 13-14.

Accordingly, under Righthaven's own interpretation of Rule 11, its failure to provide the disclosure required by Rule 7.1-1 is sanctionable conduct, even assuming, contrary to the evidence, that it were the result of counsel's good faith ignorance or gross miscalculation of the meaning of Rule 7.1-1. Given Righthaven's stated position on Rule 11, this Court is empowered to prohibit Righthaven from arguing for a narrower construction now. *See generally New Hampshire v. Maine*, 532 US 742 (2001) (describing doctrine of judicial estoppel, which allows a court to prohibit parties from flipping legal positions from one proceeding to the next, according to the exigencies of the moment); *see also Wagner v. Prof'l Eng'rs in Cal. Gov't,* 354 F.3d 1036, 1044 (9th Cir. 2004) ("Judicial estoppel is an equitable doctrine that is intended to protect the integrity of the judicial process by preventing a litigant from playing fast and loose with the courts.").

### IV. THE CERTIFICATE OF INTERESTED PARTIES WAS PART OF A CAMPAIGN TO SHIELD STEPHENS MEDIA FROM LITIGATION.

From the very beginning, Righthaven did everything it could to foster the impression that Stephens Media had nothing to do with the case and conceal Stephens Media's role.[9] While Righthaven acknowledged that the original source of the work was Stephens Media, it failed to disclose Stephens Media's close connections to control over the lawsuit, its copyright interest in the work, or its pecuniary interest in the lawsuit. Righthaven presented an "Assignment" to the Court that, because it failed to disclose the SAA, concealed all these facts and pretended that ownership was vested in Righthaven. Indeed, in hundreds of cases, the Complaint, Assignment and other initial case documents, including the Certificate of Interested Parties, were designed to leave the reader with the impression that Righthaven purchased the copyright outright.

Even before the litigation campaign began, Righthaven and Stephens Media undertook to disguise Stephens Media's connection through the creation of a holding company, SI Content Monitor LLC, to invest in Righthaven. While SI Content Monitor LLC was ostensibly a separate entity, the SAA required that Stephens Media ensure that SI Content Monitor and Stephens Media would both be controlled by "common owners with no material variation in said ownership." SAA § 2.[10] On this basis, Righthaven identified SI Content Monitor LLC in its Certificate of Interested Parties, without disclosing that the company was merely an entity holding ownership interest in Righthaven for the benefit of the same people who control Stephens Media. Moreover, Righthaven disclosed SI Content Monitor despite the fact that it had no right to any share of the proceeds of this case—it only owned an ownership interest in Righthaven, not the proceeds—yet it still concealed Stephens Media's direct interest in the very proceeds at issue in every litigation it filed.

---

[9] Democratic Underground recognizes that this Court is "only focus[ing] on the most factually brazen" of Righthaven's "multiple inaccurate and likely dishonest statements to the Court." *Democratic Underground*, 2011 WL 2378186 at *9. However, Democratic Underground respectfully submits that the broader context of Righthaven's behavior is appropriate for the Court's analysis.

[10] Righthaven's Operating Agreement even provided that, should SI Content Monitor experience a change in control such that it was no longer controlled by "members of the family of Warren A. Stephens and trusts for the benefit of such individuals" it would forfeit its interest in Righthaven to Mr. Gibson's own shell company, Net Sortie Systems LLC. RHOA, § 15.5.

1    The pleading Righthaven filed with this Court, including the Complaint in this case, are
2 filled with subterfuge. Righthaven claims its "holds" the various exclusive rights in the Works,
3 when it knew the ability to exercise those rights was retained exclusively by Stephens Media. *See*
4 Complaint ¶¶ 35-38; SAA § 7.2. Righthaven claimed it suffered ongoing harm from the alleged
5 infringement, when it knew that it had no right to exploit the work whatsoever. *See id*. at ¶ 45
6 and 46.

