1   LAURENCE F. PULGRAM (CA State Bar No. 115163) (*pro hac vice*)
    lpulgram@fenwick.com
2   JENNIFER J. JOHNSON (CA State Bar No. 252897) (*pro hac vice*)
    jjjohnson@fenwick.com
3   CLIFFORD C. WEBB (CA State Bar No. 260885) (*pro hac vice*)
    cwebb@fenwick.com
4   FENWICK & WEST LLP
    555 California Street, 12th Floor
5   San Francisco, California 94104
    Telephone: (415) 875-2300
6   Facsimile:  (415) 281-1350

7   KURT OPSAHL (CA State Bar No. 191303) (*pro hac vice*)
    kurt@eff.org
8   CORYNNE MCSHERRY (CA State Bar No. 221504) (*pro hac vice*)
    corynne@eff.org
9   ELECTRONIC FRONTIER FOUNDATION
    454 Shotwell Street
10  San Francisco, California 94110
    Telephone: (415) 436-9333
11  Facsimile:  (415) 436-9993

12  CHAD BOWERS (NV State Bar No. 7283)
    bowers@lawyer.com
13  CHAD A. BOWERS, LTD
    3202 West Charleston Boulevard
14  Las Vegas, Nevada 89102
    Telephone: (702) 457-1001

15  Attorneys for Defendant and Counterclaimant
    DEMOCRATIC UNDERGROUND, LLC, and
16  Defendant DAVID ALLEN

17                  UNITED STATES DISTRICT COURT
18                  FOR THE DISTRICT OF NEVADA

19  RIGHTHAVEN LLC, a Nevada limited liability company,

20                          Plaintiff,

         v.

21  DEMOCRATIC UNDERGROUND, LLC, a District of
    Columbia limited-liability company; and DAVID ALLEN,
22  an individual,

23                          Defendants.

24  DEMOCRATIC UNDERGROUND, LLC, a District of
    Columbia limited-liability company,

25                          Counterclaimant,

         v.

26  RIGHTHAVEN LLC, a Nevada limited liability company,
27  and STEPHENS MEDIA LLC, a Nevada limited-liability
    company,

28                          Counterdefendants.

Case No. 2:10-cv-01356-RLH (GWF)

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIM; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION ........................................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................... 2

INTRODUCTION ............................................................................................................. 2

STATEMENT OF FACTS ................................................................................................ 4

    A.    Democratic Underground and David Allen ............................................ 4

    B.    The "Pampango" Post .............................................................................. 5

    C.    The Article's Origins .............................................................................. 5

    D.    Righthaven Sues Democratic Underground and David Allen ............... 6

LEGAL STANDARD ........................................................................................................ 7

ARGUMENT ..................................................................................................................... 7

I.    THE UNDISPUTED FACTS DEMONSTRATE THAT PLAINTIFF'S CLAIMS
WERE MERITLESS FROM THEIR INCEPTION ........................................... 7

    A.    Democratic Underground Has Committed No Volitional Act of
Infringement ........................................................................................... 7

    B.    The Excerpt is a Non-Infringing Fair Use ........................................... 10

        1.    Posting the Excerpt to the DU Website Was Highly Transformative
and Minimally Commercial ...................................................... 10

            a.    Pampango's Post is a Non-Commercial Transformative Use ....... 11

            b.    Democratic Underground's  Repost Would Be A Minimally
Commercial Transformative Use ................................................... 12

        2.    The Highly Factual, Politically Important, and Previously Published
Nature of the Article Supports Fair Use.................................... 12

        3.    The Small Amount of the Article Taken Supports a Finding of Fair
Use ............................................................................................. 13

        4.    The Lack of Potential or Actual Market Harm Supports Fair Use .......... 15

            (1)    Pampango's Use Did Not Harm the Market ........ 15

            (2)    Reposting Would Not Harm the Market ............... 18

        5.    The Public Interest Is Served By Discussion Boards Like the DU
Website........................................................................................ 21

CONCLUSION.................................................................................................................. 22

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Geophysical Union v. Texaco Inc.*,
  60 F.3d 913 (2d Cir. 1994)................................................................................ 11

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)........................................................................................... 7

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994).................................................................................. *passim*

*Cartoon Network LP v. CSC Holdings, Inc.*,
  536 F.3d 121 (2d Cir. 2008).............................................................................. 8

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)........................................................................................... 7

*Consumers Union of U.S., Inc. v. Gen. Signal Corp.*,
  724 F.2d 1044 (2d Cir. 1983), *cert. denied*,
  469 U.S. 823 (1984).......................................................................................... 13

*CoStar Group, Inc. v. LoopNet, Inc.*,
  373 F.3d 544 (4th Cir. 2004)......................................................................... 8, 9

*Elvis Presley Enters., Inc. v. Passport Video*,
  349 F.3d 622 (9th Cir. 2003).......................................................................... 15

*Field v. Google, Inc.*,
  412 F. Supp. 2d 1106 (D. Nev. 2006) .............................................................. 8

*Fisher v. Dees*,
  794 F.2d 432 (9th Cir. 1986).......................................................................... 10

*Harper & Row, Publrs. v. Nation Enters.*,
  471 U.S. 539 (1985).......................................................................................... 12

*Hustler Magazine, Inc. v. Moral Majority, Inc.*,
  796 F.2d 1148 (9th Cir. 1986).......................................................................... 21

*L.A. News Serv. v. CBS Broad., Inc.*,
  305 F.3d 924 (9th Cir. 2002)........................................................................... 13

*Marobie-Fl., Inc. v. Nat'l. Ass'n of Fire Equip. Distribs.*,
  983 F. Supp. 1167 (N.D. Ill. 1997) .................................................................. 8

*Matsushita Elec. Indus. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)........................................................................................... 7

*Mattel, Inc. v. Walking Mountain Prod.*,
  353 F.3d 792 (9th Cir. 2003)........................................................................... 22

*Maxtone-Graham v. Burtchaell*,
  803 F.2d 1253 (2d Cir. 1986).......................................................................... 14

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

*New Era Publ'ns Int'l ApS v. Carol Publ'g Group*,
   904 F.2d 152 (2d Cir. 1990)........................................................................... 14

*Nuñez v. Caribbean Int'l News Corp.*,
   235 F.3d 18 (1st Cir. 2000).......................................................................... 10

*Parker v. Google, Inc.*,
   422 F. Supp. 2d 492 (E.D. Pa. 2006) ............................................................ 8

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007)............................................................... *passim*

*Religious Tech. Ctr. v. Netcom On-line Commnc'n Servs.*,
   907 F. Supp. 1361 (N.D. Cal. 1995) ................................................... 8, 9, 11

*Righthaven LLC v. Democratic Underground, LLC*,
   _ F.Supp.2d _, 2011 WL 2378186 (D. Nev. June 14, 2011) ................... 3, 5, 6

*Righthaven LLC v. Hill*,
   No. 1:11-cv-00211 (D. Colo. Apr. 7, 2011), Dkt. 16................................... 2

*Righthaven, LLC v. Hoehn*,
   No.: 2:11-CV-00050-PMP-RJJ, 2011 WL 2441020
   (D. Nev. June 20, 2011) ......................................................................... 11, 13