7    The Assignment was artfully drafted to obscure the truth. It speaks vaguely of
8 unidentified "monetary commitments and commitment to services provided" rather than
9 disclosing that Stephens Media got 50% of the proceeds. Moreover, the "Copyright Assignment"
10 characterized itself as a transfer of "all copyrights *requisite* to have Righthaven recognized as the
11 copyright owner," obscuring what rights were transferred—which turned out to be only the right
12 to sue.

13   The purpose of this design is obvious. In litigation, Righthaven could and did trot out a
14 copy of the one-page Assignment, assert a presumption of ownership based on its fraudulently
15 obtained copyright registration, and yet keep the true nature of the transaction secret. And
16 Righthaven was not shy about executing this plan, aggressively using the Assignment to misdirect
17 defendants away from Stephens Media, and leading "the district judges of this district to believe
18 that it was the true owner of the copyright in the relevant news articles." *Democratic*
19 *Underground,* 2011 WL 2378186 at *6. For example, in *Righthaven v. Malik,* Righthaven
20 vigorously argued that the Assignment provided all the information necessary to show that it, not
21 Stephens Media, owned the copyright, and that no further analysis was necessary. *See e.g.*
22 *Righthaven v. Malik*, Righthaven Opposition to Motion to Dismiss (Dkt. 11).

23   Righthaven now claims that Stephens Media's deep involvement was sufficiently clear all
24 along. OSC Response at 3-4 & 7. Yet Righthaven was previously content to allow Stephens
25 Media to emphatically and repeatedly deny *any* involvement. When Righthaven and Stephens
26 Media filed motion papers with this Court seeking to dismiss Democratic Underground's
27 counterclaim, Righthaven stood idly by as Stephens Media falsely asserted "Stephens Media's
28 involvement with Righthaven. . . is limited to its role as the assignor of the subject copyright."

1  Stephens Media Motion to Dismiss (Dkt. 38) at 2:16-18.  Indeed, Stephens Media's Motion to
2  Dismiss is replete with assertions designed to give the false impression it was an innocent
3  bystander dragged into this lawsuit simply because it was a prominent media company "despite
4  its utter disconnection with the pertinent factual and legal issues at issue herein."  *Id.* at 2:14-16.

5  More disturbingly, Righthaven saw no need to clarify or correct matters even when
6  Stephens Media began using Righthaven's inaccurate Certificate of Interested Parties itself as a
7  basis for dismissal.  Stephens Media Reply in Support of Motion to Dismiss (Dkt. 56) at 10:20-22
8  ("Stephens Media has never been identified or disclosed as a party who has a direct pecuniary
9  interest in the outcome of any Righthaven case. And for good reason . . .").  At a minimum, this
10 should have indicated to Righthaven the importance of making sure there was a good legal and
11 factual basis for its Certificate of Interest.

12 When this litigation moved into discovery, Righthaven failed to identify the SAA in its
13 original initial disclosures (Dkt. 63-1) produced in December 2010.  In its first supplemental
14 initial disclosures (Dkt. 63-2), Righthaven still did not disclose the SAA, and instead went on the
15 offensive, threatening to conduct spurious discovery on Kurt Opsahl, one of Democratic
16 Underground's outside counsel, on topics like "Electronic Frontier Foundation's ('EFF')
17 prosecution of claims against Stephens Media LLC despite their lack of merit" and "EFF's
18 attempts to unnecessarily and without justification bring Stephens Media, LLC in this action for
19 self-promotion and publicity purposes."

20 In a court hearing on December 28, 2010, Righthaven's outside counsel, Shawn Mangano
21 told Judge James Mahan that, while he was "sure" that Stephens Media's continued publication of
22 the news article at issue was "covered in their license agreement with the RJ and the assignment,
23 he was "not privy to that information as to how." *Righthaven v. Jama (Center for Intercultural*
24 *Organizing)*, Case No. 2:10-cv-01322-JCM–LRL, Transcript of Dec. 28, 2010 Hearing, (Dkt 27)
25 at 34.  Judge Mahan also asked if Righthaven had "licensed the rights to others."  Mr. Mangano
26 responded "I don't know as I stand here right now."  *Id.* at 24.  Taking Mr. Mangano's response
27 as true, this exchange strongly suggests that, as of December 28, Mr. Gibson had not shared the
28