*Righthaven LLC v. Pahrump Life*,
   Case No. 10-cv-01575-JCM (D. Nev. Aug. 12, 2011),
   Order Dismissing Complaint (Dkt. 67)................................................... 2, 14

*Righthaven LLC v. Realty One Group, Inc.*,
   Case. No. 2:10-cv-01036-LRH-PAL, 2010 WL 4115413
   (D. Nev. Oct. 19, 2010)........................................................................ *passim*

*Righthaven LLC v. Realty One Group, Inc.*,
   Case. No. 2:10-cv-01036-LRH-PAL, Dkt. 12 at 10-11 ............................ 14

*Sega Enters. Ltd. v. Maphia*,
   948 F. Supp. 923 (N.D. Cal. 1996) ......................................................... 9, 11

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984).......................................................................... 11, 14, 21

*Stewart v. Abend*,
   495 U.S. 207 (1990)................................................................................... 10

*Sundeman v. Seajay Soc'y, Inc.*,
   142 F.3d 194 (4th Cir. 1998)...................................................................... 14

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,
   996 F.2d 1366 (2d Cir. 1993).............................................................. 13, 14

**STATUTES**

17 U.S.C. § 106 ................................................................................................................. 8

17 U.S.C. § 107 ..................................................................................................... 10, 11, 12

17 U.S.C. § 107(4) ........................................................................................................... 15

**RULES**

Fed. R. Civ. P. 56(c)(2) ...................................................................................................... 7

**OTHER AUTHORITIES**

H.R. Rep. No. 105-551(I), (1998) ...................................................................................... 8

H.R. Rep. No. 2222, 60th Cong., 2d Sess. 7 (1909) ....................................................... 21

U.S. CONST. Article I, § 8, cl. 8......................................................................................... 21

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

## NOTICE OF MOTION

Defendant/Counter-Claimant Democratic Underground, LLC, by and through its attorneys of record, hereby move pursuant to Fed. R. Civ. P. 56 for summary judgment against Counterdefendant Stephens Media, LLC on the counterclaim for a declaration of non-infringement on the grounds that (i) Democratic Underground committed no "volitional act" giving rise to a claim for direct copyright infringement; and (ii) fair use provides a complete defense to infringement. As there are no genuine issues of material fact, Democratic Underground is entitled to summary judgment as a matter of law.

This motion is supported by the following Memorandum of Points and Authorities, the pleadings and papers on file, the Declaration of Kurt Opsahl, the Declaration of David Allen (Dkt. 48) filed separately, and any oral argument the Court allows at hearing of the Motion.

Dated this 24th day of October, 2011.

FENWICK & WEST LLP

By:   /s/ Jennifer J. Johnson
JENNIFER J. JOHNSON
Fenwick & West LLP
555 California Street, 12th Floor
San Francisco, California  94104

Attorneys for Defendant and Counterclaimant
DEMOCRATIC UNDERGROUND, LLC, and
Defendant DAVID ALLEN

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

As this Court previously recognized, "Righthaven and Stephens Media have attempted to create a cottage industry of filing copyright claims, making large claims for damages and then settling claims for pennies on the dollar."[1]  Counter-Defendant Stephens Media LLC's business partner, Righthaven LLC, has filed more than 200 copyright actions in this Court, each case alleging "willful infringement" of a copyright owned by Stephens Media and attempting to extract settlements by threats of statutory damages (up to $150,000), seizures of domain names and attorneys' fees.  For most defendants, it makes no economic sense to invest in litigation.[2]  Regardless of the merits, it is better to pony up a settlement and get on with their work.  The settlement proceeds would then be shared with Stephens Media.

In this action, Righthaven sued a political discussion forum, Defendant and Counter-Claimant Democratic Underground LLC, and, for added *in terrorem* effect, its principal, David Allen (collectively "Defendants"), based on a forum participant's posting of a short, five sentence excerpt of a fifty sentence news article copyrighted by Stephens Media.  Much to the Counter-Defendants' surprise, these Defendants decided to take a different approach: fighting back.  As the court is aware, Democratic Underground responded with a counterclaim that joined Righthaven's affiliate and funder, Stephens Media, LLC, and, as a result of discovery, exposed Righthaven's lack of ownership of the copyright necessary to pursue its claim.

It is now time to resolve the case as to the Counter-Defendant, Stephens Media.  As this Court has already found, Stephens Media played a substantial role in Righthaven's business model and lawsuit against Defendants.  May 15, 2011 Declaration of Mark Hinueber (Dkt. 105-1) at ¶ 7; *see generally* May 20, 2010 Letter from Righthaven to Mark A. Hinueber (October 2011 Declaration of Kurt Opsahl ("Opsahl Decl.") at ¶ 3, Ex. 1).  Stephens Media threatened the public

---

[1] Order on Motion for Reconsideration (Dkt. 94) at 2; *see generally*, *Righthaven LLC v. Pahrump Life*, Case No. 10-cv-01575-JCM (D. Nev. Aug. 12, 2011), Order Dismissing Complaint (Dkt. 67) (including findings of fact on background to these lawsuits).

[2] As the Colorado District Court recognized, Righthaven's business plan is "encouraging and exacting settlements from Defendants cowed by the potential costs of litigation and liability." *Righthaven LLC v. Hill*, No. 1:11-cv-00211 (D. Colo. Apr. 7, 2011), Dkt. 16.

that if it republished Stephens Media work, it would "send my little friend Righthaven" to do its bidding. *Righthaven LLC v. Democratic Underground, LLC,* _ F.Supp.2d _, 2011 WL 2378186, *8 (D. Nev. June 14, 2011); Dkt. 47 ¶ 8, Ex. C.  Before this suit, Righthaven told Stephens Media "If you wish for Righthaven to refrain from pursuing infringement actions [regarding the listed work] please advise us without five business days."  Opsahl Decl. ¶ 3, Ex. 1.  This Court has acknowledged that by consenting to the suit, on a copyright in which it owned an interest, Stephens Media has threatened and directed litigation against Democratic Underground. *Democratic Underground*, 2011 WL 2378186, *8.  Indeed, Stephens Media "actually did send Righthaven after Democratic Underground." *Id.*  Thus, as this Court has determined, there is a live controversy over whether or not the actions described in the Counterclaim amount to infringement. *Id.*  Moreover, Democratic Underground desires to repost the work at issue to maintain a complete archive, and it should receive a declaration that such a future post will not lead to further threats and litigation at the direction of Stephens Media.  Declaration of David Allen (Dkt. 48) ("Allen Decl.") ¶ 25.

As described below, the undisputed facts establish that Democratic Underground did not infringe Stephens Media's copyright on at least two grounds (among others not briefed here):  (i) as the mere host of a discussion forum to which a third party posted an excerpt of an article, Democratic Underground committed no "volitional act" of copying or distribution giving rise to copyright liability; and (ii) in all events, fair use provides a complete defense to the infringement claimed.