1   SAA with his company's outside counsel, though it also suggests that outside counsel was on
2   notice to seek it out thereafter.[11]

3   Nevertheless, Righthaven claims that it "did not intend hide [sic] Stephens Media's
4   association with this action." Response to OSC at 2, n.1. To back up this questionable assertion,
5   Righthaven notes that "[t]he SAA was produced during discovery" (*id.*) using the passive voice to
6   obfuscate the fact that Righthaven did not produce it—Stephens Media did so, belatedly, in
7   response to discovery requests. Decl. of Clifford Webb (Dkt. 96) at ¶ 10. Indeed, Righthaven
8   consistently and emphatically refused to produce this information. *See generally id.* It refused to
9   provide the SAA pursuant to DU's Requests for Production and refused to answer Interrogatories
10  about the "momentary commitments" referenced in the Assignment.[12]

11  Shortly after Stephens Media produced the SAA, Democratic Underground identified the
12  problem with Righthaven's Certificate of Interested Parties. Democratic Underground's
13  Supplemental Memorandum (Dkt. 72-1), filed March 4, 2011, put Righthaven on even more
14  specific notice of the deficiency of its Certificate. Dkt. 72-1, at 6, n.4. Still, for four months,
15  Righthaven did nothing to rectify the Certificate of Interested Parties in this and the hundreds of
16  other cases. Instead, it put all of its efforts into convincing this Court not to look at the SAA or
17  the Supplemental Memorandum and towards keeping the documents from the public view. *See*
18  Righthaven's Motion to Reconsider (Dkt. 78); Righthaven's Joinder in Stephens Media's Motion
19  for Leave to File (Dkt. 84); Righthaven's Response to Request to Unseal and Application for
20  OSC re Contempt (Dkt. 88); Righthaven's Joinder in Stephens Media's Motion to Strike (Dkt.
21  89); and Righthaven's Joinder in Stephens Media's Reply (Dkt. 92).

---

[11] The Strategic Alliance Agreement provides that Stephens Media retains an exclusive license in the works and prohibits Righthaven from licensing the rights to others. SAA, § 7.2. If Mr. Mangano had read the SAA, he would have been able to answer Judge Mahan's questions.

[12] *See* Webb Decl. ¶¶ 6, 27, Exhibits E and CC. After meeting and conferring was unsuccessful, Democratic Underground moved to compel compliance with its document discovery. DU Motion to Compel (Dkt. 95). The motion was held mooted by Righthaven's dismissal for lack of standing. Order (Dkt. 117). If Stephens Media had not produced the SAA, the SAA would have remained secret until Democratic Underground won a motion to compel.

1  In sum, Righthaven not only misrepresented the interested parties, it took a series of steps to hide the role of Stephens Media in its litigation operation. The Court can and should take this additional misconduct into consideration.

## **CONCLUSION**

Righthaven's failure to fully disclose its relationship with Stephens Media has prolonged this litigation and hundreds of other cases, placed unnecessary burdens on the Court and the defendants and tarnished the integrity of the justice system. To address the harm that Righthaven's litigation tactics have caused, and to deter such conduct in the future:

> District judges have an arsenal of sanctions they can impose, including both monetary and nonmonetary sanctions such as: striking the offending paper; issuing an admonition, reprimand, or censure to counsel; requiring participation in CLE courses, seminars, or other educational programs; referring the matter to disciplinary authorities, and disqualifying counsel.

*Kwok v. Recontrust*, 2010 WL 4810704 at *2. Democratic Underground leaves it to this Court's sound discretion to determine what sanction would be appropriate.

Dated:   July 7, 2011                            ELECTRONIC FRONTIER FOUNDATION


BY:   */s/ Kurt Opsahl*
       KURT OPSAHL

       Attorneys for Defendant and
       Counterclaimant DEMOCRATIC
       UNDERGROUND, LLC, and
       Defendant DAVID ALLEN