Accordingly, this Court should enter judgment in favor of Counter-Claimant Democratic Underground against Counter-Defendant Stephens Media and declare that (1) Democratic Underground did not engage in copyright infringement by virtue of the prior posting by a user of the Democratic Underground forum and (2) will not be infringing for the proposed reposting by Democratic Underground itself.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

## STATEMENT OF FACTS

### A.   Democratic Underground and David Allen

Democratic Underground maintains a website at www.democraticunderground.com (the "DU Website") devoted to disseminating and discussing political news and progressive policies. Allen Decl. ¶ 3.  Defendant David Allen is the principal of Democratic Underground LLC.  *Id.* ¶ 4.  The company has two other employees.  The DU Website consists primarily of user-generated content in the form of posting by readers in one of various discussion forums (the "DU Forum"). *Id.* ¶ 5.  The DU Website has more than 165,000 registered users who have, since its founding in 2001, posted more than 52 million posts to discussion threads addressing items of political and public interest.  *Id.*  The DU Website is supported by advertising revenue generated by display of advertising on the site.  *Id.* ¶ 6.

While Democratic Underground owns and manages the DU Website, it does not pre-screen posts by contributors.  *Id.* ¶ 7.  Once a contributor writes a post, the post gets added through an automated process into a database on the server that hosts the DU Website.  *Id.*  When a reader seeks to access the web address of a particular post or DU Forum (such as by clicking a link to that location in a browser), a request is automatically sent to the server.  Its software will then automatically retrieve the contents of that post from the database and send them to the reader through the Internet.  *Id.* ¶ 8.  Neither Mr. Allen nor the other two employees read every post made by users at the DU Website; in fact, such a task would be impossible as there are an average of 14,000 posts per day.  *Id.* ¶ 9.  Democratic Underground does not offer posters any financial incentive for adding content to the site.  *Id.* ¶ 10.

Democratic Underground proactively works against copyright infringement by, among other things, advising users to post only short excerpts and to provide a link to the original when posting about a news article.  *Id.* ¶ 11-12; Ex. A.  For example, on the forum for "Latest Breaking News," contributors must identify the source and provide a link to the news article they post about in the form they fill out to make the post.  *Id.* ¶ 12.  In addition, Democratic Underground encourages readers to notify moderators if a post contains an entire article by clicking on an

1    "Alert" link that is included on every post.  *Id.* ¶ 13.  The moderator will then edit the post to

2    include only a short excerpt or delete the post.  *Id.*

3    **B.**    **The "Pampango" Post**

4    On May 13, 2010, a Democratic Underground user named "Pampango" posted a portion

5    of an article (the "Article") from the *Las Vegas Review-Journal* ("*LVRJ*") entitled "U.S. Senate

6    Race: Tea Party Power Fuels Angle" (the "Excerpt").  *See* Righthaven's Complaint ("Compl.")

7    Dkt. 1, Ex. 3.  Pampango is neither an agent nor an employee of Democratic Underground.  Allen

8    Decl. ¶ 15.  The Excerpt in Pampango's post reported on the ranking and movement in political

9    polls of candidates in the Republican Senate primary in Nevada.  Compl., Ex. 3.  On its face, the

10   Excerpt contains content that is primarily informational, factual, or news and that is of concern to

11   persons nationwide interested in the future of the Tea Party or Senate Majority Leader Reid's

12   prospects.  *Id.*  The entire Article as found at the *LVRJ* is 50 sentences long; the post by

13   Pampango contained just *five* of those sentences and a link back to the full article at the *LVRJ*'s

14   website.  *Id.* Exs. 2, 3.  Within 40 minutes, three Democratic Underground users left comments

15   on the post, each of which dealt with the subject matter of the article.  *Id.* Ex. 3.

16   In the 92 days it was posted, Pampango's post garnered 565 views, less than 6.5 per day,

17   and less than one-thousandth of one-percent (0.001%) of the traffic to the DU Website.  *Id.* ¶ 16.

18   In contrast, on a typical day, the DU Website as a whole serves roughly 700,000 page views to

19   90,000 unique visitors.  *Id.* ¶ 17.  During its display, Pampango's post appeared on pages that,

20   like the rest of the DU Website, contained advertising.  However, none of that advertising was

21   sold for display with or targeted by Democratic Underground to go with Pampango's post; it was

22   simply the same advertising displayed generally throughout the DU Website.  *Id.* ¶ 18.  Given the

23   average advertising revenue that the DU Website makes from views of its site, Pampango's post

24   would not have been connected to any more than $2 in revenue.  *Id.* ¶ 19.

25   **C.**    **The Article's Origins**

26   Stephens Media does not dispute that it was the "author" of the Article as a work made for

27   hire.  Compl., Ex. 4; *see also* Answer to Counterclaim at ¶ 4.  However, neither Stephens Media

28   nor the *LVRJ* first registered the copyright; Righthaven did that on July 9, 2010, claiming rights

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

through assignment by "written agreement."  Compl. ¶ 30, Ex. 4.  The records reflect two

purported assignments, one dated July 8, 2010 and the other dated July 19, 2010.[3]  Opsahl Decl.

¶¶ 4, 5, Exs. 2, 3.  Notwithstanding the purported assignment, the entire Article remains publicly

available on the *LVRJ* website at no cost, with a copyright notice credited to the *LVRJ,* not

Righthaven.  *Id.* ¶ 7; ¶ 6, Ex. 4 (Responses to Request for Admissions ("RFA") 22, 30).  Printed

versions of the Article available on the *LVRJ* website do not contain advertising.  Complaint,

Exhibit 2 (Dkt. 1-1); Opsahl Decl. ¶ 9, Ex. 5; Answer to Counterclaim (Dkt. 13) ¶ 90.

As with other articles on its website, the *LVRJ* encouraged—and still encourages—users

to save and share the Article of which Pampango posted the Excerpt.  Opsahl Decl. ¶ 8.  In fact,

the *LVRJ* encourages users to share articles on at least 18 different third-party Internet resources

or to email, save, or print the article at no cost.  *Id.*

### D.    Righthaven Sues Democratic Underground and David Allen

Once Mr. Allen learned of this lawsuit, he had no choice but to hire attorneys to defend

himself and Democratic Underground.  Allen Decl. ¶ 26.  Unwilling to be bullied into a

settlement of a baseless claim, he spent $3,600 on an attorney before finding pro bono counsel at

the Electronic Frontier Foundation and its cooperating law firms.  *Id.* ¶ 27.  Democratic

Underground filed a Counterclaim naming Stephens Media, as well as Righthaven, as Counter-

Defendants, based on the former's creation of, direction of, control of, financial interest in, and

collusion with the latter to pursue meritless claims of infringement.  This Court denied Stephens

Media's motion to dismiss the counterclaim, recognizing that the Counter-Defendants' Strategic

Alliance Agreement ("SAA") retained all exclusive rights to the Article in Stephens Media.

*Democratic Underground*, 2011 WL 2378186 (discussing SAA Dkt. 79-1 Ex. A)[4].  Righthaven

---

[3] As this Court has determined, these assignments failed to transfer any of the exclusive rights in the Article necessary for Righthaven to maintain its lawsuit.  *Democratic Underground,* 2011 WL 2378186.

[4] Neither Stephens Media's subsequent May 9, 2011 "clarification"  (Clarification and Amendment to SAA (Declaration of Mark A. Hinueber (Dkt. 101), Ex. 3) at 1), nor its July 7, 2011 "restatement" of that agreement changed this.  *See* Amended and Restated SAA (Dkt. 134-1).  Indeed, Righthaven's own Operating Agreement (Dkt. 107-2) deprived it of the types of rights purportedly transferred to it.  *See* Dkt. 107 (Reply in Support of Supplemental Memo.) at 4-5.  Similarly, Stephens Media expressly claimed to retain the rights it purported to assign away to Righthaven in its license agreements with various third parties.  *See* Opsahl Decl. ¶ 16, Ex. 12;

1  has been dismissed from this lawsuit entirely, and its motion to intervene denied, *inter alia*, on the

2  grounds that Stephens Media will fully protect its interests.

3  ## LEGAL STANDARD

4  A court may grant summary judgment when the submissions in the record "show that

5  there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

6  matter of law." Fed. R. Civ. P. 56(c)(2).  A "genuine issue" of material fact means that there is

7  sufficient evidence in favor of the non-moving party to allow a jury to return a verdict in its favor.

8  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  The burden is on the non-moving

9  party to designate specific facts showing a genuine issue for trial.  *See Celotex Corp. v. Catrett*,

10  477 U.S. 317, 322 (1986).  However, a mere "scintilla" of evidence will not suffice to meet that

11  burden.  *Anderson,* 477 U.S. at 252.  Nor is it enough for the non-moving party to show that there

12  is some "metaphysical doubt as to the material facts," provided that any inferences from the

13  underlying facts are viewed in the light most favorable to the non-moving party.  *Matsushita Elec.*

14  *Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

15  ## ARGUMENT

16  **I.**   **THE UNDISPUTED FACTS DEMONSTRATE THAT PLAINTIFF'S CLAIMS
    WERE MERITLESS FROM THEIR INCEPTION**

17
18  **A.**   **Democratic Underground Has Committed No Volitional Act of Infringement**

19  Democratic Underground is entitled to a declaration that it did not infringe Stephens

20  Media's copyright by virtue of Pampango's post.  Under the Copyright Act, direct liability only

21  attaches, if at all, to the party who controls the decision to copy—in the case of an online forum,

22  the user who uploaded the material.[5]  An online forum host like Democratic Underground, whose

23
24  Dkt. 140 (Declaration of Clifford Webb) ¶¶  3-5, Exs. 2, 4-6 (ProQuest and Lexis-Nexis licenses
    agreements, submitted under seal, and ShareThis Publisher Terms of Service and copy of the

25  Article showing use of ShareThis).  Stephens Media is and always was the real party in interest,
    creating and controlling Righthaven merely as a vehicle to bring lawsuits on its behalf.  *See* Dkt.

26  47 (December 7, 2010 Declaration of Kurt Opsahl) ¶¶ 7, 13-15, Exs. B, H-J (demonstrating
    Stephens Media's control over Righthaven) and ¶¶ 9-11, Ex. D-F (demonstrating Stephens
    Media's significant ownership interest and control over Righthaven).

27  [5] As explained in Part II.B. below, no liability attaches to Pampango because he engaged in a fair

28  use of the Article.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   role is limited to hosting the material, cannot be liable for direct infringement as a matter of law.

2   This Court addressed the volitional act requirement in *Field v. Google, Inc.*, 412 F. Supp.

3   2d 1106 (D. Nev. 2006), in which the plaintiff alleged that Google directly infringed when it

4   showed users copies of material that were "cached" on its computers—*i.e.*, stored automatically

5   for ease of delivery to those searching for those materials. *See id.* at 1115. The Hon. Robert

6   Jones disagreed, holding that a "plaintiff must also show volitional conduct on the part of the

7   defendant in order to support a finding of direct copyright infringement." *Id.*; *accord Parker v.*

8   *Google, Inc.*, 422 F. Supp. 2d 492 (E.D. Pa. 2006). This Court's decision relied upon *Religious*

9   *Tech. Ctr. v. Netcom On-line Commnc'n Servs.*, 907 F. Supp. 1361 (N.D. Cal. 1995), one of the

10   seminal and most important cases addressing online service provider copyright liability.

11   In *Netcom*, an Internet service provider was accused of direct copyright infringement

12   based on a customer's posting of material to the service provider's servers. *See id.* at 1367-68.

13   The court rejected the direct infringement claim, holding that it requires "some element of

14   volition or causation which is lacking where a defendant's system is merely used to create a copy

15   by a third party." *Id.* at 1370. Volitional control over the copying is necessary because any other

16   "theory would create many separate acts of infringement and carried to its natural extreme, would

17   lead to unreasonable liability" through the mere operation of the Internet. *Id.* at 1369.

18   While the volitional act requirement is tremendously important to the Internet, it is not a

19   new rule. The Copyright Act has always required volition–as embodied within its protection of

20   the exclusive right "to do" one of the actions reserved for copyright owners in 17 U.S.C. § 106.

21   *Netcom* simply interpreted § 106 for the digital age and has been widely followed.[6]

22   The Fourth Circuit's holding in *CoStar* is particularly instructive. CoStar was a real estate

23   listing service that took photos of commercial real estate offered by its customers. LoopNet

24   ――――――――――――

[6]   *See CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544 (4th Cir. 2004) (concluding "that

25   *Netcom* made a particularly rational interpretation of § 106 when it concluded that a person had to engage in volitional conduct—specifically, the act constituting infringement—to become a direct

26   infringer."); *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008) (agreeing with *CoStar* that *Netcom* was "particularly rational"); *Marobie-Fl., Inc. v. Nat'l. Ass'n*

27   *of Fire  Equip. Distribs.*, 983 F. Supp. 1167, 1176-79 (N.D. Ill. 1997) (following *Netcom*); H.R. Rep. No. 105-551(I), at 11 (1998) (Congress describes *Netcom* as the "leading and most

28   thoughtful judicial decision to date" in the subject of Internet liability).

1   provided an online hosting service for real estate listings.  Some of CoStar's customers also

2   wanted listings on LoopNet, and uploaded CoStar's copyrighted photographs for display on the

3   LoopNet website.  *See CoStar Group, Inc.*, 373 F.3d at 546-47.  CoStar sued for direct

4   infringement.  Following *Netcom,* the Fourth Circuit held that "[b]ecause LoopNet, as an Internet

5   service provider, is simply the owner and manager of a system used by others who are violating

6   CoStar's copyrights and is not an actual duplicator itself, it is not directly liable for copyright

7   infringement."  *Id*. at 546.

8         Accordingly, the fact that Democratic Underground operates the DU Website, upon which

9   a third party posted allegedly infringing material, does not state a claim for direct copyright

10  infringement.  Although the burden of proof for a copyright claim includes the essential element

11  of volition, the undisputed facts show that Democratic Underground did not engage in any

12  volitional act to display the Excerpt.  Allen Decl. ¶¶ 5-9; 21.  Moreover, as soon as Democratic

13  Underground learned of a potential infringement claim, it removed the Excerpt.  *Id.* ¶¶ 23-24.

14        Likewise, to the extent that Stephens Media adopts Righthaven's assertions that

15  Democratic Underground can be held liable because of its alleged general knowledge that some

16  postings contain infringing material (Compl. ¶ 19), or because of "willful blindness" to

17  infringement (*Id.* ¶ 23), these will not suffice.  As *CoStar* cogently explains, even constructive

18  knowledge that some DU Website users may be using the forum to engage in copyright

19  infringement would be insufficient to state a direct liability claim.  *CoStar*, 373 F.3d at 549; *see*

20  *also Sega Enters. Ltd. v. Maphia*, 948 F. Supp. 923, 934 (N.D. Cal. 1996) (no direct liability even

21  where defendant operating website knew some infringing games were uploaded and solicited

22  others to upload games).  Indeed, in *CoStar,* the user-uploaded photos were reviewed by LoopNet

23  employees before posting, and CoStar had informed LoopNet of its claims for copyright

24  infringement long before filing suit, yet, this was still insufficient.  Democratic Underground, by

25  contrast, does not pre-review posts, and neither Righthaven nor Stephens Media notified the

26  forum prior to the lawsuit.  Allen Decl. ¶ 9.

27        For this reason alone, the Court should grant summary judgment declaring that

28  Democratic Underground did not infringe by virtue of a user posting the Excerpt.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

**B.     The Excerpt is a Non-Infringing Fair Use**

The undisputed facts independently establish that posting the Excerpt to the DU Website constitutes fair use, and, therefore, is "not an infringement of copyright."  17 U.S.C. § 107.

The fair use doctrine "creates a limited privilege in those other than the owner of a copyright to use the copyrighted material in a reasonable manner without the owner's consent." *Fisher v. Dees*, 794 F.2d 432, 435 (9th Cir. 1986).  It permits and requires courts "to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster."  *Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 577 (1994) (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)).  17 U.S.C. § 107 lays out four non-exclusive factors that a court must consider in assessing whether a use is fair.  *See, e.g., Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1163 (9th Cir. 2007).

A declaration of fair use is sought here for both (i) the past posting and (ii) Democratic Underground's future reposting.  While similar, these present two distinct factual scenarios.  For the past posting, the Court must consider whether Pampango engaged in a fair use by posting the Excerpt.  For the future posting, the Court must consider whether Democratic Underground would engage in a fair use for reposting the Excerpt.  Based on the undisputed facts, each of the four fair use factors strongly supports a finding of fair use in each scenario.

**1.     Posting the Excerpt to the DU Website Was Highly Transformative and Minimally Commercial**

In assessing the first factor, the "purpose the character of a use," courts evaluate the extent to which the use "transforms" the original work, (*Campbell*, 510 U.S. at 579), that is, whether the use "does not 'merely supersede the objects of the original creation' but rather 'adds something new, with a further purpose or different character.'"  *Perfect 10,* 508 F. 3d at 1164 (*quoting Campbell*, 510 U.S. at 579).  As the Ninth Circuit recognized in *Perfect 10*, where the use is made to "serve a different purpose," that use can be "highly transformative." *Id*. at 1165, 1168 (exact replicas of images, reduced in size to thumbnails, found transformative); *see also Nuñez v. Caribbean Int'l News Corp*., 235 F.3d 18 (1st Cir. 2000) (modeling photo taken for portfolio purpose was transformed into news when published in newspaper).  Criticism and comment are

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

recognized as canonical examples of a transformative use (*Campbell,* 510 U.S. at 579); indeed, Section 107 expressly calls out protections for uses "such as criticism, comment [and] news reporting . . . ."  17 U.S.C. § 107.

The use made of the Excerpt on the DU Website is a classic example of a transformative use.  Like the defendant in *Righthaven, LLC v. Hoehn*, No.: 2:11-CV-00050-PMP-RJJ, 2011 WL 2441020 (D. Nev. June 20, 2011), Pampango "posted the Work as part of an online discussion." *Id*. at *9.  In posting an excerpt on a political forum, Pampango invited critical analysis and commentary—a core purpose of the fair use doctrine. Other users of the forum responded to this post by posting their own comments, consistent with the purpose of the DU Website of fostering criticism and debate.  Compl., Ex. 3; Allen Decl. ¶ 3.  In a world where the public forum increasingly exists online, the ability to include excerpts of news to prompt discussion is of singular importance.[7]

The first factor may also consider "whether the original was copied in good faith to benefit the public or primarily for the commercial interests of the infringer."  *Am. Geophysical Union v. Texaco Inc*., 60 F.3d 913, 922 (2d Cir. 1994).   Here, the nature of Pampango's post and Democratic Underground's proposed repost are analyzed slightly differently.

### a.     Pampango's Post is a Non-Commercial Transformative Use

For purposes of the May 12, 2010 posting of the Excerpt that previously occurred, it is *Pampango's* use that is relevant, and that was wholly non-commercial.[8]  Democratic Underground provides posters, like Pampango, no financial benefit or payment for their posting

---

[7] The importance of public commentary also demonstrates the "public interest" in the use at issue—another factor the Court should consider in determining fair use. *See, e.g., Perfect 10*, 508 F.3d at 1166, *supra*.

[8] As noted above, Democratic Underground cannot be directly liable for Pampango's post.  Even if secondary liability were asserted, however, the proper focus for analysis of fair use would be the use made by the person who could be a potential direct infringer, here, the poster Pampango. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) (analyzing whether end user's time shift was a fair use to determine secondary liability).  This does not mean however that courts do not also recognize the possibility of an independent fair use defense for potential indirect infringers.  *See Netcom*, 907 F. Supp. at 1378 (fair use analysis based on Netcom's actions); *Sega Enters.,* 948 F. Supp. at 934 (citing *Netcom* for proposition that service provider has independent fair use rights).

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   of material to the forum.  Allen Decl. ¶ 10.  Given the highly transformative, non-commercial

2   nature of Pampango's posting, the first factor strongly favors finding that post to be fair use.

### b.   Democratic Underground's  Repost Would Be A Minimally Commercial Transformative Use

Democratic Underground wishes to repost the Excerpt—still consisting of only five

sentences from the 50 sentence article—both to preserve the historical record of its discussion

forum and so that its users may see for themselves the post that their forum has been litigating for

over a year.  Allen Decl. ¶ 25.  This proposed use is fundamentally transformative of the original

use by Stephens Media, which was to inform the public of the mid-primary poll results for the

2010 Republican Senate race.  The primary and subsequent general election are now long since

over.  Anyone viewing the repost will necessarily be interested only in the transformative use of

preserving the record of public discourse at that time.

Democratic Underground will make no special effort to commercially exploit the Excerpt;

while a trivial amount of revenue might be generated, it stems from the simple fact that all forums

on the website contain advertising.[9]  As the Supreme Court and Ninth Circuit have recognized,

any potential commercial character fades in significance where a highly transformative use is

involved.  *Campbell,* 510 U.S. at 579; *Perfect 10, 5*08 F. 3d at 1164.  Thus, the first factor favors

Democratic Underground's reposting.

### 2.   The Highly Factual, Politically Important, and Previously Published Nature of the Article Supports Fair Use

In assessing the second factor, the  "nature of the work" used, "[t]he law generally

recognizes a greater need to disseminate factual works than works of fiction or fantasy."

*Harper & Row, Publrs. v. Nation Enters.,* 471 U.S. 539, 563 (1985) (also noting greater fair use

---

[9] At most the DU Website generated approximately $2 connected to the original post. Allen Decl. ¶ 20. This in no way undermines the first factor's strong support of fair use. *See, e.g., Campbell*, 510 U.S. at 584 ("If . . . commerciality carried a presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed" in 17 U.S.C. § 107). *Realty One* likewise followed this rule in holding that a real estate sales blog with a mixed commercial and educational character was entitled to a finding of fair use as a matter of law.  *See Righthaven LLC v. Realty One Group, Inc.*, Case. No. 2:10-cv-01036-LRH-PAL, 2010 WL 4115413, at *4-5 (D. Nev. Oct. 19, 2010).

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   rights for works of a published nature).  Accordingly, where the work copied is largely composed

2   of factual material, a finding of fair use is more likely.  *See, e.g., L.A. News Serv. v. CBS Broad.,*

3   *Inc.*, 305 F.3d 924 (9th Cir. 2002) (republication of a video depicting a news report was a fair use

4   because it was informational rather than creative).  It was these firmly established principles that

5   led Judge Hicks to conclude in the *Realty One* case that a similar excerpt of a largely factual news

6   report in the *LVRJ* constituted fair use.  *See Realty One*, 2010 WL 4115413 at *2; *c.f. Hoehn*,

7   2011 WL 2441020, at *9 (finding an editorial published by the *LVRJ* "contains a significant

8   informational element, [so that] the scope of fair use is greater than it would be for a creative

9   work, but likely less than it would for a purely informational work.").

10          Here, too, the Excerpt posted was highly factual:  an account of poll results in the 2010

11   Nevada Senate Republican Primary.  Compl. Ex. 3.  Much as in *Realty One*, the five sentences

12   actually copied from the article represent little more than purely factual reporting.  *Id.*  Moreover,

13   in the present case, the nature of the Excerpt also involved core issues of political discourse,

14   which deserve the greatest fair use protection.  The scope of the fair use doctrine is wider when,

15   as here, the use relates to issues of public concern.  *Consumers Union of U.S., Inc. v. Gen. Signal*

16   *Corp.*, 724 F.2d 1044 (2d Cir. 1983), *cert. denied*, 469 U.S. 823 (1984).

17          The second factor favors Democratic Underground.

18          **3.      The Small Amount of the Article Taken Supports a Finding of Fair**

19                    **Use**

20          The third factor asks "whether the amount and substantiality of the portion used in relation

21   to the copyrighted work as a whole . . . are reasonable in relation to the purpose of the copying."

22   *Campbell*, 510 U.S. at 586.  Courts recognize that some amount of copying is necessary in order

23   to identify "the subject matter of a writing . . .  before any useful comment may be made about

24   it."  *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1375 (2d Cir. 1993).

25          Here, the amount of the work copied was minimal:  five sentences of a 50-sentence article,

26   or 10%.  *Compare* Cmpl., Ex. 3 *to* Ex. 2.  Moreover, rather than copying the whole article, the

27   post provided a link to the full article at the *LVRJ* site.  Compl. Ex. 3.  This amount of copying

28   was indisputably reasonable for the purpose of engendering discussion.  Copying a small portion

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   of the story was important to allow others to understand and comment with adequate context.

2   Without this factual background, commentary would be essentially meaningless.  *See Twin Peaks*

3   *Prods., Inc.*, 996 F.2d at 1375.

4          Numerous cases have upheld findings of fair use based on copying of similarly small

5   excerpts.  *See, e.g., New Era Publ'ns Int'l ApS v. Carol Publ'g Group*, 904 F.2d 152, 158-159 (2d

6   Cir. 1990) (excerpts of between 5%-8% of works found fair use, especially where portions taken

7   were merely the initial sections of the work that "set the tone for the sections they precede.");

8   *Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194, 206 (4th Cir. 1998) (copying approximately 6% of

9   work and paraphrasing substantially more was found to be fair use for purposes of criticism

10  noting further that "criticism of a book will require the critic to quote and paraphrase from the

11  work."); *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1263 (2d Cir. 1986) (excerpts of 4.3%

12  of book considered fair use); *see also Sony Corp.*, 464 U.S. at 449-50 (copying even 100% of a

13  work can still constitute fair use).  In *Realty One*, Judge Hicks concluded that this factor favored a

14  blogger who had copied the first eight sentences of a 30-sentence *LVRJ* article, or 26%.  *See*

15  *Realty One*, 2010 WL 4115413, at *3.  Of course, that was  a far greater percentage than the 10%

16  of the Article that Pampango posted.

17         What is more, even former plaintiff *Righthaven* acknowledged that copying and

18  distributing proportionally *greater* excerpts than the one at issues here would be fair use.[10]  And,

19  Stephens Media has implicitly acknowledged the same.  In the wake of this Court's June 14, 2011

20  ruling, Stephens Media published a column by former CEO Sherman Frederick suggesting that

21  readers should look at three posts by GametimeIP blogger Patrick Anderson.  Sherman Frederick,

22  *Content protection -- Night of the unthinking commentator*, *Las Vegas Review-Journal* (Jun 18,

23  2011), Opsahl Decl. ¶ 11, Ex. 7; Opsahl Decl. at ¶ 6, Ex. 4 (Responses to RFAs 56, 57).

24  Frederick's column links to the three posts, and then copies, verbatim, from each—five sentences

25

26  [10] In opposition to the motion to dismiss in *Realty One*, Righthaven asserted that had the copying
    been limited to the first two paragraphs of the article it would likely have constituted a fair use.
27  *See Righthaven LLC v. Realty One Group, Inc.*, Case. No. 2:10-cv-01036-LRH-PAL, Dkt. 12 at
    10-11.  In that case, the first two paragraphs contained  three sentences of the 28 sentence article,
28  more than the 10% copied here.  *See id*. Dkt. 1, Exs. 2, 3.

1    from the first article, three from the second, and ten sentences from the third.  The quotes were

2    not initially denoted as such, and virtually every word after "Article 1, which in part points out:"

3    is copied.  Mr. Frederick did not have Mr. Anderson's permission.  Patrick Anderson, *Three*

4    *Copyright Assets Available For Purchase From Gametime IP,* GametimeIP.com (Jun. 23, 2011),

5    Opsahl Decl. ¶ 12, Ex. 8.  Thus, Mr. Frederick (and his publisher, Stephens Media) copied a

6    *larger* excerpt from Mr. Anderson than the Excerpt at issue in this lawsuit, presumably because

7    they thought the use was fair.

8          The third factor favors Democratic Underground.

9          **4.      The Lack of Potential or Actual Market Harm Supports Fair Use**

10         The fourth factor is the potential effect of the use on the market for the work.  17 U.S.C.

11   § 107(4).  The focus of this factor is the extent to which the use at issue could stand as a realistic

12   market substitute for the original work (*see Perfect 10,* 508 F.3d at 1168), and whether it can

13   supplant the demand for the original.  *See Campbell,* 510 U.S. at 598.

14         **(1)      Pampango's Use Did Not Harm the Market**

15         To date, Stephens Media has provided no facts establishing any harm to any market for

16   the Article by virtue of Pampango's posting of a small, incomplete excerpt and a link back to the

17   full Article.  There is no evidence that the Excerpt substituted for the full Article, or that a single

18   viewer of the Excerpt otherwise would have, but instead did not, view the Article on the *LVRJ*

19   webpage.

20         This utter lack of evidence of harm is significant, because as a highly transformative use,

21   Pampango's posting of the Excerpt cannot be presumed to cause any market harm.  *Campbell*,

22   510 U.S. at 591 ("No 'presumption' or inference of market harm . . . is applicable to a case

23   involving something beyond mere duplication for commercial purposes.");[11] *Elvis Presley*

24   *Enters., Inc. v. Passport Video,* 349 F.3d 622, 631 (9th Cir. 2003) ("The more transformative the

25   new work, the less likely the new work's use of copyrighted materials will affect the market for

26   the materials.").

27   _____

28   [11] Moreover, even assuming a focus on DU as opposed to the poster, the small amount of revenue
     attributable to the use warrants no presumption of any market harm.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

Nor, under the circumstances here, is any market harm remotely likely.  The practice of posting small *portions* of articles to blogs for comment—even assuming that practice to be widespread—poses no genuine threat of market harm to the original articles, especially where, as here, the incomplete excerpt links back to the full original.  Compl. Ex. 2; Opsahl Decl. ¶ 6, Ex. 4 (Responses to RFAs  39, 40).  Like the use of thumbnails images in *Perfect 10*, the use of 10% of the Article does not supplant the original.  *See Perfect 10*, 508 F.3d at 1168.  Instead, by providing an Excerpt along with a link to the original Article on the *LVRJ* website, the posting *encourages* users to view the original, augmenting the market rather than supplanting it.  *See* Compl. Ex. 3.  Moreover, the link to the original can enhance the original's ranking in online search engines, indirectly increasing the market for the original.[12]

This much is all but acknowledged by Stephens Media's undisputed policy for the *LVRJ* website, which encourages users to share articles on at least 18 different third-party Internet resources and to email, save, or print the article.  Opsahl Decl. ¶ 8.  In fact, when a user chooses the "Print This" option, the *LVRJ* site opens a new window reproducing the text of the full article to be duplicated without advertising.  *Id.* ¶ 9, Ex. 5; Answer to Counterclaim at ¶ 90.  These practices undermine any suggestion that publicizing short teaser excerpts and disseminating links to the original over the Internet somehow diminishes any market for the Article.

Moreover, in this specific case, the Excerpt could not substitute for the original because it does not contain the heart of the work, including the actual poll numbers at issue.  Not surprisingly, Judge Hicks ruled, as a matter of law on the pleadings, that an excerpt of a significantly larger portion of a *LVRJ* article on a similar blog could not "satisfy a reader's desire to view and read the article in its entirety" and, when published with a link to the original article, constituted fair use.  *See Realty One*, 2010 WL 4115413, at *2.

Given this lack of substitutability—and the lack of any reason to believe that any potential viewer of the Article failed to do so as a result of seeing the Excerpt—there is no evidence of any

---

[12] *See, e.g.*, Eric Goldman, *Search Engine Bias and the Demise of Search Engine Utopianism*, 8 Yale J. L. & Tech. 188 (Spring 2006) (discussing search engine's use of "popularity metrics" in their algorithms which increase the ranking of websites based on the number and popularity of other websites linking to them).

harm to advertising revenue.  In fact, Stephens Media does not sell ads or even maintain records of advertising receipts for individual articles.  Opsahl Decl. ¶ 14, Ex. 10 (Response to Interrogatory 4).  Accordingly, any assertions about actual advertising revenues for the Article would be sheer speculation at best.

But even assuming, arguendo, that a potential view of the Article on the *LVRJ* was lost due to the presence of the Excerpt, the undisputed facts demonstrate that any potential harm from lost advertising revenues would be inconsequential.  Stephens Media's online ads are sold by either the Section of the website (*i.e.* Sports, Business, Lifestyles) or for the run of the site. Stephens Media's advertising rate chart (Opsahl Decl. ¶ 15, Ex. 11) at SM000049.  Rates vary, with a CPM (cost per thousand)[13] between $8 (for non-profits) to $17.50 (for geo-targeted ads). The online "advertising average cost is $12 cpm."  *Id*. at SM000048.  In this case, the Article was displayed with four online banner ads.[14]  Article (*Id*. ¶ 10, Ex. 6).  Thus, the average revenue per viewer would be, at most, five cents:  4 x $0.012 = $0.048.

Only 565 visitors viewed the Excerpt on the DU Website, virtually all of them in the days immediately after its posting.  Allen Decl. ¶ 16.  While there is no evidence that a single one of the viewers of this progressive discussion forum would otherwise have been new viewers of the Article on lvrj.com, even assuming that *every* viewer would have been, the total revenues at stake was only $0.048 x 565 = $27.12.

For the same reason, there is no basis to claim that Stephens Media stands to lose licensing revenue based on the Excerpt at the DU Website.  Stephens Media includes its entire catalog of news articles in a variety of licensing deals with "various databases, such as NewsBank and Lexis Nexis."  Opsahl Decl. ¶ 14, Ex. 10 (Response to Interrogatory 11), *see also* Stephens Media license agreements (Opsahl Decl. Exs. 12-17).  ███████████████████ ██████████████████████████  There is no evidence to suggest that the appearance of a

---

[13] Stephens Media defines CPM as the "cost per thousand site impressions or page views" Opsahl Decl. ¶ 15, Ex. 11  at SM000048, *see generally* http://en.wikipedia.org/wiki/Cost_per_impression.

[14] One Leaderboard ad, one Large Square ad, and two Skyscraper ads.  *See* Opsahl Decl. ¶ 15, Ex. 11  at SM000049 (defining sizes of ads).

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

short Excerpt on the DU Website somehow would have affected the value of the *LVRJ's* content

to these licensees.

███████████████████████████████████████████████ is the Burrelles*Luce*

agreement.  BurrellesLuce agreement, Opsahl Decl. ¶ 16, Ex. 12.  Burrelles*Luce* is a clipping

service that provides copies of news articles to public relations agencies and in-house departments

of companies.  *See generally* Burrelles*Luce*, *Company - About Us*,

http://www.burrellesluce.com/company/about_us; *see also* ██████████████

████████████████████████████ Under this agreement. Burrelles*Luce* agrees to pay

Stephens Media ██████████████████████████████████████

███████████████████████████████████████████████████

*Id*. at SM000058.[15]  Stephens Media has provided no evidence that any lesser funds were paid it

under these terms for circulation of the Article, nor any reason to believe that Pampango's posting

of a short Excerpt somehow could have caused the actual Article not to have been clipped and

circulated.  Again, all logic suggests that any increased notoriety of the Article by virtue of the

Excerpt appearing on the DU Website would have *enhanced* the likelihood of circulation and

therefore payment by Burrels*Luce*.  Nonetheless, in order to quantify the *theoretical* maximum

harm, assuming, *arguendo* that all 565 viewers of the Excerpt on the DU Website would

otherwise have paid the royalty set by the Burrelles*Luce* license for the entire article, the revenue

would have been less than ████████████

In sum, while there is no evidence of a single lost viewer of the Article on the DU

Website, even if there were, the revenues in play would be only $0.05 ███████ each—a level of

harm vastly outweighed by the benefits of the transformative use of the Excerpt to spur public

discussion.

### (2)    Reposting Would Not Harm the Market

Likewise, there is no evidence that Stephens Media would lose any future revenue, even if

---

[15] ████████████████████████████████████████████████████
████████████████████████████████████████

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   Democratic Underground reposts the Excerpt.  The Article concerns a Mason-Dixon poll

2   conducted May 10-11, 2010, regarding the June 8, 2010 Republican primary for the right to

3   contest the 2010 election for the United States Senator for Nevada.  Compl. Ex. 2 (Dkt. 1-1). In

4   the run-up to the primary, there were at least 12 polls, at least four of which were conducted after

5   the Article was published.  The results of all of these polls are compiled and available in the

6   public record.  *See* Wikipedia, *United States Senate Election in Nevada, 2010*.[16]  On June 8, 2010,

7   Sharron Angle won the primary, and subsequently lost the general election to the incumbent

8   Senator Harry Reid on November 2, 2010.  *Id.*  Today, almost a year after the general election, it

9   is unlikely that whatever protectable expression might be imbedded in this factual news piece

10  about a mid-primary poll result would be of interest to current readers.  At most, the *fact* of the

11  results might be of historical interest (*e.g.*, for a study of the Tea Party movement or Angle's

12  political career).  But that factual information is both freely available elsewhere (*see, e.g., id*.) and

13  uncopyrightable.

14          The lack of a continuing market is born out by the graph Stephens Media produced, which

15  shows number of page views over time.



21  Opsahl Decl. ¶ 13, Ex. 9 at SM000003.

24                                                              *Id.*  The most recent user comment on

[16] Available at
https://secure.wikimedia.org/wikipedia/en/wiki/United_States_Senate_election_in_Nevada,_2010
#Polling_2 (last visited Oct. 17, 2011).

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   the article is dated May 20, 2010.[17]  Opsahl Decl. ¶ 10, Ex. 6.

2        Assuming there were a chance individual who might want to view the Article for its own

3   sake going forward—for example, to see how the *LVRJ* covered the election—there is no factual

4   basis to believe that reposting the Excerpt at the DU Website would substitute for a visit to the

5   *LVRJ* site.  *See Realty One*, 2010 WL 4115413 at *2.  A person interested in the historical context

6   of the Article would hardly find a review of 10% of it on the DU Website to be adequate.

7        Nor is there any realistic possibility of any harm in the form of lost revenue from paid

8   archives.  Although the *LVRJ* has a paid archive, the Article is now and has always been available

9   for free on the *LVRJ* website.  Opsahl Decl. ¶ 6, Ex. 4 (Responses to RFAs 22, 30).  Thus, the

10  posting of the Excerpt did not, and will not, deprive Stephens Media of any fees for use, since it

11  has been charging none.

12       The lack of value is further confirmed by Stephens Media's multiple amendments to its

13  agreements with Righthaven.  On May 9, 2011, Stephens Media signed a document that purported

14  to require "payment in the amount of One Dollar and Zero Cents ($1.00) per year to Righthaven

15  as a license or royalty for each Stephens Media Assigned Copyright."  Clarification and

16  Amendment to SAA (Declaration of Mark A. Hinueber (Dkt. 101), Ex. 3) at 1.  By this measure,

17  with the Article's entire value placed at $1 for a full year of all possible uses by Stephens Media,

18  any injury from a small excerpt being published with a link would be trivial.  However, even this

19  nominal fee proved to be too much.  On July 7, 2011, Stephens Media and Righthaven signed

20  another purported amendment, which removed the nominal $1 per year license fee, recognizing

21  that there was no market value for the work other than the proceeds of litigation (which the

22  parties agreed to share).  *See* Amended and Restated SAA (Dkt. 134-1).

23       * * *

24

25

26  _____

27  [17] At least some of the subsequent page views were a result of this lawsuit. For example, 147 page views appear to come from eff.org, resulting from links on the website of DU's counsel, and 73 views from lasvegassun.com, which has extensively covered the Righthaven lawsuits. Opsahl

28  Decl. ¶ 13,Ex. 9 at SM000004.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1    Accordingly, Stephens Media was not harmed by Pampango's posting, and will suffer no

2    cognizable market harm for the work if Democratic Underground is allowed to repost the Article.

3    The fourth factor, like all of the others, favors Democratic Underground.

4         **5.    The Public Interest Is Served By Discussion Boards Like the DU
              Website**

5

6    Finally, the fair use analysis must consider the public interest and the purposes of

7    copyright law.  The "Supreme Court … has … directed [courts] to be mindful of the extent to

8    which a use promotes the purposes of copyright and serves the interests of the public." *Perfect*

9    *10,* 508 F.3d at 1166 (citations omitted).  The central purpose of copyright, of course, is "[t]o

10   promote the Progress of Science and use Arts," U.S. CONST. art. I, §8, cl. 8, and to serve "'the

11   welfare of the public.'" *Sony Corp.*, 464 U.S. at 429 n.10 (quoting H.R. Rep. No. 2222, 60th

12   Cong., 2d Sess. 7 (1909)).  Indeed, the doctrine of fair use was developed to provide a "means of

13   balancing the need to provide individuals with sufficient incentives to create public works with

14   the public's interest in the dissemination of information." *Hustler Magazine, Inc. v. Moral*

15   *Majority, Inc.,* 796 F.2d 1148, 1151 (9th Cir. 1986).

16   The DU Website is dedicated to serving the public's interest in the dissemination and

17   discussion of information.  It provides a forum for commentary and criticism about political

18   issues (Allen Decl. ¶ 3), which is precisely what Pampango's post of the Excerpt stimulated.

19   Thus, the public service Democratic Underground provides in facilitating the sharing of political

20   and factual information on important matters of the day favors fair use.  Likewise, reposting the

21   article to preserve the historical record and illustrate the subject of this litigation serves the public

22   interest in fostering discussion and debate over copyright policy and Stephens Media's use of

23   Righthaven.

24            * * *

25   Given that every factor points to a finding of fair use, the Court should grant summary

26   judgment of a declaration of non-infringement to Democratic Underground.  Moreover, even if

27   one could find that any single factor was neutral or weighed slightly against fair use, the

28   overwhelming balance of factors would still require a finding of fair use given the minimal

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   amount of the Article used here, and the minimal even theoretical market harm, if any.  *See*

2   *Mattel, Inc. v. Walking Mountain Prod.*, 353 F.3d 792, 800 (9th Cir. 2003) (fair use is a mixed

3   question of fact and law and where the material facts are not in dispute summary judgment is

4   appropriate).

5                                    **<u>CONCLUSION</u>**

6          For all of these reasons, Democratic Underground respectfully requests that the Court

7   grant summary judgment in its favor on its Counterclaim.

8   Dated:  October 24, 2011                    FENWICK & WEST LLP

9

10                                          By:    /s/ *Jennifer J. Johnson*
                                                 _____
11                                              JENNIFER J. JOHNSON
                                                 Fenwick & West LLP
12                                              555 California Street, Suite 1200
                                                 San Francisco, CA 94104
13                                              Telephone:  (415) 875-2300
                                                 Facsimile:   (415) 281-1350
14                                              lpulgram@fenwick.com

15                                              Attorneys for Defendant and Counterclaimant
                                                 DEMOCRATIC UNDERGROUND, LLC, and
16                                              Defendant DAVID ALLEN

17

18

19

20

21

22

23

24

25

26

27

28